SECOND

AMENDED AND RESTATED

ASSET PURCHASE AGREEMENT

by and among

OEP IMAGING CORPORATION

and

POLAROID CORPORATION

and

THE POLAROID SUBSIDIARIES IDENTIFIED HEREIN

Dated as of July 3, 2002

458114.25.02

## TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ................................................................................ 1

    Section 1.01.   Defined Terms. .................................................................. 1

**ARTICLE II PURCHASE AND SALE OF BUSINESS** ................................ 13

    Section 2.01.   Purchase and Sale of Business. ...................................... 13
    Section 2.02.   Excluded Assets. ............................................................ 16
    Section 2.03.   Assumed Liabilities. ...................................................... 17
    Section 2.04.   Excluded Liabilities. ...................................................... 18
    Section 2.05.   Consideration; Cash and Cash Equivalents. .................. 20
    Section 2.06.   Deposit Amount. ............................................................ 20

**ARTICLE III THE CLOSING** ....................................................................... 21

    Section 3.01.   Closing. ........................................................................... 21
    Section 3.02.   Consideration; Deliveries. ............................................. 21
    Section 3.03.   Purchase Price Allocation. ............................................ 23

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS** ............. 23

    Section 4.01.   Organization and Good Standing. .................................. 23
    Section 4.02.   Authority Relative to this Agreement. ........................... 24
    Section 4.03.   Governmental Consents and Approvals. ........................ 25
    Section 4.04.   No Violations. ................................................................. 25
    Section 4.05.   Contracts; Compliance. .................................................. 25
    Section 4.06.   Accounts Receivable; Accounts Payable. ...................... 26
    Section 4.07.   Inventory. ....................................................................... 26
    Section 4.08.   All Assets. ...................................................................... 27
    Section 4.09.   Financial Statements. ..................................................... 27
    Section 4.10.   Relationship with Customers and Suppliers. ................. 27
    Section 4.11.   No Changes. .................................................................... 28
    Section 4.12.   Litigation. ....................................................................... 29
    Section 4.13.   No Default. ..................................................................... 29
    Section 4.14.   No Violation of Law. ..................................................... 29
    Section 4.15.   Environmental Matters. .................................................. 30
    Section 4.16.   Employee Benefits. ........................................................ 31
    Section 4.17.   Real Property. ................................................................. 33
    Section 4.18.   Title to and Use of Property. .......................................... 35
    Section 4.19.   Brokers. .......................................................................... 35
    Section 4.20.   Intellectual Property. ..................................................... 35
    Section 4.21.   Labor Matters. ................................................................ 37
    Section 4.22.   Tax Matters. ................................................................... 37
    Section 4.23.   Products Liability. .......................................................... 38
    Section 4.24.   Debt Repayment. ............................................................ 38
    Section 4.25.   Investment. ..................................................................... 39

Section 4.26.    Representations and Warranties..................................................... 39

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE PURCHASER........ 39**

Section 5.01.    Organization.............................................................................. 39
Section 5.02.    Authority Relative to This Agreement........................................... 39
Section 5.03.    No Violations. ........................................................................... 39
Section 5.04.    Consents and Approvals. ............................................................ 40
Section 5.05.    Litigation................................................................................... 40
Section 5.06.    Financing................................................................................... 40
Section 5.07.    Brokers...................................................................................... 40

**ARTICLE VI COVENANTS...................................................................................... 41**

Section 6.01.    Conduct of Business by the Polaroid Entities Pending the Closing. .............. 41
Section 6.02.    Access and Information. ............................................................. 42
Section 6.03.    Filings; Other Actions................................................................ 42
Section 6.04.    Public Announcements. .............................................................. 43
Section 6.05.    Acquired Assets. ....................................................................... 43
Section 6.06.    Bankruptcy Actions. .................................................................. 43
Section 6.07.    Tax Matters. ............................................................................. 44
Section 6.08.    Certain Employee Benefit Matters............................................... 47
Section 6.09.    WARN Act Notices. .................................................................. 49
Section 6.10.    Additional Matters. ................................................................... 49
Section 6.11.    Guarantees................................................................................ 50
Section 6.12.    No Solicitations......................................................................... 50
Section 6.13.    Assumed Contracts; Cure Amounts.............................................. 50
Section 6.14.    Title Insurance. ......................................................................... 51
Section 6.15.    Surveys..................................................................................... 52
Section 6.16.    Zoning Compliance.................................................................... 52
Section 6.17.    Bulk Transfer Laws.................................................................... 52
Section 6.18.    Use of Name. ............................................................................ 52
Section 6.19.    Treatment of Intercompany Payables and Intercompany Receivables. ..... 52
Section 6.20.    Closing Date Dividends and Share Buyback. ................................ 54

**ARTICLE VII ADDITIONAL POST-CLOSING COVENANTS ............................ 54**

Section 7.01.    Further Assurances..................................................................... 54
Section 7.02.    Books and Records; Personnel..................................................... 54
Section 7.03.    Continued Cooperation. .............................................................. 55
Section 7.04.    Estate Costs. ............................................................................. 55
Section 7.05.    Distribution of the Sellers' Stock................................................. 57
Section 7.06.    Non-transferable Claims. ............................................................ 57

**ARTICLE VIII CONDITIONS PRECEDENT ......................................................... 58**

Section 8.01.    Conditions Precedent to Obligations of the Sellers and the Purchaser. ......... 58
Section 8.02.    Conditions Precedent to Obligation of the Sellers. ........................ 58
Section 8.03.    Conditions Precedent to Obligation of the Purchaser. .................... 59

**ARTICLE IX FURTHER AGREEMENTS AND TERMINATION** .................................... 60

    Section 9.01.    Termination. .............................................................................. 60
    Section 9.02.    Termination Payment. .............................................................. 62
    Section 9.03.    Procedure and Effect of Termination. ................................... 64

**ARTICLE X GENERAL PROVISIONS** .................................................................... 64

    Section 10.01.  Disclosure Schedule. ............................................................... 64
    Section 10.02.  Notices. ................................................................................... 64
    Section 10.03.  Descriptive Headings. ............................................................. 66
    Section 10.04.  Entire Agreement; Assignment. .............................................. 66
    Section 10.05.  Governing Law. ....................................................................... 66
    Section 10.06.  Venue and Retention of Jurisdiction. ..................................... 66
    Section 10.07.  Risk of Loss. ........................................................................... 66
    Section 10.08.  Expenses. ................................................................................ 66
    Section 10.09.  Amendment. ............................................................................ 66
    Section 10.10.  Waiver. .................................................................................... 67
    Section 10.11.  Counterparts; Effectiveness. ................................................... 67
    Section 10.12.  Severability; Validity. ............................................................ 67
    Section 10.13.  No Third Party Beneficiaries or Liabilities. ........................... 67
    Section 10.14.  Enforcement of Agreement. .................................................... 67
    Section 10.15.  Separate Agreements. ............................................................. 67
    Section 10.16.  Non-Survival of Representations and Warranties and Certain Covenants. .... 68

