Agreement by the Purchaser in violation of this Agreement, the Sellers and the Purchaser shall jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by the Sellers in the Deposit Escrow Agreement, to be retained by the Sellers; and

(d)     upon termination of this Agreement pursuant to Section 9.01 (other than Section 9.01(d)(v), 9.01(e)(i) or 9.01(e)(ii)), the Sellers and the Purchaser shall jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by the Purchaser in the Deposit Escrow Agreement, to be retained by the Purchaser.

## ARTICLE III

## THE CLOSING

Section 3.01.  Closing.  The closing of the Contemplated Transactions (the "Closing") shall take place at the New York offices of Skadden, Arps, Slate, Meagher & Flom LLP at 10:00 a.m. on the later of July 29, 2002 or the second Business Day after the conditions set forth in Article VIII shall have been satisfied or waived, or at such other time, date and place as shall be fixed by agreement among the Purchaser and Polaroid (the date of the Closing being herein referred to as the "Closing Date").

Section 3.02.  Consideration; Deliveries.

(a)     Purchaser Deliveries.  Subject to the terms and conditions hereof, at the Closing, the Purchaser shall deliver, or cause to be delivered, to the Sellers the following:

(i)     the Cash Consideration less the Deposit Amount, in immediately available funds by wire transfer to an account designated by Polaroid;

(ii)     stock certificates representing the Sellers' Stock registered in the name of Polaroid Corporation, as agent for itself and the other Sellers;

(iii)     a certificate, dated the Closing Date, executed on behalf of the Purchaser by its Chief Executive Officer or Chief Financial Officer, certifying that the conditions specified in Section 8.02(a) have been fulfilled;

(iv)     a certificate, dated the Closing Date, executed on behalf of the Purchaser by its Secretary or an Assistant Secretary, certifying: (a) a true and correct copy of the Purchaser's Organizational Documents, (b) a true and correct copy of the resolutions of the Purchaser's board authorizing the execution, delivery and performance of this Agreement by the Purchaser and the consummation of the transactions contemplated hereby and (c) incumbency matters;

(v)     a certificate of the Secretary of State of the State of Delaware, dated as of a date not earlier than the second Business Day prior to the Closing, certifying the good standing of the Purchaser in the State of Delaware; and

(vi)    duly executed Ancillary Agreements.

(b)    <u>Sellers Deliveries</u>.  Subject to the terms and conditions hereof, at the Closing the Sellers shall deliver, or cause to be delivered, to the Purchaser or its permitted assigns the following:

(i)    duly executed Ancillary Agreements;

(ii)    a certificate, dated the Closing Date, executed on behalf of the Sellers by Polaroid's Chief Executive Officer or Chief Financial Officer, certifying that the conditions specified in Section 8.03(a) have been fulfilled;

(iii)    a certificate, dated the Closing Date, executed on behalf of the Sellers by Polaroid's Secretary or an Assistant Secretary, certifying: (a) a true and correct copy of each Seller's Organizational Documents, (b) a true and correct copy of the resolutions of each Seller's board authorizing the execution, delivery and performance of this Agreement by each Seller and the consummation of the transactions contemplated hereby and (c) incumbency matters;

(iv)    certified copies of all orders of the Bankruptcy Court pertaining to the Contemplated Transactions, including the Sales Procedures Order and the Approval Order;

(v)    to the extent that Equity Interests of Acquired Subsidiaries are represented by stock certificates, original certificates evidencing the Acquired Stock (to the extent applicable in the respective jurisdiction), which certificates shall be duly endorsed for transfer or accompanied by duly executed stock transfer powers or other appropriate instruments of assignment and transfer in favor of Purchaser or its permitted assigns;

(vi)    if the Equity Interests of an Acquired Subsidiary are not represented by stock certificates, evidence of the transfer of said Equity Interests to the Purchaser or its permitted assigns;

(vii)    title certificates to any motor vehicles included in the Acquired Assets, duly executed by Sellers (together with any other transfer forms necessary to transfer title to such vehicles);

(viii)    a receipt for the payment of the Cash Consideration less the Deposit Amount duly executed by Sellers; and

(ix)    all such other instruments of assignment, transfer or conveyance as shall, in the reasonable opinion of the Purchaser and its counsel, be necessary to vest in the Purchaser good, valid and marketable title to the Acquired Assets and to put the Purchaser in actual possession or control of the Acquired Assets.

Section 3.03.  Purchase Price Allocation.

(a)  Prior to the Closing, the Purchaser and the Sellers shall agree upon the allocation of the Consideration (and all other items properly included in "consideration," as described in Treasury Regulation section 1.1060-1(c)(1)), in a manner consistent with Section 1060 of the Code and the rules and regulations thereunder (the "Allocation"). The Allocation shall be adjusted as necessary to reflect any adjustments to the Consideration after the Closing Date.  The Purchaser and the Sellers agree to use such allocation in filing all required forms under Section 1060 of the Code (or any comparable forms under state or foreign law), and all other Tax Returns, and the Purchaser and the Sellers further agree that they shall not take any position inconsistent with such allocation upon any examination of any such Tax Return, in any refund claim or in any tax litigation.  Not later than 30 days prior to the filing of their respective Forms 8594 relating to this transaction, each party shall deliver to the other party a copy of its Form 8594.

(b)  The Purchaser and the Sellers further agree that the payment of the Consideration to Sellers contemplated by Section 3.02 may be made to a single Seller that is designated by Polaroid in writing as being authorized to act as agent for all of the Sellers, whereupon each Seller shall be deemed to have received the Consideration allocable to the Acquired Assets owned by such Seller in accordance with the allocation determination under this Section 3.03, provided that any Taxes that arise as a result of the payment being made to a single Seller shall be Excluded Liabilities.

(c)  The Purchaser and the Sellers agree that, in the event that the Acquired Assets to be transferred pursuant to this Agreement ultimately are transferred pursuant to more than one separate agreement between the Purchaser and/or its designated Affiliate and the Sellers, the Purchaser and/or its designated Affiliate and the Sellers will treat the transfers under all such agreements as a series of related transactions within the meaning of Treasury Regulations section 1.1060-1(b)(5), and such transfers shall therefore be treated as the transfer of a single trade or business, as described in Section 1060 of the Code and the rules and regulations thereunder.  The Purchaser and the Sellers shall aggregate the amounts paid under all such agreements and allocate that aggregate amount among all assets acquired under all such agreements as if all such transactions had been consummated pursuant to a single purchase and sale transaction, resulting in a single Form 8594 being filed for the Contemplated Transactions.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Disclosure Schedule, the Sellers jointly and severally represent and warrant to the Purchaser on and as of the date hereof and as of the Closing Date as follows:

Section 4.01.  Organization and Good Standing.

(a)  Each Polaroid Entity is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and has all requisite corporate or other organizational power and, subject to Bankruptcy Court

approval, authority to own, use, lease and operate its properties and assets as now owned, used, leased and operated and to carry on its business as and where presently being conducted, and is qualified or licensed to do business and is in good standing in every jurisdiction where the nature of the business conducted by it or the properties owned, leased or operated by it requires qualification or licensure, except where the failure to be so licensed or qualified would not have a Material Adverse Effect.

(b)     Except as set forth on Section 4.01(b) of the Disclosure Schedule, there are no direct or indirect Subsidiaries of Polaroid other than the other Sellers and the Acquired Subsidiaries. Except as set forth on Section 4.01(b) of the Disclosure Schedule, Sellers own all of the issued and outstanding capital stock and other Equity Interests of each Acquired Subsidiary. There are no other shares of capital stock or other Equity Interests of any Acquired Subsidiary issued other than as set forth on Section 4.01(b) of the Disclosure Schedule and there are no declared and unpaid dividends or distributions on any such capital stock or other Equity Interests. The Acquired Stock (i) has been duly authorized, validly issued, and is fully paid and nonassessable (in those jurisdictions in which such concepts are applicable), (ii) has not been issued in violation of any preemptive rights of stockholders or of any terms of any agreement or other understanding binding upon any Polaroid Entity, and (iii) has been offered and sold in compliance with any and all applicable securities laws, rules and regulations. Except for directors' qualifying shares and shares held by other Polaroid appointees required to be issued to comply with local government regulations, all of the outstanding capital stock and other Equity Interests of the Foreign Subsidiaries are owned beneficially and of record (directly or indirectly) by Polaroid free and clear of any and all Encumbrances. Except as set forth in Section 4.01(b) of the Disclosure Schedule, there is no security, option, warrant, right, call, subscription agreement, commitment or understanding of any nature whatsoever to which any of the Polaroid Entities is a party or by which it is bound, that (i) calls for the issuance, sale, pledge or other disposition of any Equity Interests of the Foreign Subsidiaries or any securities convertible into or exchangeable for, or other rights to acquire, any Equity Interests of the Foreign Subsidiaries, (ii) obligates any Polaroid Entity to grant, offer or enter into any of the foregoing or to repurchase, redeem or otherwise acquire any capital stock or other Equity Interests of the Foreign Subsidiaries or (iii) relates to the transfer, dividends rights, voting, control, or registration rights of such Equity Interests or rights. Upon the Closing, Purchaser or its designee will be the sole owner of all right, title and interest in the Equity Interests of the Acquired Subsidiaries.

Section 4.02.  Authority Relative to this Agreement.  Each Seller has the corporate or other organizational power and authority to enter into and deliver this Agreement and the Ancillary Agreements and, subject to Bankruptcy Court approval, to carry out its obligations hereunder and thereunder. The execution, delivery, and performance of this Agreement and the Ancillary Agreements by each of the Sellers party thereto and the consummation by each of the Sellers of the Contemplated Transactions have been duly authorized by all requisite corporate or other organizational actions. Subject to the entry and effectiveness of the Sale Procedures Order and the Approval Order, this Agreement has been duly and validly executed and delivered by or on behalf of each of the Sellers and (assuming this Agreement constitutes a valid and binding obligation of the Purchaser) constitutes a legal, valid and binding agreement of the Sellers, enforceable against the Sellers in accordance with its terms, and the Ancillary Agreements will be, when executed and delivered by the Sellers parties thereto, the legal, valid and binding obligations of the Sellers parties thereto, enforceable against

the Sellers parties thereto in accordance with their respective terms, in each case subject to applicable bankruptcy, reorganization, insolvency, moratorium, and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

Section 4.03. <u>Governmental Consents and Approvals</u>. No consent, approval, authorization of, declaration, filing, or registration with, any domestic or foreign government or regulatory authority, is required to be made or obtained by any of the Sellers in connection with the execution, delivery, and performance of this Agreement and the Ancillary Agreements and the consummation of the Contemplated Transactions, except for: (a) consents, approvals, authorizations of, declarations, or filings with, the Bankruptcy Court, (b) the filing of a notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>"), and the expiration or earlier termination of the applicable waiting period thereunder, (c) the filing of required notifications under applicable foreign antitrust laws and regulations and the receipt of any necessary approvals thereunder, and (d) consents, approvals, authorizations, declarations, filings and registrations the lack of which would not have a Material Adverse Effect. The items referred to in clauses (a) through (c) of this Section 4.03 are hereinafter referred to as the "<u>Governmental Requirements</u>."