**ARTICLE XI INDEX OF DEFINED TERMS** ........................................................ 68

    Section 11.01.  Index. ...................................................................................... 68

EXHIBITS

Exhibit A        Acquired Subsidiaries
Exhibit B        Sale Procedures Order
Exhibit C        Approval Order
Exhibit D        Disclosure Schedule
Exhibit E        Deposit Escrow Agreement
Exhibit F        Bill of Sale
Exhibit G        Assignment and Assumption of Contracts
Exhibit H        Assumption of Liabilities
Exhibit I         Assignment and Assumption of Lease
Exhibit J         Assignment of Copyrights
Exhibit K        Assignment of Patents
Exhibit L-1      Assignment of Trademarks (for filing in foreign jurisdictions)
Exhibit L-2      Assignment of Trademarks (for filing in the United States)
Exhibit L-3      Assignment of Trademark Applications
Exhibit M      Bidding Procedures

| Exhibit N | Quitclaim Deeds |
| Exhibit O | Foreign Investment in Real Property Tax Act Certification and Affidavit |
| Exhibit P | Projected Balance Sheet |
| Exhibit Q | Tax Records |
| Exhibit R | 2002 Financial Plan |
| Exhibit S | Acquisition Agreement |
| Exhibit T | Wire Instructions of Purchaser |
| Exhibit U | Registration Rights Agreement |

SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of July 3, 2002, is entered into by and among OEP Imaging Corporation, a Delaware corporation (the "Purchaser"), Polaroid Corporation, a Delaware corporation ("Polaroid"), and its Subsidiaries (as herein defined) listed on the signature pages of this Agreement (collectively, together with Polaroid, the "Sellers").

WHEREAS, on October 12, 2001 (the "Filing Date"), the Sellers filed voluntary bankruptcy petitions (the "Petitions") pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), jointly administered as Case No. 01-10864 (PJW) (Bankr. D. Del.) (the "Case");

WHEREAS, the Sellers desire to sell to the Purchaser and the Purchaser desires to purchase from the Sellers, (i) all of the outstanding capital stock of the Subsidiaries of Polaroid that are incorporated or organized outside of the United States which are directly owned by a Seller and identified on the list attached hereto as Exhibit A (the "Acquired Subsidiaries") and (ii) all of the assets, rights and properties of the Sellers relating to the Business (as herein defined) not conducted by the Acquired Subsidiaries and, in connection with such purchase and sale, the Purchaser will assume certain obligations and liabilities of Sellers, all on the terms and subject to the conditions set forth in this Agreement and in accordance with Sections 363 and 365 of the Bankruptcy Code (the "Contemplated Transactions"); and

WHEREAS, Sellers and Purchaser are parties to that certain Amended and Restated Asset Purchase Agreement, dated as of May 14, 2002 (the "Restated Asset Purchase Agreement"), and desire to amend and restate the Restated Asset Purchase Agreement in its entirety as set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements and covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto acknowledge and agree that this Agreement shall amend and supersede in its entirety the Restated Asset Purchase Agreement, and hereby agree as follows:

**ARTICLE I**

**DEFINITIONS**

Section 1.01.  Defined Terms.  As used herein, the terms below shall have the following meanings. An index of defined terms is set forth in Article XI.

"Accounts Payable" means all trade accounts and notes payable of the Business determined in accordance with GAAP and reflected on the books and records of the Polaroid Entities with respect to the Business, but excluding any other accrued liabilities.

"Accounts Receivable" means all accounts and notes receivable of the Business determined in accordance with GAAP and reflected on the books and records of the Polaroid Entities with respect to the Business.

"Acquisition Proposal" means a proposal involving a third party (other than the Purchaser or any of its Affiliates) and any Seller or any Affiliate of any Seller relating to any merger, consolidation, business combination, sale of all or substantially all of any Seller's assets, sale of shares of capital stock or other Equity Interests or any restructuring, recapitalization, investment, or similar transaction (whether through a plan of reorganization or otherwise) involving, in each case, a significant portion of the Acquired Assets or Business to be purchased by the Purchaser pursuant to this Agreement.

"Affiliate" shall mean with respect to any Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with that Person.

"Agent" means the agent for the secured lenders to the Sellers.

"Ancillary Agreements" means the Bill of Sale substantially in the form attached hereto as Exhibit F, the Assignment and Assumption of Contracts substantially in the form attached hereto as Exhibit G, the Assumption of Liabilities substantially in the form attached hereto as Exhibit H, each Assignment and Assumption of Lease substantially in the form attached hereto as Exhibit I, the Assignment of Copyrights substantially in the form attached hereto as Exhibit J, the Assignment of Patents substantially in the form attached hereto as Exhibit K, the Assignments of Trademarks substantially in the forms attached hereto as Exhibit L-1 and L-2, the Assignment of Trademark Applications substantially in the form attached hereto as Exhibit L-3, the Deposit Escrow Agreement, the Quitclaim Deeds substantially in the form attached hereto as Exhibit N, the Foreign Investment in Real Property Tax Act Certification and Affidavit substantially in the form attached hereto as Exhibit O, the Acquisition Agreement substantially in the form attached hereto as Exhibit S, the Registration Rights Agreement substantially in the form attached hereto as Exhibit U, and any other assignment or transfer documents delivered at Closing.

"Applicable Law" means any law, statute, order, rule, ordinance or regulation in any jurisdiction where the Business is conducted.

"Approval Order" means an order or orders of the Bankruptcy Court in the form attached hereto as Exhibit C, with such modifications thereto as the Purchaser shall approve or request in its sole discretion, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets to the Purchaser in accordance with the terms and conditions of this Agreement, free and clear of all Encumbrances other than Permitted Encumbrances, pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Assumed Contracts" has the meaning set forth in Section 6.13.

"Bidding Procedures" means those bidding procedures, attached hereto as Exhibit M, to be employed with respect to the sale of the Acquired Assets subject to Bankruptcy Court approval pursuant to the Sale Procedures Order.

"Books and Records" shall mean all books, records, lists, ledgers, files, manuals, permits, Contracts, agreements, correspondence, reports, plans, drawings and operating records of every kind (in any form or medium) pertaining to the Business, the Acquired Assets, the Assumed Liabilities, customers, suppliers, vendors, distributors or personnel, including, without limitation,

(A) all corporate books and records, disk or tape files, printouts, runs or other computer-based information and Sellers' interest in all computer programs required to access, and the equipment containing, all such computer-based information, (B) all product, business and marketing plans, (C) all environmental control records, (D) all sales, maintenance and production records, (E) all technical information, product development techniques, details of clients, client and customer lists, referral sources, consultant Contracts, or operational methods, (F) all litigation records, accounting records and personnel records and (G) other proprietary information relating to the Business, the Acquired Assets and the Assumed Liabilities, together with all plans and designs of buildings, structures, fixtures and equipment.