Section 4.04. <u>No Violations</u>. Assuming that the Governmental Requirements will be satisfied, made, or obtained and will remain in full force and effect, and assuming receipt of the consents, approvals and authorizations listed in Section 4.04 of the Disclosure Schedule, neither the execution, delivery, or performance of this Agreement and the Ancillary Agreements by the Sellers parties thereto, nor the consummation by any Seller of the Contemplated Transactions, nor compliance by any Seller with any of the provisions hereof and of the Ancillary Agreements, will (a) result in any breach of any provisions of the articles of incorporation or bylaws or similar organizational documents of any Polaroid Entity, (b) result in a violation, or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, amendment, vesting, payment, exercise, acceleration, suspension, or revocation) under any of the terms, conditions, or provisions of any note, bond, mortgage, deed of trust, security interest, indenture, loan or credit agreement, license, permit, contract, lease, agreement, plan, or other instrument, commitment or obligation to which any Polaroid Entity is a party or by which such Polaroid Entity's properties or assets may be bound or affected, (c) violate any order, writ, governmental authorization, injunction, decree, statute, rule, or regulation applicable to any Polaroid Entity or to any properties or assets of any Polaroid Entity, or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on any asset of a Polaroid Entity, except in the case of clauses (b) and (d) above, for violations, breaches, defaults, terminations, cancellations, accelerations, creations, impositions, suspensions, or revocations that (i) would not individually or in the aggregate have a Material Adverse Effect or (ii) are excused by or unenforceable as a result of the filing of the Petitions or the applicability of any provision of or any applicable law of the Bankruptcy Code.

Section 4.05. <u>Contracts; Compliance</u>. True and complete copies of all material Contracts relating to the Business have been made available to Purchaser. Each of the Contracts relating to the Business is valid, binding and, subject to payment of all cure amounts payable to effectuate, pursuant to the Bankruptcy Code, the assumption by and assignment to the Purchaser of such Contracts under the Approval Order, if applicable, enforceable against the Polaroid Entity party thereto and, to the Sellers' Knowledge, the other parties thereto, in accordance with

its terms and is in full force and effect. Except as set forth in Section 4.05 of the Disclosure Schedule and other than with respect to monetary defaults by the Sellers under Contracts that are curable by payment of all cure amounts payable to effectuate, pursuant to the Bankruptcy Code, the assumption by and assignment to the Purchaser of such Contracts under the Approval Order, if applicable, the Polaroid Entities party thereto and, to the Sellers' Knowledge, each of the other parties thereto, have performed all obligations required to be performed by them under, and are not in default in respect of, any of such Contracts, and no event has occurred which, with notice or lapse of time, or both, would constitute such a default, other than where the failure to perform such obligations or such default would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Except as set forth in Section 4.05 of the Disclosure Schedule and other than with respect to monetary defaults by the Sellers under Contracts that are curable by payment of all cure amounts payable to effectuate, pursuant to the Bankruptcy Code, the assumption by and assignment to the Purchaser of such Contracts under the Approval Order, if applicable, to the Sellers' Knowledge, Sellers have received no claim or notice from any other party to any such Contract that any Polaroid Entity has breached any obligations to be performed by it thereunder, or is otherwise in default or delinquent in performance thereunder, where the consequence of such breach or default would be reasonably expected to have a Material Adverse Effect. Section 4.05 of the Disclosure Schedule lists all Post-Petition Contracts of the Sellers relating to the Business other than immaterial Post-Petition Contracts and open purchase orders entered into in the Ordinary Course of Business. Except as set forth on Section 4.05 of the Disclosure Schedule and except for Post-Petition Contracts that are immaterial to the Business, none of the Post-Petition Contracts contains any provisions restricting its assignment to the Purchaser pursuant to the terms of this Agreement.

Section 4.06.  Accounts Receivable; Accounts Payable

(a)    All of the Accounts Receivable of the Business reflected on the Audited Financial Statement for the year ended December 31, 2001 (the "2001 Audited Financial Statement") or acquired after the date thereof and on or before the Closing Date represent amounts receivable for products actually delivered or services actually provided, and have arisen from bona fide transactions in the Ordinary Course of Business. All Accounts Receivable of the Business reflected on the 2001 Audited Financial Statement or acquired after the date thereof and on or before the Closing Date are accurately reflected on the books of the Business and have arisen from bona fide transactions. The reserve on the 2001 Audited Financial Statement for doubtful accounts is adequate in accordance with GAAP.

(b)    All of the Accounts Payable and all payables and other accruals of the Business reflected on the 2001 Audited Financial Statement or which have arisen after the date thereof and on or before the Closing Date are accurately reflected on the books of the Business and have arisen from bona fide transactions in the Ordinary Course of Business.

Section 4.07.  Inventory.  The raw materials and works-in-process are useable in the Ordinary Course of Business in the production or completion of the finished goods included in the Acquired Assets.  All of the raw materials and works-in-process can reasonably be expected to be consumed (other than with respect to scrappage consistent with past practice of the Business) in the Ordinary Course of Business within a reasonable period of time, and the finished goods included in the Acquired Assets are fit for the ordinary purposes, or if applicable,

the particular purposes, for which such finished goods are used and are saleable in the Ordinary Course of Business. All Inventory of the Polaroid Entities relating to the Business and reflected on the 2001 Audited Financial Statement or acquired by the Polaroid Entities thereafter and on or before the Closing Date is carried on Sellers' books and records relating to the Business at not in excess of the lower of historical cost or market price determined in accordance with GAAP. Sellers have provided for adequate reserves in accordance with GAAP with respect to slow moving, damaged and obsolete Inventory.

Section 4.08.  <u>All Assets</u>.  Except for the Excluded Assets, the Acquired Assets include all assets and properties of Sellers which are primarily related to, or otherwise material to the conduct of, the Business.  To Sellers' Knowledge, no additional assets other than those included in the Acquired Assets are necessary in order to operate the Business.

Section 4.09.  <u>Financial Statements</u>.  The books of account and related records of each Polaroid Entity for the Business fairly reflect in reasonable detail all assets, liabilities and transactions relating to the Business in accordance with GAAP.  Polaroid has delivered to the Purchaser true, correct and complete copies of the audited consolidated financial statements of Polaroid as of and for the 12-month periods ended December 31, 2001, December 31, 2000 and December 31, 1999, each together with a report thereon by the Sellers' Auditors (the "<u>Audited Financial Statements</u>").  Attached hereto as Section 4.09 of the Disclosure Schedule are the unaudited historical balance sheet of the Business as of June 2, 2002 and the unaudited historical statements of results of operations and cash flows of the Business for the five-month period ended June 2, 2002 (collectively, the "<u>Interim Financial Statements</u>" and together with the Audited Financial Statements, the "<u>Financial Statements</u>").  The Financial Statements were compiled from each Polaroid Entity's books and records for the Business, are in accordance with such books and records, present fairly in all material respects the financial position of Polaroid and its consolidated Subsidiaries as of the dates thereof, their results of operations and cash flows for the periods then ended (except, in the case of the Interim Financial Statements, in respect of normal and recurring year end adjustments, none of which is material in amount), and the assets and liabilities of the Business as of the dates thereof, in accordance with GAAP consistently applied throughout the period.  Except for (a) Liabilities incurred in the Ordinary Course of Business after the Determination Date; (b) Liabilities disclosed, reflected or provided for in the Financial Statements; (c) Liabilities disclosed in the Disclosure Schedule and (d) Liabilities incurred in connection with the transactions contemplated hereby, from the Determination Date, no Polaroid Entity has incurred any Liabilities that would both (i) be required to be reflected or provided for in a balance sheet prepared in accordance with GAAP and the policies, procedures and methods used to prepare the Financial Statements and (ii) be reasonably likely to have a Material Adverse Effect.

Section 4.10.  <u>Relationship with Customers and Suppliers</u>.  Section 4.10 of the Disclosure Schedule sets forth a complete and correct list of the twenty (20) largest customers (by net sales) and twenty (20) largest suppliers (by dollar volume) of the Polaroid Entities for the fiscal year ended December 31, 2001 and for the two-month period ended March 3, 2002.  To Sellers' Knowledge, no such customer or supplier listed on Section 4.10 of the Disclosure Schedule, or any customer who is the sole purchaser of a product or any supplier who is the sole source of any supplies, intends to terminate or adversely and materially modify its business relationship with any Polaroid Entity.

Section 4.11. <u>No Changes</u>. From the Determination Date to the date hereof, except as disclosed in Section 4.11 of the Disclosure Schedule, the Polaroid Entities have conducted the Business only in the Ordinary Course of Business. Without limiting the generality of the foregoing, since the Determination Date, except as disclosed in Section 4.11 of the Disclosure Schedule, there has not been:

(a)     any Material Adverse Effect;

(b)     any increase in the salaries or other compensation payable or to become payable to any Employee whose aggregate annual compensation prior to the Determination Date was in excess of $100,000 (or the foreign currency equivalent thereof) or any general increase in the salaries or other compensation payable or to become payable to Employees outside the Ordinary Course of Business, or any advance (excluding advances for ordinary business expenses) or loan to, any Employee or any increase in, or any addition to, other benefits (including any bonus, profit-sharing, pension or other plan) to which any of the Employees may be entitled, or any payments to any pension, retirement, profit-sharing, bonus or similar plan except payments in the Ordinary Course of Business made pursuant to the benefit plans described in Section 4.11(b) of the Disclosure Schedule, or any other payment of any kind to or on behalf of any Employee other than payment of base compensation and reimbursement for reasonable expenses in the Ordinary Course of Business;

(c)     any damage, destruction or loss affecting the Business in excess of $500,000, whether or not covered by insurance;

(d)     any cancellation or waiver of any right material to the Business or any cancellation or waiver of any material debts or claims of the Business;

(e)     any change by any Polaroid Entity in its method of accounting or keeping its books of account or accounting practices;

(f)     any disposition of or failure to keep in effect any rights in, to or for the use of any of the Intellectual Property (other than with respect to Trade Secrets) relating to the Business, or, to the Sellers' Knowledge, any disposition of or failure to keep in effect any rights in, to or for the use of any Trade Secrets relating to the Business;

(g)     any sale, transfer or other disposition of any material assets, properties or rights of the Business, except sales of Inventory in the Ordinary Course of Business;

(h)     any mortgage, pledge or subjection to an Encumbrance of any kind (other than Permitted Encumbrances) of any assets, tangible or intangible, of the Business;

(i)     any making or authorization of any single capital expenditure in excess of $500,000, or capital expenditures in excess of $5,000,000 in the aggregate; or

(j)     any material change or modification of any Polaroid Entity's credit, collection and payment policies, procedures and general practices with respect to the collection of Accounts Receivable and the payment of Accounts Payable.