"Breach" means any breach of, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant, obligation, term or condition in or of this Agreement, any Ancillary Agreement or in any exhibit, schedule, writing, document, instrument or certificate delivered pursuant to this Agreement or in connection with the transactions contemplated hereby, or any event which with the passing of time or the giving of notice, or both, would constitute such a breach, inaccuracy or failure.

"Bulk Sales Laws" means any foreign, federal, state or local "bulk sales," "bulk transfer" or similar Laws.

"Business" means the business and activities conducted by the Sellers and their respective Affiliates on and after the date hereof, including, without limitation, the business of designing, developing, manufacturing, marketing and selling products and services relating to instant and conventional photography, to photographic accessories, to eyewear, and to printing devices; the business of enhancing and exploiting certain Intellectual Property assets owned by the Sellers; and the business of inventing, developing, licensing and otherwise exploiting inventions and such Intellectual Property assets.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banking institutions in New York are authorized or required by law or executive order to close.

"Capital Lease Obligations" means, as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and, for the purposes of this Agreement, the amount of such obligations plus related interests at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Cash and Cash Equivalents" means all cash (including checks received prior to the close of business on the Closing Date, whether or not deposited or cleared prior to the close of business on such day), certificates of deposit and other bank deposits, treasury bills and other cash equivalents.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System.

"Claim" means any claim (including, without limitation, as defined by Bankruptcy Code Section 101(5)), demand, action, complaint, suit, lawsuit, litigation, inquiry, hearing, investigation, audit, notice of a violation, citation, summons, subpoena, grievance, arbitration, proceeding, labor dispute, arbitral action, audit, order, appeal or other dispute (whether civil, criminal, administrative, judicial, investigative or otherwise, whether formal or informal, whether public or private) commenced or brought.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the official committee of unsecured creditors appointed in the Case.

"Competing Transaction" means a Successful Bid (as defined in the Bidding Procedures) that is submitted by a Person other than the Purchaser and is accepted by the Sellers and approved by the Bankruptcy Court.

"Confidentiality Agreement" means the letter agreement between Polaroid and the Purchaser regarding confidential treatment of certain information concerning Polaroid and its subsidiaries, dated November 15, 2001.

"Contingent Assets" means all rights of Sellers from and after the date hereof under (i) the Contingent Purchase Price Agreement dated May 15, 2001 by and between PD Winter Street, LLC and Polaroid, (ii) the Promissory Note dated June 21, 2000 made by 103 Fourth Avenue, LLC in favor of Polaroid in the original principal amount of $400,000, (iii) the Convertible Promissory Note dated April 7, 2000, and due April 7, 2005, made by Boston Laser, Inc. in favor of Polaroid in the original principal amount of $1,000,000, (iv) the balance outstanding on the date hereof under the Promissory Note dated April 7, 2000, and due October 7, 2001, made by Boston Laser, Inc. in favor of Polaroid in the original principal amount of $1,000,000, and (v) the Operating Agreement of GNBIF/Polaroid, LLC between The Greater New Bedford Industrial Foundation and Polaroid that is the subject of that certain Motion for Order Pursuant to 11 U.S.C. Sections 105(a) and 363(b) and Fed. R. Bankr. P. 6004, Authorizing Polaroid Corporation's Entry into an Operating Agreement with the Greater New Bedford Industrial Foundation filed by Polaroid with the Bankruptcy Court on March 28, 2002 (Docket No. 775).

"Contract" means any agreement, lease, note, loan, evidence of Indebtedness, the terms of any security, purchase order, letter of credit, franchise agreement, undertaking, covenant not to compete, employment agreement or arrangement, License, instrument, obligation, commitment, quotation or other executory commitment (including all amendments and supplements to any of the foregoing), whether oral or written, express or implied, and which pursuant to its terms has not expired, terminated or been fully performed by the parties thereto.

"Copyrights" means all copyrightable works, mask works, copyrights, and all domestic and foreign applications, registrations, and renewals in connection therewith.

"date hereof" and "date of this Agreement" each means, and "current" and "currently" each relates to, April 18, 2002.

"Deposit Escrow Agreement" means the deposit escrow agreement, dated as of the date hereof, by and among the Purchaser, the Sellers and the Escrow Agent substantially in the form attached hereto as Exhibit E.

"Determination Date" means December 31, 2001.

"DIP Financing Order" means the Final Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1), and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. §363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§361, 362 and 363 entered by the Bankruptcy Court on November 5, 2001.

"Disclosure Schedule" means the disclosure schedules to this Agreement delivered by the Sellers to the Purchaser.

"$" or "Dollar" means lawful currency of the United States.

"Domain Names" means all rights in Internet web sites and Internet domain names.

"Employee" means any Person who is directly employed by any Polaroid Entity immediately prior to the Closing Date, including Persons on leave, vacation, disability or other approved periods of absence.

"Employment of Professionals Order" means the Order Pursuant to Section 327 and 328 of the Bankruptcy Code Authorizing Employment of Professionals Utilized in the Ordinary Course of Business entered by the Bankruptcy Court on November 5, 2001.

"Encumbrance" means any Claim, encumbrance, pledge, option, charge, easement, security interest, lien, deed of trust, mortgage, adverse claim, right-of-way, encroachment, building or use restriction, encumbrance or other right of Third Parties, whether voluntarily incurred or arising by operation of law, and includes, without limitation, any agreement to give any of the foregoing in the future, and any contingent or conditional sale agreement or other title retention agreement or lease in the nature thereof, any capital lease having substantially the same economic effect as any of the foregoing and any financing statement or other lien notice filed, given or made pursuant to any Law governing Encumbrances.

"Environmental Laws" means any and all Laws of any Governmental Authority relating to pollution (including the presence, Release or Management of Hazardous Materials), protection of human health or safety or the environment.

"Environmental Liabilities" means, regardless of whether any of the following are contained in the Disclosure Schedule or otherwise disclosed to the Purchaser prior to the Closing, any (A) environmental conditions, including, without limitation, the presence, Release, threat of Release, Management of or exposure to Hazardous Materials first occurring on or prior to the Closing Date at, on, in or under any property now or previously owned, operated or leased by Sellers, any predecessors of Sellers or with respect to the Business (as currently or formerly operated); (B) the off-site transportation, storage, treatment, recycling, disposal or Release of Hazardous Materials Managed or Released by or on behalf of Sellers or any predecessors of

Sellers or with respect to the Business (as currently or formerly operated); or (C) any violation of any Environmental Law first existing on or prior to the Closing Date (including, without limitation, costs and expenses for pollution control or monitoring equipment required to bring the Business into compliance with Environmental Laws and fines, penalties and reasonable defense costs incurred for such reasonable time after the Closing Date as it takes the Business to come into compliance with Environmental Laws).