Section 4.12. <u>Litigation</u>. Except for the pendency of the Case, there is no suit, action, proceeding, or investigation (whether at law or equity, before or by any federal, state, or foreign commission, court, tribunal, board, agency, or instrumentality, or before any arbitrator) pending or, to any of the Sellers' Knowledge, threatened against or affecting any Polaroid Entity, the outcome of which would have, individually or in the aggregate, a Material Adverse Effect, nor is there any judgment, decree, injunction, rule, or order of any court, governmental department, commission, agency, instrumentality, or arbitrator outstanding against any Polaroid Entity that would have a Material Adverse Effect.

Section 4.13. <u>No Default</u>. No Acquired Subsidiary is in violation, breach of, or default under (and no event has occurred that with notice or the lapse of time would constitute a violation, breach of, or a default under) any term, condition, or provision of (a) its articles of incorporation or bylaws or other organizational documents, (b) any note, bond, mortgage, deed of trust, security interest, indenture, loan or credit agreement, license, permit, contract, lease, agreement, plan, or other instrument, commitment or obligation to which such Acquired Subsidiary is a party or by which such Acquired Subsidiary's properties or assets may be bound or affected, or (c) any order, writ, governmental authorization, injunction, decree, statute, rule, or regulation applicable to such Acquired Subsidiary or to such Acquired Subsidiary's properties or assets, except, in the case of clause (b) above, as would not, individually or in the aggregate, result in a Material Adverse Effect.

Section 4.14. <u>No Violation of Law</u>.

(a)    Except as set forth in Section 4.14 of the Disclosure Schedule, the Polaroid Entities possess and are in compliance with all Permits (other than Environmental Permits which are governed by Section 4.15) required in connection with the conduct of the Business under all applicable laws, rules, regulations and ordinances, the failure of which to obtain or hold would be reasonably expected to have a Material Adverse Effect. Except as set forth in Section 4.14 of the Disclosure Schedule, since December 31, 1999, the Polaroid Entities have conducted the Business and are currently doing so in compliance with all Applicable Law relating to the Business, except for such violations which would not be reasonably expected to have a Material Adverse Effect. Except as set forth in Section 4.14 of the Disclosure Schedule, no Permit (other than Environmental Permits which are governed by Section 4.15) not presently possessed by the Polaroid Entities is required under applicable law to conduct the Business, except as would not, individually or in the aggregate, result in a Material Adverse Effect. Except as set forth in Section 4.14 of the Disclosure Schedule, the Permits (other than Environmental Permits which are governed by Section 4.15) of the Polaroid Entities relating to the operation of the Business are in full force and effect and there are no proceedings pending or, to Sellers' Knowledge, threatened that seek the revocation, cancellation, suspension or any adverse modification of any such Permits, except as would not, individually or in the aggregate, result in a Material Adverse Effect.

(b)    Except to the extent excused by or unenforceable as a result of the commencement or pendency of the Case or the application of any provision of the Bankruptcy Code, no Polaroid Entity is in violation of, or has been given notice or been charged with any violation of, Applicable Law relating to the Business, except for such violations, notices, or changes that would not, individually or in the aggregate, result in a Material Adverse Effect.

Section 4.15.  Environmental Matters.   Except as specifically disclosed in Section 4.15 of the Disclosure Schedule (which disclosed items would not, individually or in the aggregate, result in a Material Adverse Effect):

(a)    each Polaroid Entity is, and has been for the applicable statute of limitations period, in compliance in all material respects with all applicable Environmental Laws (which, for purposes of this subsection, does not include the Occupational Safety and Health Act);

(b)    no Polaroid Entity is subject to any pending or, to the Sellers' Knowledge, threatened claim, action, suit, investigation, inquiry, or proceeding under any Environmental Law with respect to the Release or threat of Release of any Hazardous Materials, or with respect to any Environmental Liability;

(c)    there has been no Release, or, to the Sellers' Knowledge, threat of Release, of Hazardous Materials by any Polaroid Entity or any of their predecessors, or otherwise arising in connection with the Business (as currently or formerly operated) or at any of the properties currently used, owned, operated or leased by the Business that requires or may reasonably be expected in the future to require investigation, remediation, or other responses or actions ("Remediation") under Environmental Laws;

(d)    the Polaroid Entities hold and have been for the applicable statute of limitations period, and are in compliance in all material respects with, all permits, certificates, licenses, approvals, registrations and authorizations required under Environmental Laws ("Environmental Permits"), all such Environmental Permits are in full force and effect and, to the extent required so that the Business can continue operations immediately after Closing in all material respects in the same manner as conducted immediately before the Closing, all Environmental Permits are transferable or assignable to the Purchaser or can be reissued to the Purchaser under Environmental Laws without material interruption to the Business.

(e)    the Sellers have not received any written or, to the Sellers' Knowledge, any other request for information, notice of claims, demand or other notification that they (or any of their predecessors) are or may be potentially responsible with respect to any Remediation of Hazardous Materials (whether on-site or off-site).  No Hazardous Materials Managed or Released by or on behalf of Sellers have come to be located at any site listed on the National Priorities List promulgated pursuant to CERCLA, CERCLIS, any similar list maintained by any Governmental Authority, or which requires Remediation under applicable Environmental Laws;

(f)    there are no underground storage tanks (either active or abandoned), asbestos or asbestos-containing materials, or PCB-containing equipment at any property owned, leased or operated by Sellers which requires closure, removal, abatement, or retrofilling under Environmental Laws;

(g)    all non-privileged environmental investigations, inspections, studies, audits, tests, reviews or other analysis conducted in relation to Sellers, any real property currently or formerly owned, operated or leased by Sellers (or their predecessors) or the Business

(as currently or formerly operated) (collectively, "Environmental Audits") in the possession or control of Sellers have been made available to Purchaser, and none of the privileged Environmental Audits which have not been made available to the Purchaser contains material information not otherwise disclosed to the Purchaser in writing; and

(h)     the Sellers have not retained or assumed by contract any liability or responsibility for any Environmental Liabilities, environmental claims or environmental conditions.

Section 4.16.    Employee Benefits.

(a)     Section 4.16(a) of the Disclosure Schedule contains a true, correct and complete list of Pension Plans and Welfare Plans (including, but not limited to, medical, dental, life insurance and severance plans) or other material employee fringe benefit plans presently maintained by, or contributed to by, Sellers for the benefit of any current Employees of Sellers who are or were engaged in the Business. True and complete copies of each of said plans have been or will be furnished or made available to Purchaser.

(b)     There are no Multiemployer Plans applicable to any Hired Employees.

(c)     Except as may be disclosed on Section 4.16 of the Disclosure Schedule, or as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect:

(i)     no asset of any Seller or any ERISA Affiliate, which is to be acquired by Purchaser pursuant to this Agreement, is subject to any lien under Code section 401(a)(29), ERISA Section 302(f) or Code section 412(n), ERISA Section 4068 or arising out of any action filed under ERISA Section 4301(b).

(ii)     Neither the Sellers nor any ERISA Affiliate has incurred any liability which would reasonably be expected to subject Purchaser or any asset to be acquired by Purchaser pursuant to this Agreement to material liability under Section 4062, 4063, 4064 or 4069 of ERISA.

(iii)     Neither the Sellers nor any ERISA Affiliate, has incurred any withdrawal liability, within the meaning of Section 4201 of ERISA, including a contingent withdrawal liability as a result of a transaction described in Section 4204 of ERISA with respect to any multiemployer pension plan, as defined in Section 4001 of ERISA, that could reasonably be expected to subject Purchaser or any asset to be acquired by Purchaser pursuant to this Agreement to material liability, which liability has not been fully paid as of the date hereof.

(d)     (i)     Schedule 4.16(d) of the Disclosure Schedule contains a true and complete list of each pension plan and each plan comparable to a Welfare Plan, including, but not limited to, each medical, dental, life insurance and severance plan maintained by Sellers or any Acquired Subsidiary, for any current Employee in the United Kingdom, The Netherlands, Japan, Hong Kong, Mexico, Germany and Italy. True copies of each such plan, or an accurate

description of any such plan that is not written, has been furnished or made available to Purchaser prior to the Closing Date.

(ii)    For purposes of Sections 4.16(e) and (f), the terms "Foreign Plan" or "Foreign Plans" includes any pension plan, plan comparable to a Welfare Plan, including, but not limited to, medical, dental, life insurance and severance plans, as well as any bonus, deferred compensation or other material fringe benefit plan maintained or required to be maintained by the law of the relevant jurisdiction by any Seller or any Acquired Subsidiary for the benefit of any employee or former employee of any Acquired Subsidiary.

(e)    Sellers and the Acquired Subsidiaries and each of the Foreign Plans are in compliance in all material respects with the provisions of the laws of each jurisdiction in which any of the Foreign Plans are maintained, to the extent such laws are applicable to the Foreign Plans.

(f)    Except as may be set forth in Schedule 4.16 of the Disclosure Schedule, or as could not reasonably be expected, individually or in the aggregate to have a Material Adverse Effect:

(i)    all contributions to, and payments from, the Foreign Plans, or to or from a trust, insurance contract or other funding medium maintained in connection with any such Foreign Plan, which may have been required to be made in accordance with the terms of any such plan or the law of the jurisdiction in which such plan is maintained, have been timely made.  All contributions to the Foreign Plans, and all payments under the Foreign Plans, for any period ending before the Closing Date that are not yet, but will be, required to be made are properly accrued and reflected on the financial statements of the employer maintaining such plan.