"Equity Interest" means (A) the shares of capital stock of a corporation, (B) the general or limited partnership interests in any partnership, (C) the membership or other ownership interest in any limited liability company, (D) the equity securities of or other ownership interests or rights in any other legal entity, or (E) any option, warrant or other right to convert into or otherwise receive any of the foregoing, in any such case, whether owned or held beneficially or legally.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any Person which is (or at any relevant time was) a member of a "controlled group of corporations" with, under "common control" with, or a member of an "affiliated service group" with, or otherwise required to be aggregated with, any of the Sellers as set forth in Section 414(b), (c), (m) or (o) of the Code.

"Escrow Agent" means JP Morgan Chase.

"Estate Costs" means, to the extent any of the following constitutes Non-Assumed Liabilities Payments, (i) the amounts required to be paid after June 2, 2002 by the Sellers and/or their successor(s) under sections 503(b) and 507(a) of the Bankruptcy Code; (ii) payments after June 2, 2002 of allowed secured claims against the Sellers and/or their successor(s) other than those held or represented by the Agent; (iii) actual, necessary, and reasonable costs paid after June 2, 2002 by the Sellers and/or their successor(s) in connection with the wind-down of their affairs; and (iv) actual, necessary, and reasonable professional fees paid after June 2, 2002 by the Sellers and/or their successor(s) in connection with the pursuit of Chapter 5 actions.

"Foreign Subsidiaries" means the Acquired Subsidiaries and their Subsidiaries.

"GAAP" means generally accepted accounting principles and practices in effect in the United States from time to time, consistently applied for the periods presented.

"Governmental Authority" shall mean any domestic or foreign national, regional, state, provincial or local court, governmental or regulatory agency with jurisdiction over the Business, the Sellers or the Acquired Assets (including the Bankruptcy Court).

"Guarantee Obligation" means, as to any Person (the "guaranteeing person"), any obligation of (A) the guaranteeing person or (B) another Person (including, without limitation, any bank under any letter of credit) to induce the creation of which the guaranteeing person has issued a reimbursement, counter indemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or

not contingent, (i) to purchase any such primary obligation or any real property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the Ordinary Course of Business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (A) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (B) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by Polaroid in good faith with the consent of the Purchaser.

"Hazardous Materials" means: (A) any "waste," "hazardous waste," "industrial waste," "solid waste," "hazardous material," "hazardous substance," "toxic substance," "hazardous material," "pollutant," or "contaminant" as those or similar terms are defined, identified, or regulated under any Environmental Laws; (B) any asbestos, polychlorinated biphenyls, radioactive materials or radon; (C) any petroleum, petroleum hydrocarbons, petroleum products, crude oil and any components, fractions, or derivatives thereof; and (D) any substance that, whether by its nature or its use, is subject to regulation under any Environmental Law or results in any Governmental Authority requiring any environmental investigation, remediation, or monitoring thereof.

"Hired Employee" means any Employee who becomes an employee of the Purchaser or an Affiliate as of the Closing Date pursuant to Section 6.08(a).

"Improvements" means any buildings, facilities, parking lots, other structures and improvements, building systems and fixtures located in, on or under any real property or facility owned, leased, operated or used in the operation of the Business at any time by any Polaroid Entity or by any predecessor of any Polaroid Entity.

"including" means including without limitation.

"Indebtedness" means, with respect to any Person, the following, without duplication: (A) all indebtedness of such Person for borrowed money, (B) all obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the Ordinary Course of Business), (C) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (D) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (E) all Capital Lease

Obligations or Synthetic Lease Obligations of such Person, (F) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (A) through (E) above, (G) all obligations of the kind referred to in clauses (A) through (F) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Encumbrance on property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (H) the liquidation value of any mandatorily redeemable preferred Equity Interests in such Person or its Subsidiaries held by any Person other than such Person and its wholly owned Subsidiaries.

"Intellectual Property" means (A) Marks, (B) Patents, (C) Trade Secrets, (D) Domain Names, (E) Copyrights, (F) all computer software (including data and related documentation and both object code and source code) and all web site designs, (G) all inventions (whether patentable or unpatentable and whether or not reduced to practice), and all improvements thereto, (H) all other proprietary rights, (I) all rights under any licenses to use any of the intellectual property described in clauses (A)-(H) above, and (J) all copies and tangible embodiments (in whatever form or medium) of any of the foregoing.

"Interest Rate" means 6.5% per year calculated on the basis of a 365 day year and charged for the actual number of days elapsed.

"Inventory" means all of the inventory which is held for lease, sale or resale, and all of the raw materials, works-in-process, finished goods, products under research and development, demonstration equipment, spare parts, wrappings, supply and packaging items related thereto, and office and other supply items, in each case wherever the same may be located, including any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person, together with all rights against suppliers of any of the foregoing.

"Issued Stock" means, with respect to each class of stock included in the OEP Equity Securities, the sum of the number of shares of such class included in the Sellers' Stock and the number of shares of such class included in the OEP Equity Securities.

"Law" means any federal, state, local, municipal or foreign statute, law, constitution, ordinance, regulation, rule, code, decree, order, rule of common law or treaty.

"Legal Proceeding" means any judicial, administrative, regulatory or arbitral proceeding, investigation or inquiry or administrative charge or complaint pending at law or in equity before any domestic or foreign governmental or regulatory body or authority.

"Liability" means any liability, Indebtedness, obligation, co-obligation, commitment, expense, Claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"Licenses" means all franchises, certificates of occupancy, consents or orders of, or filings with, any Governmental Authority or any other Person, necessary or desirable for the past, present or anticipated conduct of, or relating to the operation of, the Business or the Acquired Assets.

"Manage" means manage, use, posses, generate, treat, manufacture, process, handle, store, recycle, transport or dispose.

"Marks" means all domestic and foreign trademarks, trade dress, service marks, logos, corporate names, assumed fictional business names, and trade names (including the name "Polaroid"), together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith.

"Material Adverse Effect" means any events, conditions or matters (or series of related events, conditions or matters) in respect of the Business (other than the filing of the Petitions and the pendency of the Case and any proceedings with respect thereto) that, individually or in the aggregate, has or is reasonably likely to have (A) a material adverse effect on the Business, the Acquired Assets, the Assumed Liabilities or results of operations or condition (financial or otherwise) of the Business taken as a whole, (B) a material adverse effect on the ability of the Sellers to perform their obligations hereunder, or (C) a material adverse effect on the ability of the Purchaser to continue to operate the Business immediately after the Closing in substantially the same manner as the Business is conducted immediately prior to the Closing, except in any such case where the event, condition or matter results from (i) the public announcement of the transactions contemplated by or actions required by this Agreement, (ii) any act or omission of a Seller taken with the prior consent of the Purchaser, (iii) changes affecting the industries in which any part of the Business operates which do not disproportionately affect the Business, (iv) changes in the United States, European or Asian economies which do not disproportionately affect the Business, (v) changes resulting from the filing of the Case or from any action approved by the Bankruptcy Court with the Purchaser's Consent, (vi) changes resulting from actions taken to bring costs in line with available funds in accordance with the 2002 Financial Plan, which changes are in accordance with the 2002 Financial Plan, (vii) the regulatory status of the Purchaser, or (viii) a decline in revenue which is not below projected revenue of the Business under the 2002 Financial Plan and which is due to a reduction in demand for the products of the Business.