(ii)    All material reports, returns and similar documents with respect to any Foreign Plan required to be filed with any government agency or distributed to any Foreign Plan participant have been duly and timely filed or distributed.

(iii)    Each of the Foreign Plans has obtained from the government or governments having jurisdiction with respect to such plan any required determinations that such plans are in compliance with the laws and regulations of any government.

(iv)    Each of the Foreign Plans has been administered at all times, in all material respects, in accordance with its terms.  There are no pending investigations by any governmental agency involving the Foreign Plans, no claims pending or threatened in writing (except for claims for benefits payable in the normal operation of the Foreign Plans), suits or proceedings against any Foreign Plan or asserting any rights or claims to benefits under any Foreign Plan which could give rise to any liability, nor are there any facts that could give rise to any material liability in the event of such investigation, claim, suit or proceeding.

(v)    The assets of each of the Foreign Plans (which is comparable to an employee pension benefit plan as defined in Section 3(2) of ERISA or

otherwise provides retirement, medical or life insurance benefits following retirement) are at least equal to the liabilities of such plans. Purchaser will incur no material liability with respect to any Foreign Plan with respect to service thereunder performed before the Closing Date, other than liability for contributions attributable to periods following the Closing Date.

(vi) No Foreign Plan entitles any Employee or former Employee covered under any such Plan to purchase or otherwise acquire any equity interest in any Seller or any Affiliate of the Seller maintaining such Foreign Plan.

Section 4.17. Real Property.

(a) Section 4.17 of the Disclosure Schedule sets forth a list of all of the real estate owned by the Polaroid Entities and used in the Business (such real estate, together with all beneficial, appurtenant easements and other appurtenances thereto and with all Improvements, is collectively referred to herein as the "Owned Real Estate"), and includes the street address and the related deeds or the legal description of each parcel of the Owned Real Estate. Sellers have made available to Purchaser true, correct and complete copies of all (A) title reports, title insurance policies and commitments therefor, (B) surveys, and (C) licenses, certificates of occupancy, plans, specifications and permits pertaining to the Owned Real Estate that are in the possession or control of Sellers. Sellers represent and warrant with respect to the Owned Real Estate:

(i) Except as set forth in Section 4.17 of the Disclosure Schedule, the Polaroid Entities have good, valid, marketable and indefeasible fee simple title to, and are in actual, exclusive possession of, the Owned Real Estate. The Owned Real Estate is free and clear of all Encumbrances other than Permitted Encumbrances.

(ii) No portion of any of the Owned Real Estate is subject to a special ad valorem tax valuation or rate that will be lost as a result of the transfer to Purchaser pursuant to the provisions hereof.

(iii) Sellers have not received notice from any Governmental Authority or insurance carrier of any matter that would have a Material Adverse Effect upon the Owned Real Estate.

(iv) The Owned Real Estate and the use thereof by the Polaroid Entities in connection with the Business as currently used and consistent with past practice complies in all material respects with all covenants, easements and restrictions of record affecting the Owned Real Estate.

(b) Section 4.17 of the Disclosure Schedule sets forth a list of all of the leases or rights of occupancy pursuant to which the Polaroid Entities lease or sublease any real property or interest therein related to or used by the Polaroid Entities in the Business (collectively, as heretofore modified, amended or extended, the "Leases"), including the identification of each of the lessors thereof and the street addresses of all of the real estate demised under each of the Leases (collectively, the "Leased Real Estate"). To the extent within Sellers' possession and control, Sellers have made available to Purchaser true, correct and

complete copies of all (A) leasehold title reports, leasehold title insurance policies and commitments therefor, (B) surveys, (C) licenses, certificates of occupancy, plans, specifications and permits and other documents pertaining to the Leased Real Estate that are in the possession or control of Sellers and (D) each of the Leases, including all amendments, modifications and extensions, and together with all subordination, non-disturbance and/or attornment agreements related thereto. Sellers represent and warrant with respect to the Leased Real Estate:

> (i)    Except as set forth in Section 4.17 of the Disclosure Schedule, one or more of the Polaroid Entities is the lessee under all Leases and has actual exclusive possession of the Leased Real Estate. No party other than one or more of the Polaroid Entities has any right to possession, occupancy or use of any of the Leased Real Estate.

> (ii)    Each of the Leases is valid and in full force and effect and is binding and enforceable in accordance with its terms. Except as set forth in Section 4.17 of the Disclosure Schedule, none, of the Sellers has received any written notice of default under any provision of any of the Leases.

> (iii)    Except as set forth in Section 4.17 of the Disclosure Schedule, none of the Polaroid Entities and, to Sellers' Knowledge, none of the lessors under any of the Leases is in material breach or default under any of the Leases and no event has occurred that with notice, the passage of time or both would constitute such a material breach or default or permit termination, modification or acceleration thereunder.

> (iv)    The Polaroid Entities have good, valid and indefeasible title to all the leasehold estates conveyed under the Leases free and clear of all Encumbrances, except Permitted Encumbrances.

> (v)    Except as set forth in Section 4.17 of the Disclosure Schedule, there have been no casualties or condemnations which could result in the termination of any of the Leases.

> (vi)    Except as set forth in Section 4.17 of the Disclosure Schedule: (i) no consent of any of the lessors under any of the Leases is required by reason of any of the transactions contemplated by this Agreement, and (ii) none of the rights of the Polaroid Entities under any of the Leases will be impaired by the consummation of the transactions contemplated by this Agreement.

> (c)    Sellers represent and warrant with respect to both the Owned Real Estate and the Leased Real Estate (collectively, the "Real Estate") that (i) there is no violation of any Applicable Laws that would have a Material Adverse Effect, (ii) all the Real Estate is adequately serviced in all material respects by appropriate utilities to carry on the Business at the Real Estate, (iii) there is adequate pedestrian and vehicular access in all material respects to all the Real Estate, and (iv) other than the Real Estate, no other real estate or rights, titles, estates or interest therein is necessary to the conduct of the Business in the United States as currently conducted and consistent with past practice.

Section 4.18.  <u>Title to and Use of Property</u>.

(a)     Sellers have good, valid and marketable (or with respect to personal property, merchantable) title to, or valid and subsisting leasehold interests in, all of the Acquired Assets; none of the Acquired Assets is owned jointly with, or leased to, any other Person, including Affiliates of Sellers; and except as disclosed in Section 4.18 of the Disclosure Schedule, none of the Acquired Assets is subject to any Encumbrance, all of which scheduled Encumbrances, other than the Permitted Encumbrances (and except as specifically noted in Section 4.18 of the Disclosure Schedule) shall be removed on or prior to the Closing.

(b)     Except as disclosed in Section 4.18 of the Disclosure Schedule, the buildings, machinery, equipment, tools, office furniture and fixtures, improvements and other tangible assets of the Business included in the Acquired Assets are in good operating condition and repair, subject to reasonable wear and tear.

Section 4.19.  <u>Brokers</u>.  Except for Dresdner Kleinwort Wasserstein, Inc., the fees related to which shall be borne by Sellers, no person is entitled to any brokerage, financial advisory, finder's, or similar fee or commission payable by any Polaroid Entity or any of their Affiliates in connection with the Contemplated Transactions based upon arrangements made by or on behalf of any Polaroid Entity or any of their Affiliates.

Section 4.20.  <u>Intellectual Property</u>.

(a)     The Polaroid Entities, collectively, own, or are licensed or, to Sellers' Knowledge, otherwise possess legally enforceable rights to use the Intellectual Property used in or held for use in the Business (the "Polaroid Intellectual Property").  The Polaroid Intellectual Property includes all rights reasonably necessary for operation of the Business.

(b)     Except for such omissions as would be individually or collectively immaterial to the Business, Section 4.20 of the Disclosure Schedule sets forth a complete and accurate list of all Patents, registered Marks, registered Copyrights, and Domain Names included in the Polaroid Intellectual Property, specifying as to each such item, as applicable: (A) the owner of the item, (B) the jurisdictions in which the item is issued or registered or in which any application for issuance or registration has been filed, (C) the respective issuance, registration, or application number of the item, and (D) the date of application and issuance or registration of the item.

(c)     Except for such omissions as would be individually or collectively immaterial to the Business, Section 4.20 of the Disclosure Schedule also contains a complete and accurate list of all material licenses, sublicenses, consents and other agreements (whether written or otherwise) by which the Polaroid Entities license or otherwise authorize a Third Party, or are licensed or otherwise authorized by a Third Party, to use any Intellectual Property. Other than with respect to monetary defaults by the Sellers under Contracts that are curable by payment of all cure amounts payable to effectuate, pursuant to the Bankruptcy Code, the assumption by and assignment to the Purchaser of such Contracts under the Approval Order, if applicable, none of the Polaroid Entities or, to Sellers' Knowledge, any other party is in breach of or default under in any material respect any material license or other agreement and each such license or other

agreement is now and immediately following the Closing shall be valid and in full force and effect.