"Multiemployer Plan" means any "multiemployer plan," as defined in Section 4001(a)(3) or 3(37) of ERISA, which (A) any Seller or any ERISA Affiliate maintains, administers, contributes to or is required to contribute to, or within seven years prior to the Closing Date, maintained, administered, contributed to or was required to contribute to and (B) covers any current or former Employee, director, officer or consultant of such Seller or any ERISA Affiliate (with respect to their relationship with any such entity).

"Non-Assumed Liabilities Payments" means any payment, satisfaction or other discharge by any Polaroid Entity after June 2, 2002 of any Liability of any Polaroid Entity other than (i) Liabilities that otherwise would have been Assumed Liabilities or (ii) professional fees and expenses incurred and paid in the Ordinary Course of Business pursuant to the DIP Financing Order or the Employment of Professionals Order and in accordance with the 2002 Financial Plan. The Purchaser understands that the Sellers intend to pay up to $50,000,000 to the secured lenders of the Business prior to the Closing and the Sellers agree that such payment shall constitute a Non-Assumed Liability Payment.

"OEP Equity Securities" means the equity securities issued at Closing to One Equity Partners LLC and/or its Affiliates in exchange for its or their $60,000,000 investment in equity securities of the Purchaser.

"Ordinary Course of Business" means (i) with respect to the Sellers, the ordinary course of business consistent with custom and practice of the Business from and after the Filing Date to the extent permitted or required by the funds available to support the Business and to the extent limited by the proceedings of the Case and (ii) with respect to the Foreign Subsidiaries, the ordinary course of business consistent with past custom and practice of the Business to the extent permitted or required by the funds available to support the Business.

"Patents" means all domestic and foreign patents, patent applications and patent disclosures, together with all reissues, continuations, continuations-in-parts, divisions, provisional applications, and reexaminations thereof.

"Pension Plan" means any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) (A) which any Seller or any ERISA Affiliate maintains, administers, contributes to or is required to contribute to, and (B) which covers any current or former Employee, director, officer or consultant of any Seller or any ERISA Affiliate (with respect to their relationship with such entity).

"Permits" means all franchises, approvals, permits, licenses, orders, registrations, certificates, variances, tax abatements and other similar permits or rights (including Environmental Permits obtained from any Governmental Authority, and all pending applications therefor).

"Permitted Encumbrances" means (A) with respect to the Real Estate, an easement, encroachment or similar reservation which does not impair the current use, occupancy, or value, or the marketability of title, of such Real Estate and which would not individually (or in the aggregate with others) have a material adverse effect on the Business or the use or enjoyment of such Real Estate; (B) with respect to the Acquired Assets, any liens imposed by law, such as carriers', warehouseman's, mechanics', materialmen's, landlords', laborers', suppliers' and vendors' liens, incurred in good faith in the ordinary course of the Business and securing obligations which are not yet due (other than any Tax liens) or which are being contested in good faith by appropriate proceedings as to which the Sellers shall, to the extent required by GAAP, have set aside on its books appropriate provision for liability; (C) those Encumbrances set forth in Section 1.01(a) of the Disclosure Schedule and those Encumbrances under the Assumed Contracts, none of which, individually or in the aggregate, has a material adverse effect upon the value of the property subject thereto or the use to which such property is presently put; and (D) extensions, renewals and replacements of liens referred to in (A) through (C) of this sentence; provided, that any such extension, renewal or replacement lien shall be limited to the property or assets covered by the lien extended, renewed or replaced and that the obligations secured by any such extension, renewal or replacement lien shall be in an amount not greater than the amount of the obligations secured by the original lien extended, renewed or replaced, none of which, individually or in the aggregate, has a material adverse effect upon the value of the property subject thereto or the use to which such property is presently put. Notwithstanding the

foregoing, Permitted Encumbrances shall not include, in any event, Liens securing or with respect to the Excluded Liabilities.

"Person" means any natural person, firm, partnership, limited liability company, association, corporation, trust, business trust or other similar entity.

"Polaroid Employee" means any Employee who is directly employed by any Seller.

"Polaroid Entities" means Polaroid and each of its Subsidiaries.

"Post-Petition Contracts" means the Contracts of the Sellers relating to the Business entered into by any Seller in the Ordinary Course of Business or approved by the Bankruptcy Court on or after the Filing Date.

"Projected Balance Sheet" means the Sellers' projected balance sheet as of June 30, 2002 attached hereto as Exhibit P.

"Purchaser's Consent" means the written consent of the Purchaser, which consent shall be deemed to have been given if the Bankruptcy Court enters an order on a motion filed by the Sellers duly noticed to the Purchaser in accordance with Section 6.06(c), to which the Purchaser does not provide a written objection to Polaroid within ten (10) days of receipt of such notice.

"Recapitalization" means a transaction or series of transactions pursuant to which the holders of the Indebtedness of any Seller obtain a majority, directly or indirectly, of the equity interests of any Seller or all or substantially all of the assets of any Seller in exchange for such Indebtedness.

"Release" means release, spill, leak, discharge, disposal, pumping, pouring, emitting, emptying, injection, leaching, dumping, or allowing to escape.

"Representative" means with respect to a particular Person, any director, officer, manager, employee, agent, consultant, contractor, advisor, accountant, financial advisor, legal counsel or other representative of such Person.

"Sale Procedures Order" means an order or orders of the Bankruptcy Court substantially in the form attached hereto as Exhibit B.

"Sellers' Auditors" means KPMG LLP.

"Sellers' Knowledge" means, when modifying any representation and warranty of Sellers, the actual knowledge, after due inquiry, of the officers and employees of Sellers and the Foreign Subsidiaries listed on Section 1.01(c) of the Disclosure Schedule.

"Sellers' Stock" means, with respect to each class of stock included in the OEP Equity Securities, a number of shares of such class such that the number of shares of such class issued to the Sellers is equal to 35% of the sum of (i) the number of such shares of such class issued to the Sellers plus (ii) the number of shares of such class included in the OEP Equity Securities (i.e., the ratio of Sellers' Stock to OEP Equity Securities is 35 to 65).

"Subsidiary" means with respect to any Person (the "Owner") (A) any corporation or other Person of which the Owner (either alone or through or together with one or more of its Subsidiaries) owns or holds, directly or indirectly, through one or more intermediaries, more than 50% of the stock or other Equity Interests of such other Person, (B) any corporation or other Person of which stock or other Equity Interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of such Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held or owned, directly or indirectly, through one or more intermediaries, by the Owner (either alone or through or together with one or more of its Subsidiaries), or (C) any Person, the operations of which are consolidated or combined with the Owner, pursuant to GAAP, for financial reporting purposes.