(d)    Except as would not have a Material Adverse Effect:

(i)    no Polaroid Entity will, as a result of the execution and delivery of this Agreement or the consummation of the Contemplated Transactions be in breach of or suffer any loss of rights under any material license, sublicense or other agreement relating to the Polaroid Intellectual Property;

(ii)    (A) each Patent, registered Mark, and registered Copyright owned by a Polaroid Entity which is used in the Business is subsisting and, to the Sellers' Knowledge, valid and enforceable; (B) no Polaroid Entity, as of the date hereof, is a party to any currently pending litigation which involves a claim of infringement of any Patent, Mark, or Copyright or violation of any Trade Secret or other proprietary right of any Third Party, or has received written notice of any such threatened claim; and (C) to the Sellers' Knowledge, the manufacturing, marketing, licensing, or sale of any products of the Business, in the manner currently manufactured, marketed, sold, or licensed by the Polaroid Entities, does not and will not as of the Closing infringe or misappropriate any Patent, Mark, Copyright, Trade Secret or other proprietary right of any Third Party;

(iii)    at the Closing, Sellers will transfer and assign to the Purchaser all of the Sellers' right, title and interest in and to the Polaroid Entities' rights in the Polaroid Intellectual Property free and clear of any Encumbrances;

(iv)    all Domain Names are currently registered in the name of a Polaroid Entity with an appropriate registration authority; no such Domain Name is currently involved in any opposition, invalidation or cancellation proceeding and, to the Sellers' Knowledge, no such action is threatened with respect to any Domain Name;

(v)    to Sellers' Knowledge, none of the Trade Secrets of the Polaroid Entities has been disclosed to any person unless such disclosure was necessary, and was made pursuant to an enforceable confidentiality agreement; and

(vi)    the information technology systems owned, licensed, leased, operated on behalf of, or otherwise used or held for use by the Polaroid Entities, including computer hardware, software, firmware and telecommunications systems, perform reliably and in material conformance with the appropriate specifications or documentation for such systems.  Except for scheduled or routine maintenance, such information technology systems are reliably available for use by the Polaroid Entities and, as applicable, by their customers and clients, 24 hours per day, 7 days per week. The Polaroid Entities have taken commercially reasonable steps to provide for the archival, back-up, recovery and restoration of critical business data, including the provision of hot fail-over server capacity in the event of a systems failure or disaster.  To Sellers' Knowledge, the computer software owned by the Polaroid Entities, and all of the licensed software used in their respective businesses, perform in material conformance

- 36 -

with the applicable documentation for such software, and do not contain any viruses, trapdoors, worms, or other disabling or malicious code.

Section 4.21. <u>Labor Matters</u>.   Except as disclosed in Section 4.21 of the Disclosure Schedule, no Polaroid Entity has entered into any severance or similar arrangement in respect of any present Employee of any Polaroid Entity that will result in any obligation of the Purchaser or any Acquired Subsidiary to make any payment to any present Employee of any Polaroid Entity following termination of employment or upon a change of control of any Polaroid Entity or upon consummation of the transactions contemplated under this Agreement. Since December 31, 2000, no Polaroid Entity has engaged in any unfair labor practice and, to Sellers' Knowledge, there are no complaints against any Polaroid Entity pending before the National Labor Relations Board or any similar state, local or foreign labor agency by or on behalf of any Employee of any Polaroid Entity.   Except as set forth in Section 4.21 of the Disclosure Schedule, no Seller is a party to, or a participant in any negotiation of, any collective bargaining agreement or other labor agreement with respect to its Employees with any labor organization, union, group or association, and there are no employee unions (nor any other similar labor or employee organizations) under any Laws.   There are no labor strikes, slow downs or stoppages pending or, to the Sellers' Knowledge, threatened with respect to the Employees of any Polaroid Entity, and since December 31, 2000, no Polaroid Entity has experienced any attempt by organized labor to cause any Polaroid Entity to comply with or conform to demands of organized labor relating to its Employees or to enter into a binding agreement with organized labor that would cover any or all of its Employees.   Except as would not have a Material Adverse Effect, (a) each Polaroid Entity has complied with all Laws relating to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, occupational safety and health and plant closings (hereinafter collectively referred to as the "Employment Laws") and (b) no Polaroid Entity is liable for the payment of fines, penalties or other amounts, however designated, for failure to comply with any of the forgoing Employment Laws.   Section 4.21 of the Disclosure Schedule sets forth the number of employees employed by any of the Sellers (along with such employee's "location/site of employment" within the meaning of the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. Section 2101, et seq.) who have experienced an "employment loss" (as defined by the WARN Act) while employed by any of the Sellers during the ninety (90)-day period immediately preceding the date hereof.   Not more than five (5) days prior to the Closing Date, Sellers shall deliver to the Purchaser a list of all employees employed by any of the Sellers (along with such employees' "location/site of employment" within the meaning of the WARN Act) who have experienced an "employment loss" (as defined by the WARN Act) from the date hereof until such date of delivery.

Section 4.22. <u>Tax Matters</u>.  Except as provided in Section 4.22 of the Disclosure Schedule:  (a) All Tax Returns which were required to be filed by or with respect to any of the Sellers or the Foreign Subsidiaries have been duly and timely filed and each such Tax Return was true, correct and complete in all material respects when filed; (b) all Taxes owed by any of the Sellers or the Foreign Subsidiaries have been timely paid; (c) all Tax withholding and deposit requirements imposed on or with respect to any of the Sellers or the Foreign Subsidiaries have been satisfied in all material respects; (d) to the Sellers' Knowledge, there are no material mortgages, pledges, liens, encumbrances, charges or other security interests on any of the assets

of any of the Foreign Subsidiaries or on any of the Acquired Assets that arose in connection with any failure (or alleged failure) to pay any Tax; (e) there is no written claim against any of the Sellers or the Foreign Subsidiaries for any Taxes, and no assessment, deficiency or adjustment has been asserted or proposed in writing or, to the Sellers' Knowledge, may be proposed with respect to any Tax Return of or with respect to any of the Sellers or the Foreign Subsidiaries; (f) no payments are due or will become due by any of the Foreign Subsidiaries pursuant to any tax sharing agreement or arrangement or any tax indemnification agreement; (g) none of the Acquired Assets to be sold by a Seller that is not a United States person (within the meaning of section 7701(a)(30) of the Code) is a United States real property interest (within the meaning of section 897(c) of the Code); (h) none of the Acquired Subsidiaries is engaged in a United States trade or business (within the meaning of section 864 of the Code) or owns any assets within the United States; (i) no Foreign Subsidiary has had the amount of Subpart F income reduced for any taxable year under section 952(c)(1)(A) of the Code, except to the extent that such reduction subsequently was taken into account by such Foreign Subsidiary under section 952(c)(2) of the Code; (j) liability for Taxes reflected on the books of the Foreign Subsidiaries are at least equal to the accrued but unpaid Taxes of the Foreign Subsidiaries and on the Closing Date will at least equal the accrued but unpaid Taxes of such Foreign Subsidiaries through the Closing Date; (k) none of the Acquired Assets or Foreign Subsidiaries is treated as an interest in a partnership for Tax purposes; (l) no election has been made under section 7701 of the Code with respect to any of the Foreign Subsidiaries; (m) no Foreign Subsidiary has had its income adjusted by any taxing authority, or agreed to any adjustment, pursuant to section 482 of the Code, or any comparable provision of state, local, or foreign law, which adjustment has continuing effect; and (n) no Taxing authority with respect to which the Sellers or the Foreign Subsidiaries do not file Tax Returns has claimed that the Sellers or the Foreign Subsidiaries are or may be subject to Taxes by that Taxing authority.

Section 4.23.  Products Liability.  Except as disclosed on Section 4.23 of the Disclosure Schedule, there are no:

(a)    material liabilities of the Polaroid Entities, fixed or contingent, asserted or, to the Sellers' Knowledge, unasserted, with respect to any product liability or any similar claim that relates to any product manufactured by the Business on or prior to the Closing Date; or

(b)    material liabilities of the Polaroid Entities, fixed or contingent, asserted or, to the Sellers' Knowledge, unasserted, with respect to any claim for the breach of any express or implied product warranty or any other similar claim with respect to any product manufactured by the Business on or prior to the Closing Date, other than standard warranty obligations (to replace, repair or refund) in the Ordinary Course of Business.

Section 4.24.  Debt Repayment.  As of April 11, 2002, the Sellers and/or the Foreign Subsidiaries have paid in full all of the amounts outstanding under that certain Euros 72,500,000 Multi-Currency Revolving Loan Facility, dated August 3, 1999, among Polaroid (U.K.) Limited, as borrower, Polaroid, as guarantor, the lenders from time to time party thereto, and the agents named therein, as amended (the "UK Loan Agreement").  The total amount paid under the UK Loan Agreement, including interest, professional fees and expenses related thereto,

was $44,408,046.  The Sellers and the Foreign Subsidiaries have no further liabilities or obligations under the UK Loan Agreement.

Section 4.25.  Investment.  Each Seller (a) understands that the shares of the Sellers' Stock have not been, and, except as set forth in the Registration Rights Agreement, will not be, registered under the Securities Act of 1933, as amended (the "Securities Act"), or under any state securities laws, and are being offered and sold in reliance upon federal and state exemptions for transactions not involving any public offering, (b) is acquiring the shares of the Sellers' Stock solely for its own account for investment purposes, and not with a view to the distribution thereof, (c) is a sophisticated investor with knowledge and experience in business and financial matters, (d) has received certain information concerning the Purchaser and has had the opportunity to obtain additional information as desired in order to evaluate the merits and the risks inherent in holding the shares of the Sellers' Stock, (e) is able to bear the economic risk and lack of liquidity inherent in holding the shares of the Sellers' Stock, and (f) is an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act, and has such knowledge and experience in financial and business matters that make it capable of evaluating the merits and risks of its purchase of the shares of the Sellers' Stock.

Section 4.26.  Representations and Warranties.  The Sellers represent and warrant that all of the representations and warranties of the Sellers contained in this Agreement are true and correct in all respects as of July 3, 2002 and agree that for purposes of this Section 4.26 only, all references in the representations and warranties of the Sellers contained in this Agreement to "date hereof" and "date of this Agreement" each means, and "current" and "currently" each relates to, July 3, 2002.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Sellers as follows:

Section 5.01.  Organization.  The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

Section 5.02.  Authority Relative to This Agreement.  The Purchaser has the corporate power and authority to enter into and deliver this Agreement and to carry out its obligations hereunder.  The execution, delivery, and performance of this Agreement by the Purchaser and the consummation by the Purchaser of the Contemplated Transactions have been duly authorized by all requisite corporate actions.  This Agreement has been duly and validly executed and delivered by the Purchaser and (assuming this Agreement constitutes a legal, valid and binding obligation of the Sellers) constitutes a legal, valid and binding agreement of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium, and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

Section 5.03.  No Violations.  Neither the execution, delivery, or performance of this Agreement by the Purchaser, nor the consummation by the Purchaser of the Contemplated

Transactions, nor compliance by the Purchaser with any of the provisions hereof, will (a) except for the Governmental Requirements, require the Purchaser to obtain any consent, approval or action of, or make any filing with or give notice to, any domestic or foreign governmental or regulatory body or any other Person, (b) conflict with or result in any breach of any provisions of the certificate of incorporation or bylaws of the Purchaser, (c) result in a violation or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, acceleration, vesting, payment, exercise, suspension, or revocation) under any of the terms, conditions, or provisions of any note, bond, mortgage, deed of trust, security interest, indenture, license, contract, agreement, plan, or other instrument or obligation to which the Purchaser is a party or by which the Purchaser or the Purchaser's properties or assets may be bound or affected, (d) violate any order, writ, injunction, decree, statute, rule, or regulation applicable to the Purchaser or the Purchaser's properties or assets, or (e) result in the creation or imposition of any Encumbrance on any asset of the Purchaser.