"Synthetic Lease Obligations" means all monetary obligations of a Person under (A) a so-called synthetic, off-balance sheet or tax retention lease, or (B) an agreement for the use or possession of property creating obligations which do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would, or are intended to, be characterized as Indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all federal, state, local, and foreign taxes, and other assessments of a similar nature (whether imposed directly or through withholding), including without limitation, any payroll or value added tax, interest, additions to tax, or penalties applicable thereto.

"Tax Items" means all items of income, gain, loss, deduction and credit or other items required to be included in the Tax Returns.

"Tax Election" means the making or changing of a choice permitted under any statutory or regulatory tax provisions which impacts the calculation of current or future taxable income, timing of tax payments, or the form of reporting entity for tax purposes.

"Tax Returns" means all federal, state, local, and foreign tax returns, declarations, statements, reports, schedules, forms, and information returns and any amended Tax Returns relating to Taxes, and any other documents made part of the foregoing.

"Third Party" means a Person that is not a party to this Agreement, other than an Acquired Subsidiary or a Subsidiary of an Acquired Subsidiary.

"Trade Secrets" means all trade secrets and confidential business information including, to the extent protectible under applicable law, ideas, research and development, invention disclosures, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals.

"2002 Financial Plan" means the Polaroid Corporation's 2002 Financial Plan, dated March 14, 2002, previously delivered to the Purchaser and attached hereto as Exhibit R.

"Welfare Plan" means any "employee welfare benefit plan" as defined in Section 3(1) of ERISA, (A) which any Seller or any ERISA Affiliate maintains, administers, contributes to or is

required to contribute to, and (B) which covers (or covered) any current or former Employee, officer, director or consultant of any Seller or any ERISA Affiliate (with respect to their relationship with such entity).

<h1 style="text-align:center">ARTICLE II</h1>

<h2 style="text-align:center">PURCHASE AND SALE OF BUSINESS</h2>

Section 2.01.  Purchase and Sale of Business.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Sellers shall sell, convey, transfer, assign and deliver to the Purchaser or its designated Affiliates or permitted assigns, and the Purchaser or its designated Affiliates or permitted assigns shall purchase and accept (i) all of the Sellers' rights, title and interest in and to all of the outstanding capital stock of the Acquired Subsidiaries (the "Acquired Stock") and (ii) all of each of the Sellers' rights, title and interests in and to all of such Seller's properties, assets and rights of every nature, kind and description, tangible and intangible (including goodwill), wherever such properties, assets and rights are located and whether real, personal or mixed, whether accrued, contingent or otherwise, other than the Excluded Assets (such rights, title and interests in and to all such assets, properties and claims being collectively referred to herein, together with the Acquired Stock, as the "Acquired Assets"), free and clear of any and all Encumbrances (other than Permitted Encumbrances) in accordance with, and with all of the protections afforded by, Sections 363 and 365 of the Bankruptcy Code. The Acquired Assets shall include all of the Sellers' rights, title, and interests in and to the assets, properties, rights and claims described in clauses (a) through (bb) below (except as expressly excluded under Section 2.02):

(a)     all equipment, furniture, fixtures, machinery, tools, molds, parts, supplies, vehicles and other tangible personal property owned or leased by the Sellers at any location;

(b)     all real property and all of the rights arising out of the ownership thereof or appurtenant thereto together with all Improvements, including, without limitation, all leasehold interests, but only to the extent such leasehold interests are Assumed Contracts, in each case together with any options to purchase the underlying property and leasehold improvements thereon and any other rights, subleases, Licenses, security deposits and profits appurtenant to or related to such leasehold interests;

(c)     all Assumed Contracts, including, without limitation, any right to receive payment for products sold or services rendered, and to receive goods and services, pursuant to such Assumed Contracts and to assert Claims and take other rightful actions in response to breaches, defaults and other violations of such Assumed Contracts;

(d)     all notes and accounts receivable held by the Sellers (including all intercompany accounts receivable or other intercompany advances) and all notes, bonds and other evidences of Indebtedness of any Person held by the Sellers, except any Retained Related Party Accounts Receivable;

(e)     all general intangibles and intangible property of any kind or nature, including goodwill and all Intellectual Property (including the name "Polaroid"), and rights of priority and protection of interests therein under applicable Laws;

(f)     all deposits, credits, prepaid expenses, deferred charges, advanced payments, security deposits, escrowed funds, rights to refunds and prepaid items relating to the Acquired Assets or the Assumed Liabilities;

(g)     all items of Inventory related to the Business;

(h)     all rights in and to products sold or leased (including, but not limited to, products hereafter returned or reposed and unpaid Sellers' rights of rescission, replevin, reclamation and rights to stoppage in transit);

(i)     all customer and supplier lists and all other information as to sources of supply and relationships with suppliers and customers;

(j)     to the extent their transfer is permitted by Law, all Licenses (including Environmental Permits) held by each Seller or issued or granted by any Governmental Authority with respect to the operation of the Business or the use or ownership of any of the Acquired Assets;

(k)     100% of the shares of the outstanding capital stock or other Equity Interests of each Subsidiary of Polaroid identified on Exhibit A;

(l)     all Books and Records relating to the Business excluding those Books and Records solely related to the Excluded Assets and the Excluded Liabilities, subject to Section 2.02(c);

(m)     all causes of action, judgments, Claims and demands of any nature available to or being pursued by any Seller against Third Parties, whether choate or inchoate, known or unknown, contingent or otherwise, except to the extent otherwise provided in Section 2.02(d);

(n)     all investments, securities or Equity Interests in or issued by Persons that are not Subsidiaries, including any interests in partnerships or joint ventures, and any membership interests in any limited liability company listed in Section 2.01(n) of the Disclosure Schedule;

(o)     all Guarantee Obligations, warranties, indemnities and similar rights in favor of Sellers with respect to any of the Acquired Assets or Assumed Liabilities;

(p)     all goodwill generated by or associated with the Business;

(q)     all Cash and Cash Equivalents held by the Sellers and the Foreign Subsidiaries;

(r)    all rights to insurance proceeds relating to the damage, destruction or impairment of any of the Acquired Assets, which damage, destruction or impairment occurred on or prior to the Closing;

(s)    Polaroid's collection of art and photographs and the items stored in Polaroid's archives;

(t)    all rights to the return of the cash deposit securing Sellers' reimbursement obligations under Standby Letter of Credit No. 151270814 in the amount of $7,000,000 and issued by Fleet National Bank for the account of Sellers for the benefit of PD Winter Street, LLC, as beneficiary, and securing Sellers' security deposit obligations (the "Lease Deposits") under that certain Lease, dated May 15, 2001, between Sellers and PD Winter Street, LLC, as landlord, with respect to certain property located at 850 and 920 Winter Street, Waltham, Massachusetts, and commonly known as the Polaroid R2 and R5 Buildings (the "PD Winter Street Lease");