Section 5.04.  <u>Consents and Approvals</u>.  Except for Governmental Requirements, no consent, approval, or authorization of, or declaration, filing, or registration with, any domestic or foreign government or regulatory authority is required to be made or obtained by the Purchaser in connection with the execution, delivery, and performance of this Agreement and the consummation of the Contemplated Transactions.

Section 5.05.  <u>Litigation</u>.  Except for the pendency of the Case, there is no suit, action, proceeding, or investigation (whether at law or equity, before or by any federal, state, or foreign commission, court, tribunal, board, agency, or instrumentality, or before any arbitrator) pending or, to the knowledge of the Purchaser, threatened against or affecting the Purchaser which could reasonably be expected to result in the issuance of a judgment, decree, injunction, rule, or order of any court, governmental department, commission, agency, instrumentality, or arbitrator outstanding restraining, enjoining or otherwise prohibiting the Purchaser from consummating the transactions contemplated by this Agreement.

Section 5.06.  <u>Financing</u>.  The Purchaser has delivered to Polaroid a true and correct copy of a commitment letter (the "<u>Equity Commitment Letter</u>") from One Equity Partners LLC ("<u>OEP</u>") for equity financing in connection with the transactions contemplated hereunder.  The Commitment Letter has been duly executed and delivered by OEP and is in full force and effect.  As of the Closing, when the Purchaser receives the financing contemplated by the Equity Commitment Letter and by Section 9.01(d)(v), the Purchaser shall have sufficient funds to pay the Cash Consideration and to consummate the transactions contemplated under this Agreement.

Section 5.07.  <u>Brokers</u>.  Except for One Equity Partners LLC, the fees related to which shall be borne by the Purchaser, no person is entitled to any brokerage, financial advisory, finder's, or similar fee or commission payable by the Purchaser or any of its Affiliates in connection with the Contemplated Transactions based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

**ARTICLE VI**

**COVENANTS**

Section 6.01. <u>Conduct of Business by the Polaroid Entities Pending the Closing</u>. Polaroid covenants and agrees that after the date hereof and prior to the Closing Date, except (i) as contemplated by this Agreement, (ii) as disclosed in the Disclosure Schedule, or (iii) as required by, arising out of, relating to or resulting from the Petitions or otherwise approved by the Bankruptcy Court with the Purchaser's Consent:

(a)    it shall, and shall cause each of the Polaroid Entities to, use its commercially reasonable efforts to operate in the Ordinary Course of Business, and conduct, carry on and maintain and preserve the Business intact; use commercially reasonable efforts to maintain and preserve its relationships with and the goodwill of suppliers, customers and others having business relations with the Business; maintain the Acquired Assets, as well as books of account, records and files related to the conduct of the Business and the Employees, all in the Ordinary Course of Business; and use its commercially reasonable efforts to keep available to Purchaser the Employees;

(b)    it shall promptly inform Purchaser in writing of any specific event or circumstance of which it is aware, or of which it receives notice, that has or is reasonably likely to have a Material Adverse Effect, on the Acquired Assets or the current or future earnings of the Business or which constitute a breach of any representations or warranties set forth in Article IV hereof;

(c)    no Acquired Subsidiary or Subsidiary thereof shall adopt or propose any change in its certificate of incorporation or bylaws (or similar organizational documents);

(d)    no Acquired Subsidiary or Subsidiary thereof shall declare, set aside, or pay any dividend or other distribution with respect to any of its Equity Interests other than in Cash and Cash Equivalents, or split, combine, or reclassify any of its Equity Interests, or repurchase, redeem, or otherwise acquire any shares of its Equity Interests;

(e)    no Acquired Subsidiary or Subsidiary thereof shall merge or consolidate with any other Person;

(f)    no Polaroid Entity shall lease, license, or otherwise surrender, relinquish, encumber, or dispose of any material assets other than in the Ordinary Course of Business;

(g)    no Acquired Subsidiary or Subsidiary thereof shall change any material method of accounting or material accounting practice used by it, except for any change required by GAAP or Applicable Law;

(h)    other than in the Ordinary Course of Business, no Polaroid Entity shall establish, modify to increase cost or increase the compensation or benefits under, or promise to establish, modify to increase cost or increase the compensation or benefits under any

Welfare Plans or Pension Plans or Foreign Plans, or otherwise increase the compensation payable to any directors, officers, or Employees of any Polaroid Entity, and no Polaroid Entity will establish, adopt or enter into any collective bargaining or similar agreement;

        (i)    Sellers shall not, without the prior written consent of Purchaser, take or omit to take any action which if taken or omitted prior to the date hereof would constitute a breach of any representations or warranties set forth in this Agreement, or which would result in any of the occurrences or events set forth in Section 4.11 hereof; and

        (j)    no entity so bound shall agree or commit to do any of the foregoing.

        Section 6.02.  <u>Access and Information</u>.  Each of the Polaroid Entities shall afford to the Purchaser and to the Purchaser's Representatives and financing sources reasonable access without material disruption to the Business throughout the period prior to the Closing Date to all its books, documents, records, properties and facilities that relate to the Business and, during such period, shall furnish as promptly as practicable to the Purchaser (a) a copy of each report, schedule, and other document filed or received by them pursuant to the requirements of federal or state securities laws and (b) all other information as the Purchaser reasonably may request in furtherance of the Contemplated Transactions. Each of the Polaroid Entities shall permit the Purchaser and the Purchaser's Representatives and financing sources to discuss the affairs, finances and business of the Sellers and the Foreign Subsidiaries with the officers and employees of Sellers or any Affiliate of Sellers listed in Section 6.02 of the Disclosure Schedule and, with the prior consent of the General Counsel or the Deputy General Counsel of Polaroid, any other officers, employees or directors of Sellers or any Affiliate of Sellers, and to discuss the financial condition of Sellers and the Foreign Subsidiaries with Sellers' Auditors. No investigation or receipt of information by Purchaser pursuant to, or in connection with, this Agreement, shall diminish or obviate any of the representations, warranties, covenants or agreements of Sellers under this Agreement or the conditions to the obligations of Purchaser under this Agreement. Any and all information obtained by the Purchaser or the Purchaser's Representatives and financing sources pursuant to this Section 6.02 shall be subject to and maintained in compliance with the Confidentiality Agreement.

        Section 6.03.  <u>Filings; Other Actions</u>.  Subject to the terms and conditions herein provided, as promptly as practicable, the Sellers and the Purchaser shall (a) promptly make all filings and submissions under the HSR Act, (b) use all reasonable efforts to cooperate with each other in (i) determining which filings are required to be made prior to the Closing Date with, and which material consents, approvals, permits, or authorizations are required to be obtained prior to the Closing Date from, governmental or regulatory authorities of the United States and foreign jurisdictions in connection with the execution and delivery of this Agreement and the consummation of the Contemplated Transactions; provided, however, that the Purchaser and the Sellers agree that neither of them will make any voluntary filing under applicable foreign antitrust laws or regulations unless advised by legal counsel in such jurisdiction that the failure to make a filing could result in a Material Adverse Effect or otherwise be in violation of Applicable Law, and (ii) timely making all such filings and timely seeking all such material consents, approvals, permits, or authorizations, and (c) use all reasonable efforts to take, or cause to be taken, all other action and do, or cause to be done, all other things reasonably necessary or

appropriate to consummate the Contemplated Transactions, as soon as practicable. In connection with the foregoing, the Sellers will promptly provide the Purchaser, and the Purchaser will promptly provide the Sellers, with copies of all correspondence, filings, or communications (or memoranda setting forth the substance thereof) between such party or any of its representatives, on the one hand, and any governmental agency or authority or members of their respective staffs, on the other hand, with respect to all filings and submissions required hereunder.

        Section 6.04.  <u>Public Announcements</u>.  The Purchaser and the Sellers agree that they will not make any public announcement, issue any press release or respond in writing to any press inquiry with respect to this Agreement or the Contemplated Transactions without the prior approval of the Purchaser and Polaroid (which approval will not be unreasonably withheld), except as may be required by Applicable Law, the Bankruptcy Court or any requirement of any stock exchange or inter-dealer quotation system on which the stock of either party is listed or quoted.  Following the execution of this Agreement, the Purchaser and Polaroid shall issue a joint press release or separate press releases announcing the Contemplated Transactions, which press release or releases shall be approved by the Purchaser and Polaroid prior to release.  From and after the Closing, Sellers will keep confidential and cause their Affiliates to keep confidential all information relating to the Business and the Acquired Assets, except as specifically and only to the extent required by applicable law or administrative or legal process; it being understood that:  (a) Sellers will notify Purchaser in writing at least five days (to the extent possible) prior to any proposed disclosure of such nonpublic information in order to enable Purchaser to seek an appropriate protective order; and (b) Sellers shall not be required to keep confidential and may disclose any information which (i) is or becomes publicly available other than as a result of a disclosure by Sellers in breach of this Agreement, (ii) was known to the party receiving such information prior to the receipt thereof other than as a result of a disclosure by Sellers in breach of this Agreement, or (iii) was previously independently developed by the party receiving such information without the assistance of Sellers.

        Section 6.05.  <u>Acquired Assets</u>.  Amounts received by Sellers on or after the Closing Date in respect of any Acquired Assets shall be paid over to Purchaser promptly upon receipt by Sellers.  Any such amounts received by Seller by wire transfer shall be paid over to Purchaser promptly by wire transfer of immediately available funds to the account of the Purchaser designated on Exhibit T or to any other account designated by the Purchaser in writing and delivered to Polaroid in accordance with Section 10.02.  Sellers shall promptly send Purchaser copies of all remittance advices and checks related to payments received by Sellers with respect to such items.  Purchaser shall notify the Business' customers of the change in address of the owner of the Acquired Assets as may be required in order for such customers to properly remit any payments required under any applicable Acquired Asset and Sellers shall cooperate with Purchaser as is reasonably necessary to so notify such customers.

        Section 6.06.  <u>Bankruptcy Actions</u>.