(u)    the Earn-Out Note, dated May 15, 2001, executed by PD Winter Street, LLC, as maker, in favor of Polaroid, as holder, and all rights related thereto and security therefore, including the standby letter of credit in the amount of $7,000,000 issued for the account of PD Winter Street, LLC for the benefit of Seller, as beneficiary, and securing the payment obligations under such note (the "Earn-Out Note");

(v)    all rights to the return of the cash deposit securing Sellers' reimbursement obligations under Standby Letter of Credit No. 151270917 in the amount of $1,000,000 and issued by Fleet National Bank for the account of Sellers for the benefit of PD Winter Street, LLC, as beneficiary, and securing the Sellers' security deposit obligations for demolition costs (the "Demolition Deposits") under that certain Buyer Demolition Agreement, dated May 15, 2001, between Polaroid and PD Winter Street, LLC (the "Demolition Agreement");

(w)    the Contingent Assets;

(x)    the Equity Interest in and rights relating to 784 Memorial Drive LLC;

(y)    the Equity Interest in and rights relating to Digital Media and Communications LLP;

(z)    the Equity Interest in Polaroid Foundation Inc., it being understood that, if the Purchaser so requests prior to the Closing, the Equity Interest in Polaroid Foundation Inc. shall not be transferred to the Purchaser at Closing and shall become an Excluded Asset;

(aa)    all rights of Sellers to the surrender value of the Surety Bond No. 45002078 with NAC Reinsurance Corporation for self-insured worker's compensation claims and liabilities; and

(bb)    the cash collateral, refunds of premiums, and related interest on performance bonds as contemplated by that certain Asset Purchase Agreement, dated as of

December 4, 2001, among Polaroid, Polaroid ID Systems, Inc. ("Polaroid ID") and Digimarc Corporation (the "Digimarc Asset Purchase Agreement").

Section 2.02.  Excluded Assets.  The following assets, properties, and rights (the "Excluded Assets") are not included in the Acquired Assets and shall be retained by the Sellers:

(a)    all Contracts other than Assumed Contracts;

(b)    100% of the shares of the outstanding capital stock or other Equity Interests of each Subsidiary of Polaroid listed in Section 2.02(b) of the Disclosure Schedule;

(c)    all personnel records and other Books and Records that any Seller is required by Law to retain in its possession;

(d)    (i) all causes of action, judgments, Claims and demands of any nature available to or being pursued by any Seller against Third Parties, whether choate or inchoate, known or unknown, contingent or otherwise, to the extent the foregoing relate to or arise out of the Excluded Assets or the Excluded Liabilities and (ii) all causes of action, judgments, Claims and demands of any nature available to or being pursued by any Seller against (A) any Representative of any Seller, or (B) any supplier or vendor to any Seller, or (C) any Third Party insurance, reinsurance, bonding or other similar company providing insurance to the Sellers other than with respect to causes of action, judgments, Claims and demands against Representatives, suppliers or vendors described in clause (A), (B) or (C) below, including all such causes of action, choses in action and rights of recovery actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under sections 506(c), 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code and the proceeds, products, rents and profits of all of the foregoing, but only if such Representative, supplier or vendor is not a director, officer, employee or agent of, or consultant, supplier, vendor or contractor to, the Business (A) whose relationship with the Business continues immediately following the Closing Date or (B) who has been hired, retained or engaged by the Purchaser or any of its Affiliates within sixty (60) days after the Closing Date or (C) who, at the end of such sixty (60) day period, is reasonably expected to have or resume such a continuing relationship with the Business after such sixty (60) day period;

(e)    all rights of any Seller under this Agreement and the Ancillary Agreements;

(f)    except as provided in Section 2.01(bb), all rights of Sellers, including Polaroid and Polaroid ID, under the Digimarc Asset Purchase Agreement;

(g)    any intercompany receivables of any Seller held by another Seller;

(h)    prepaid expenses of Sellers relating to debt financing costs;

(i)    non-current or other assets relating to the Polaroid Pension Plan; and

(j)    any Retained Related Party Accounts Receivable.

- 16 -

Section 2.03.  Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall assume no liability or obligation of Sellers except the following specific liabilities and obligations of Sellers (the "Assumed Liabilities"), which the Purchaser shall pay, perform, or discharge in accordance with their terms, subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such liabilities or obligations are owed:

      (a)    all obligations of the Sellers under the Assumed Contracts, including all cure amounts payable in order to cure any defaults or otherwise effectuate, pursuant to the Bankruptcy Code, the assumption by and assignment to the Purchaser of Assumed Contracts assigned to the Purchaser under the Approval Order ("Cure Amounts"); and

      (b)    the following post-Petition current liabilities of Sellers incurred or accrued but only in the dollar amount and to the extent such liabilities exist on the Closing Date:

      (i)    liabilities or accruals of the type normally included in the line item "MCC S/T Debt (MCC Hedging Overdrafts)" appearing on the Projected Balance Sheet;

      (ii)    liabilities or accruals of the type normally included in the line item "Trade Payables" appearing on the Projected Balance Sheet;

      (iii)    liabilities or accruals of the type normally included in the line item "Other Payables and Accruals" appearing on the Projected Balance Sheet, except for liabilities or accruals of the type normally included in the line item "Other Payables and Accruals - Other Accruals-Professional Fees" appearing on the Projected Balance Sheet;

      (iv)    liabilities or accruals of the type normally included in the line item "Compensation & Benefits from Operations" appearing on the Projected Balance Sheet, except for liabilities or accruals for the Sellers' Retention Program as defined in that certain Order Under 11 U.S.C. Sections 105(a) and 63(b)(1) authorizing Implementation of Key Employee Retention Program entered on April 5, 2002 (Docket No. 833);

      (v)    liabilities or accruals of the type normally included in the line item "Compensation & Benefits from Restructuring" appearing on the Projected Balance Sheet; and

      (vi)    liabilities or accruals of the type normally included in the line item "Post Employment Benefits" appearing on the Projected Balance Sheet; and

      (c)    [Intentionally Omitted]

      (d)    all intercompany liabilities, including, but not limited to, ordinary course payables and loans payable, which arose on or after the Filing Date (the "Post-Petition Intercompany Payables") owed by the Sellers to the Foreign Subsidiaries, except to the extent

that such Post-Petition Intercompany Payables may be cancelled or contributed pursuant to Section 6.07(i); and

(e)    all obligations of the Sellers (excluding any pre-Petition obligations or liabilities of the Sellers) under the Stipulation and Order Resolving Motion of International Specialty Products Inc. and ISP Freetown Fine Chemicals Inc. For an Order Compelling the Debtors to (I) Immediately Assume or Reject Its Executory Contract Pursuant to Section 365(D)(2) of the Bankruptcy Code or, in the Alternative, (II) Pay Market Rate Pricing for Products Delivered Postpetition Should the Debtors Need More Time to Assume or Reject the Executory Contract or the Debtors Ultimately Reject Such Contract (Docket No. 749) entered on March 22, 2002.