        (a)    Within three days after the execution of this Agreement, Polaroid shall, and shall cause the other Sellers to, file a motion or motions (and related notices and proposed orders) with the Bankruptcy Court seeking approval of the Sale Procedures Order and the Approval Order.

(b)    If the Approval Order, or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), the Sellers agree to use commercially reasonable efforts to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts.

(c)    The Sellers shall give to the Purchaser written notice and a copy of all motions, applications and pleadings filed in the Case with the Bankruptcy Court from and after the date hereof, at the time of such filing, and in any event, so that such notice is actually received by the Purchaser no later than three (3) Business Days in advance of any hearing or presentment date with respect to such motion, application or other pleading.

Section 6.07.   Tax Matters.

(a)    The parties agree, upon request, to use their reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any transfer, documentary, sales, use, excise, ad valorem, registration, recordation, value-added, withholding, income and other similar Taxes, whether such Taxes would be imposed by law upon the Purchaser or the Sellers (such Taxes referred to herein as the "Transfer Taxes") to the extent permitted by the Bankruptcy Code, and to the extent that such certificate or other document would not increase the Taxes of the Purchaser.  In addition, the Sellers agree to obtain such tax clearance or similar certificates from any Governmental Authority as the Purchaser may reasonably require (other than any such certificates with respect to income or franchise taxes), and the Purchaser shall provide such assistance as the Sellers may reasonably request in obtaining such certificates.

(b)    The Purchaser may make elections under Code Sections 338(g) and 754 and Treasury Regulation Section 301.7701-3 (the "Elections"), as appropriate, in respect of its purchase of the Acquired Subsidiaries or other entities included in the Business under this Agreement.  Polaroid and the other Sellers shall assist the Purchaser in the preparation and filing of the Elections and shall take all such action as is required in order to give effect to such Elections for state, local and foreign Tax purposes to the greatest extent permitted by law.

(c)    Any agreement between Polaroid or the other Sellers, on the one hand, and any of the Acquired Subsidiaries, on the other hand, regarding allocation or payment of Taxes or amounts in lieu of Taxes shall be deemed terminated as of the Closing.

(d)    The Sellers and the Foreign Subsidiaries shall notify the Purchaser of any proposed United States federal, state, or local Tax Election and any material foreign Tax Election not later than thirty days prior to making such election.  Neither the Sellers nor the Foreign Subsidiaries shall make any Tax Election that could have a Material Adverse Effect without the prior written consent of the Purchaser, which shall not be unreasonably withheld. The Purchaser shall respond promptly to any request for consent to any Tax Election pursuant to this Section 6.07(d).  The Purchaser shall be deemed to consent to any such election if it has not responded to any such request within ten days of receiving such request.  However, the Sellers and the Foreign Subsidiaries may elect to carry back any Tax losses from Tax periods before the

Closing Date to prior Tax periods if such election does not bind the Purchaser or the Foreign Subsidiaries for any Tax period or any portion thereof after the Closing Date.

(e)    Not later than 45 days prior to the Closing, the Sellers shall provide to the Purchaser a list of all Tax records of the Sellers (to the extent that they relate to the Acquired Assets or the Foreign Subsidiaries) and each of the Foreign Subsidiaries in the form set forth as Exhibit Q, including without limitation the prior five Tax Returns of the Sellers (to the extent that they relate to the Acquired Assets or the Foreign Subsidiaries) and each of the Foreign Subsidiaries. The Sellers and the Foreign Subsidiaries shall grant the Purchaser access to all such records prior to the Closing and shall ensure that the Purchaser may take possession of all such records at or after the Closing if the Purchaser so elects. The Sellers and the Foreign Subsidiaries shall provide such access to their computer systems containing Tax information as may reasonably be requested by the Purchaser. The Purchaser agrees to bear any reasonable costs incurred by the Sellers in duplicating and mailing any records that the Purchaser has requested that the Sellers duplicate and mail to the Purchaser prior to the Closing.

(f)    The Sellers agree to pay all Transfer Taxes. Notwithstanding the foregoing, the Approval Order shall contain a provision that the sale, transfer, assignment and conveyance of the Acquired Assets to the Purchaser hereunder shall be entitled to the protections afforded under Section 1146(c) of the Bankruptcy Code.

(g)    The Purchaser and the Sellers agree to furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets, including, without limitation, access to Books and Records, as is reasonably necessary for the filing of all Tax Returns by the Purchaser or the Sellers, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax. Each of the Purchaser and the Sellers shall retain all Books and Records with respect to Taxes pertaining to the Acquired Assets until the later of six years following the Closing Date and the expiration of the statute of limitations period (and, to the extent notified by the Purchaser or the Sellers, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority. At the end of such period, each party shall provide the other with at least ten days prior written notice before transferring, destroying or discarding any such Books and Records, during which period the party receiving such notice can elect to take possession, at its own expense, of such Books and Records. The Purchaser and the Sellers shall cooperate fully with each other in the conduct of any audit, litigation or other proceeding relating to Taxes involving the Acquired Assets, provided that the Sellers or the Purchaser, as appropriate, shall reimburse the Purchaser or the Sellers for reasonable costs associated with such cooperation. The Purchaser and the Sellers further agree, upon request, to use their best efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby), to the extent that such certificate or other document would not increase the Taxes of the Purchaser.

(h)    Preparation of Tax Returns.

(i)    Unless prohibited by applicable law, Purchaser and Sellers shall close all Tax periods of the Foreign Subsidiaries on the Closing Date, and shall cooperate to complete any necessary elections or filings to close all Tax periods on the Closing Date. Purchaser shall cause to be prepared and filed all income or franchise Tax Returns required to be filed with respect to the Foreign Subsidiaries for taxable periods ending prior to or on the Closing Date and including amended returns, applications for loss carryback refunds and applications for estimated tax refunds (all such income and franchise Tax Returns, amended returns and refund applications are referred to as the "Prior Period Returns"). Sellers shall make available to Purchaser (and to Purchaser's accountants and attorneys) any and all books and records and other documents and information in its possession or control relating to the Foreign Subsidiaries requested by Purchaser to prepare the Prior Period Returns. If any Prior Period Returns reflect an obligation to pay Taxes that were not accrued on the books of account of the Foreign Subsidiaries through the Closing Date, then the Purchasers shall provide to the Sellers such Prior Period Returns within 15 days prior to the due date for such returns, including extensions, and the Sellers shall pay to the Purchaser, not later than 5 days prior to the due date for such returns, an amount equal to the excess of such Taxes over such accruals.

(ii)    A "Straddle Period" is any Tax period that includes (but does not end on) the Closing Date. Purchasers shall cause to be prepared and filed all income or franchise Tax Returns required to be filed with respect to the Foreign Subsidiaries for any Straddle Period (each a "Straddle Period Return"). Income or franchise Taxes attributable to any Straddle Period shall be determined as if the Tax period ended on the Closing Date based on a closing of the books on such date. The Sellers shall be responsible for income or franchise Taxes for that portion of any Straddle Period ending on the Closing Date. If the portion of the Tax shown on any such Tax Return that is the responsibility of the Sellers ("Sellers' Portion") exceeds the accruals for such Taxes on the applicable Foreign Subsidiary's books of account, then the Purchasers shall provide a copy of such Tax Return, together with a computation of the Sellers' Portion, within 15 days prior to the due date for such returns, including extensions. Sellers shall pay the excess of the Sellers' Portion over such accruals to the Purchaser no later than 5 days prior to the due date of any Straddle Period Tax Return.

(iii)    Purchaser shall file any and all other Tax Returns for any Acquired Subsidiary that are not Prior Period Returns or Straddle Period Tax Returns and which are to be filed after the Closing Date.

(i)    Not later than July 8, 2002, the Sellers shall provide to the Purchaser a list of all outstanding intercompany indebtedness in effect as of June 2, 2002 between the Foreign Subsidiaries and between any Sellers and the Foreign Subsidiaries, identifying in each case the specific obligor and obligee. With respect to any fiscal month of the Sellers ending after June 2, 2002 and prior to the Closing, the Sellers shall provide a new list of all such outstanding intercompany indebtedness in effect as of the end of such fiscal month between the Foreign Subsidiaries and between any Sellers and the Foreign Subsidiaries within 25

days following the end of any such fiscal month, identifying in each case the specific obligor and obligee. The Sellers agree that, immediately prior to the Closing, and after giving effect to the transactions set forth in Section 6.19, the Sellers will, at the Purchaser's request, (i) cause any outstanding intercompany indebtedness owed by any Foreign Subsidiary to any Seller to be contributed to such Foreign Subsidiary or Foreign Subsidiaries as may be designated by the Purchaser prior to the Closing (including, but not limited to, a new Foreign Subsidiary formed at Purchaser's request for this purpose) and (ii) cause any outstanding intercompany indebtedness owed by any Seller to any Foreign Subsidiary to be cancelled or assumed by such Foreign Subsidiary or Foreign Subsidiaries as may be designated by the Purchaser prior to the Closing (including, but not limited to, a new Foreign Subsidiary formed at Purchaser's request for this purpose); provided that, in each case the Purchaser shall bear all costs and capital or similar foreign Taxes imposed as a result of such contributions, cancellations or assumptions. Any such requests by the Purchaser shall be made only with respect to such intercompany indebtedness as remains outstanding after first taking into account the actions relating to such indebtedness set forth in Section 6.19.

(j)    The Sellers agree to cooperate with the Purchaser in making any Tax elections and any restructuring of the Sellers' operations that the Purchaser may reasonably request after the issuance of the Approval Order, including without limitation any elections under Treasury Regulations Section 301.7701-3.

Section 6.08.  Certain Employee Benefit Matters.

(a)    Not less than thirty-five (35) days prior to the Closing Date, the Purchaser shall provide Sellers with a true, correct and complete list (the "35 Day List") of (i) all Polaroid Employees to whom the Purchaser intends to offer employment, commencing on the Closing Date, at the salary levels and other terms of employment determined by the Purchaser in its sole and absolute discretion, and (ii) all temporary employees, contract employees and leased employees with whom Purchaser intends to continue a service provider relationship, all of whom shall be considered U.S. employees for purposes of this Section 6.08 and Section 6.09. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement hereunder shall confer upon any such Hired Employees any right to continue in the employ of, or as a consultant for, the Purchaser or any of its Affiliates, or shall interfere with or restrict in any way the rights of the Purchaser or any of its Affiliates, which are hereby expressly reserved, to discharge any such Hired Employees at any time for any reason whatsoever, with or without cause, except to the extent expressly provided otherwise in a written employment agreement between any such Hired Employees and the Purchaser or any of its Affiliates.