Section 2.04.    Excluded Liabilities.    Notwithstanding anything to the contrary contained in this Agreement or any other writing or commitment (written or oral) to the contrary, the parties expressly acknowledge and agree that the Purchaser shall not assume or in any manner whatsoever be liable or responsible for any Liability of any Seller, or any predecessors or Affiliate of any Seller, and any of their respective Representatives or any claim against any and all of the foregoing, whether matured or unmatured, known or unknown, contingent or absolute, direct or indirect, whensoever incurred, whether or not related to the Business, other than the Assumed Liabilities.    All such Liabilities other than the Assumed Liabilities are collectively referred to as the "Excluded Liabilities."    Notwithstanding anything to the contrary contained in this Agreement or any other writing or commitment (written or oral) to the contrary, and without limiting the foregoing, the following shall be considered "Excluded Liabilities" for the purposes of this Agreement:

(a)    any warranty or liability claim of any nature in respect of products of the Business manufactured or sold by the Sellers, or services of the Business provided by the Sellers, prior to or on the Filing Date;

(b)    any liability of Sellers for Taxes, including (i) any of such Taxes arising as a result of Sellers' operation of the Business or ownership of the Acquired Assets on or before the Closing Date or that will arise as a result of the sale of the Acquired Assets pursuant to this Agreement or that will arise as a result of the Cash Consideration being paid solely to Polaroid, (ii) any liability for Taxes pursuant to a tax sharing agreement or tax indemnity and (iii) any liability for deferred Taxes of any nature;

(c)    any Environmental Liabilities of Sellers;

(d)    any obligation or liability of Sellers arising under any Contract other than the Assumed Contracts;

(e)    any liability or obligation of Sellers to indemnify their respective Representatives;

(f)    any intercompany payables owed by any Seller to another Seller;

(g)    any liability or obligation to the Polaroid Employees or any former Polaroid Employees of Sellers, including any liability or obligation associated with, or in any

way related to (in whole or in part): (i) any Pension Plan or Welfare Plan, (ii) any other plan, agreement, arrangement or understanding of Sellers or any ERISA Affiliate of Sellers that provides any compensation or benefit to any Polaroid Employee or any former Polaroid Employee, including any retiree medical benefits, (iii) any event, occurrence, injury or illness occurring on or prior to the Closing (including any (x) claims under workers' compensation laws or (y) medical, health or disability claims arising after the Closing to the extent related to any event, occurrence, injury, illness or condition occurring on or before the Closing) or (iv) any liability or obligation related to the termination of the employment of any Polaroid Employee or any former Polaroid Employees of Sellers, or related to any employment, severance, retention or termination agreement with any Polaroid Employee or any former Polaroid Employees of Sellers;

(h)     any liability or obligation of Sellers arising out of or related to any employee grievances commenced or relating to periods on or prior to the Closing Date;

(i)     any liability or obligation in respect of the Excluded Assets;

(j)     (x) any liability or obligation of Sellers for administrative fees and expenses, including without limitation, "allowed administrative expenses" under Section 503(b) of the Bankruptcy Code, except for the Assumed Liabilities, and (y) any liability or obligation of Sellers for transaction fees and expenses and fees and expenses payable to lenders, brokers, financial advisors, legal counsel, accountants and other professionals;

(k)     any liability or obligation of Sellers under the Digimarc Asset Purchase Agreement;

(l)     any other liability or obligation of Sellers including any liability or obligation directly or indirectly arising out of or relating to the operation of the Business or ownership of the Acquired Assets on or prior to the Closing Date, whether contingent or otherwise, fixed or absolute, known or unknown, matured or unmatured, present, future or otherwise, except for the Assumed Liabilities;

(m)     all Pre-Petition Intercompany Payables (as defined in Section 6.19(a)); and

(n)     except as provided in Section 2.03(a), any liability or obligation of the Sellers incurred prior to the Filing Date.

Section 2.05.    Consideration; Cash and Cash Equivalents.

(a)    Consideration.  In addition to the assumption of the Assumed Liabilities, the consideration for the Acquired Assets (including the Acquired Stock) (the "Consideration") shall be (i) the Sellers' Stock plus (ii) $255,000,000, (w) minus the Requested Retained Cash (as defined in Section 2.05(b)), (x) minus the Non-Assumed Liabilities Payments, (y) minus the amounts set forth in Section 6.19(d) and 6.20 hereof actually used to satisfy any Retained Related Party Accounts Receivable and to pay any Net Related Party Special Dividends, in each case, to Sellers, and (z) plus the amount specified in Section 6.19(b) hereof to compensate for any Requested Dividend Withholding Taxes (the "Cash Consideration").

(b)    Requested Retained Cash.  At the Purchaser's election, the Purchaser may require that the Sellers retain at Closing, such amount of the Cash and Cash Equivalents held by the Sellers and the Foreign Subsidiaries as determined by the Purchaser (the "Requested Retained Cash"), in which case such Requested Retained Cash shall not be included in the Acquired Assets.

(c)    Cash and Cash Equivalents.  On the date that is one Business Day prior to the Closing Date, Polaroid shall deliver to the Purchaser (with copies to counsel to the Committee and counsel to the Agent) a certificate signed by an officer of Polaroid certifying (i) a good faith estimate of the amount of Cash and Cash Equivalents held by the Sellers and the Foreign Subsidiaries as of the date of delivery of the certificate and (ii) the amount of all Non-Assumed Liabilities Payments made since June 2, 2002.

Section 2.06.    Deposit Amount.  The Purchaser has delivered to the Escrow Agent pursuant to the terms of the Deposit Escrow Agreement $10 million in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the "Deposit Amount"), to be held by the Escrow Agent in an interest bearing account reasonably acceptable to the Purchaser to serve as a down payment on the Consideration, and to be released in accordance with the following procedures:

(a)    on the Closing Date, the Sellers and the Purchaser shall jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by the Sellers in the Deposit Escrow Agreement (and such amount shall be applied towards the payment of the Consideration);

(b)    upon termination of this Agreement by Purchaser under Section 9.01(d)(v), the Sellers and the Purchaser shall jointly instruct the Escrow Agent to deliver (i) $3,000,000 of the Deposit Amount, by wire transfer of immediately available funds, to an account designated by the Sellers in the Deposit Escrow Agreement, to be retained by the Sellers and (ii) the remainder of the Deposit Amount, by wire transfer of immediately available funds, to an account designated by the Purchaser in the Deposit Escrow Agreement, to be retained by the Purchaser;

(c)    (i) upon termination of this Agreement by Polaroid under Section 9.01(e)(i) or 9.01(e)(ii), and provided that no Seller is then in material breach of this Agreement for which the Purchaser had previously notified Polaroid or (ii) upon termination of this