(b)    From and after the Closing Date, each Seller shall remain responsible for any and all Liabilities (other than Assumed Liabilities) with respect to the Hired Employees or their beneficiaries or dependents that were or are incurred by such individuals on or prior to the Closing Date under such Seller's applicable Welfare Plans for health, life, accidental death and dismemberment, supplemental employment compensation, dental, fringe benefits, expense reimbursement, accident, sickness and disability benefits. For purposes of this Agreement, (i) a claim for health benefits (including, without limitation, claims for medical, prescription drug, dental, and vision care expenses) will be deemed to have been incurred on the date on which the related medical service is rendered; (ii) a claim for sickness or disability

benefits will be deemed to have been incurred on the date such sickness or disability occurs, and (iii) in the case of any claim for benefits other than health benefits (e.g., life insurance benefits), a claim will be deemed to have been incurred upon the occurrence of the event giving rise to such claims. The Purchaser shall be responsible for all claims that are incurred by the Hired Employees on or after the Closing Date under the applicable benefit plans, policies or arrangements providing health, life, accidental death and dismemberment, supplemental employment compensation, dental, fringe benefits, expense reimbursement, accident, sickness and disability benefits and which are maintained by the Purchaser (collectively, the "Purchaser's Welfare Benefit Plans"). During the period beginning on the date of this Agreement and ending no fewer than 20 days before the Closing Date, the Sellers and the Purchaser shall cooperate to determine the extent, if any, to which the Purchaser will adopt any of Sellers' Welfare Benefit Plans as Purchaser's Welfare Benefit Plans for the benefit of any Hired Employees and to determine an appropriate mechanism for the satisfaction of any COBRA obligations that are Assumed Liabilities under this Agreement.

(c)     With respect to each employee benefit plan, program or arrangement of the Purchaser or any affiliate of the Purchaser in which any Hired Employee participates, for purposes of determining eligibility to participate, vesting, and entitlement to benefits, but not including benefit accruals under any defined benefit pension plan, service with the Sellers shall be treated as service with the Purchaser or such affiliate. Such service also shall apply for purposes of satisfying any waiting periods, evidence of insurability requirements, or the application of any preexisting condition limitations. Each such plan shall waive pre-existing condition limitations to the same extent waived under the applicable plan of the Sellers. Hired Employees shall be given credit under the applicable plan of the Purchaser or any affiliate for amounts paid under a corresponding benefit plan during the same period for purposes of applying deductibles, co-payments and out-of-pocket maximums as though such amounts had been paid in accordance with the terms and conditions of the successor or replacement plan.

(d)     Purchaser will, and will cause the Purchaser's 401(k) Profit Sharing Plan and Trust (the "Purchaser's 401(k) Plan") to accept the rollover, by direct or indirect rollover, as selected by each Hired Employee, of that portion of the Hired Employees' accounts in the Sellers' 401(k) Plan ("Sellers' 401(k) Plan") that constitutes an "eligible rollover distribution" as that term is defined by section 402(c)(4) of the Code, provided that at the time a Hired Employee elects such a rollover that Hired Employee is employed by the Purchaser. Any such rollover will be effected in cash and, as applicable, any notes evidencing loans from the Sellers' 401(k) Plan to the Hired Employee electing such rollover. Purchaser and Sellers will, and will cause the trustees of their respective 401(k) plans to, cooperate with each other with respect to the rollover of the eligible rollover distribution portions of the Hired Employees' account balances in the Sellers' 401(k) Plan to the Purchaser's 401(k) Plan. Purchaser's 401(k) Plan will be substantially comparable, in the aggregate, to Sellers' 401(k) Plan, provided that (1) Purchaser is able to negotiate administrative and investment contracts with third party record keepers and investment managers comparable to those currently in effect under Sellers' 401(k) Plan and (2) Purchaser shall not be required to incur costs in connection with the design or operation of a substantially comparable plan that materially exceed those incurred by Sellers' in the maintenance and operation of Sellers' 401(k) Plan. If Purchaser is unable to negotiate administrative and investment contracts consistent with subparagraph (1) above, within the

constraints of subparagraph (2) above, Purchaser will design a 401(k) plan for the Hired Employees that is as comparable as possible to Sellers' 401(k) Plan within those constraints.

(e)     Except as specifically provided herein and except for the Assumed Liabilities, from and after the Closing Date, each Seller shall remain responsible for any and all Liabilities accrued or payable under any employment agreement between any Seller or any ERISA Affiliate and any Employee or former Employee as well as under any Pension Plans, including without limitation any supplemental retirement arrangements, bonus, stock purchase, stock ownership, stock option, deferred compensation, incentive, severance, termination or other compensation plan or arrangement, or other material employee fringe benefit plans maintained by, or contributed to by any Seller or any ERISA Affiliate for the benefit of any Employees or former Employees (and the beneficiaries or dependents of any such Employees or former Employees) of any Seller or any ERISA Affiliate.

(f)     On and after the Closing Date, Purchaser shall provide medical, dental, and life insurance benefits to Hired Employees substantially comparable in the aggregate to the medical,  dental, and life insurance benefits provided by the Sellers immediately prior to the Closing Date, provided that Purchaser shall not be required to incur costs in connection with the design or operation of a substantially comparable plan that materially exceed those incurred by Sellers in the maintenance and operation of Sellers' medical, dental, and life insurance benefits.

(g)     Sellers and each ERISA Affiliate will retain all liabilities connected with or arising from the Polaroid Pension Plan or any other defined benefit pension plan maintained by any of them.  Neither Purchaser nor any Affiliate of Purchaser shall have any liability with respect to any such plan, including, without limitation, any obligation to provide any similar pension plan after the Closing.

Section 6.09.  <u>WARN Act Notices</u>.  During the period between the date of this Agreement and the Closing Date, Sellers will terminate the employment of such number of those U.S. employees whose employment is projected to be terminated as the basis for the schedules of 2002 Projected Involuntary Terminations and 2002 Severance Cost Estimates provided by Sellers to Purchaser.  In addition, Sellers will terminate the employment of those U.S. employees who are not listed on the 35 Day List.  The Sellers shall be solely responsible for providing any required notice under the WARN Act arising from any of the Sellers' termination/layoff of any Polaroid Employees pursuant to this Section 6.09, or any other employment decision made by Sellers (whether such termination/layoff occurs on, before, or after the Closing Date).

Section 6.10.  <u>Additional Matters</u>.  Subject to the terms and conditions herein provided, each of the parties hereto agrees to use its reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper, or advisable under applicable laws and regulations to consummate and make effective the Contemplated Transactions, including using all reasonable efforts to obtain all necessary waivers, consents, and approvals in connection with the Governmental Requirements and, at the instruction of the Purchaser, to cause any local nominee holding shares of any Acquired Subsidiary to transfer such shares to a Person designated by the Purchaser.

Section 6.11.  <u>Guarantees</u>.  The Purchaser agrees to provide guarantees, effective as of the Closing, for any obligations of the Sellers provided on behalf of the Acquired Subsidiaries in the agreements and arrangements listed in Section 6.11 of the Disclosure Schedule (the "<u>Seller Guarantees</u>"), as required by the Seller Guarantees in order to relieve the Sellers of such obligations.

Section 6.12.  <u>No Solicitations</u>.  From and after the execution of this Agreement and until the date the Bankruptcy Court enters the Sale Procedures Order, the Sellers shall not cause, authorize or permit any of their Representatives, Subsidiaries or Affiliates to, directly or indirectly, (a) except with respect to the Committee, solicit, seek, initiate, negotiate, assist, facilitate or encourage the submission of, or accept or agree to, or otherwise cooperate in any way with any Acquisition Proposal or (b) except in the Ordinary Course of Business, furnish any non-public information to any Person, other than the Purchaser, its Affiliates or their Representatives, any pre-Petition and post-Petition secured lenders of the Business, or the Committee and their Representatives, with respect to the Business or any of the Acquired Assets. If Sellers or any of their Representatives, Subsidiaries or Affiliates receive from any Person any Acquisition Proposal, offer, inquiry or information request regarding the Business or any of the Acquired Assets, Sellers will promptly advise such Person, by written notice (with a copy to the Purchaser), of the terms of this Section and the Bidding Procedures and will promptly (and, in any event, within 24 hours) advise the Purchaser in writing of such Acquisition Proposal, offer, inquiry or informational request, and deliver copies of any written materials received by any Seller or their Representatives at any time in connection therewith, and keep the Purchaser fully informed of the timing and contents of, and provide the Purchaser with copies of, any further written or oral communications related thereto.

Section 6.13.  <u>Assumed Contracts; Cure Amounts</u>.

(a)    As soon as practicable after the date hereof, the Sellers shall, pursuant to a motion in form and substance acceptable to the Purchaser (which motion may be incorporated into a motion seeking the approval of all of the Contemplated Transactions), move to assume and assign to the Purchaser the Assumed Contracts (as defined below) and shall provide notice thereof in accordance with all applicable bankruptcy rules. On or before May 10, 2002, the Sellers will deliver to the Purchaser a true, correct, and complete list of the monetary amounts the Sellers believe are necessary to cure, in accordance with Bankruptcy Code section 365, the monetary defaults with respect to each pre-Petition Contract of the Sellers relating to the Business. Not later than May 17, 2002, Purchaser will provide to the Sellers a preliminary list of each pre-Petition Contract of the Sellers relating to the Business that the Purchaser has selected to constitute the pre-Petition Contracts to be assumed and assigned to Purchaser at the Closing in connection with the Transactions (the "<u>Preliminary Assumed Contracts List</u>").  As soon as practicable thereafter, and in any event, no later than May 20, 2002, the Sellers shall provide notice to the non-Seller parties to the Contracts on the Preliminary Assumed Contracts List (A) of the Sellers' intention to assume, assign, and transfer such designated Contracts to the Purchaser, (B) of the amount, if any, required to be paid to cure any monetary default related to each such Contract, (C) of the Purchasers' right to amend or modify the Preliminary Assumed Contracts List as provided in the Sale Procedures Order and in this Agreement and (D) containing such other matters as requested by the Purchaser. Specifically, Purchaser may (i) at any time up to ten (10) days prior to the Auction, add additional pre-Petition Contracts to the