Preliminary Assumed Contracts List, in which case such additional pre-Petition Contract(s) shall be assumed and assigned to the Purchaser and shall be part of the Initial Assumed Contracts (as defined below) and Acquired Assets and/or (ii) at any time up to one (1) Business Day prior to the Auction, withdraw any pre-Petition Contract from the Preliminary Assumed Contracts List, in which case such withdrawn pre-Petition Contract(s) shall not be assumed and assigned to the Purchaser and shall not be part of the Initial Assumed Contracts or the Acquired Assets, such that no later than one (1) Business Day prior to the Auction, Purchaser shall provide the Sellers with the final list of the pre-Petition Contracts of the Sellers relating to the Business to be assumed and transferred to Purchaser at the Closing pursuant to the Approval Order (collectively, the "Initial Assumed Contracts").

        (b)      In addition, subsequent to the date that is ten (10) days prior to the Auction but prior to the Closing, Purchaser may notify the Sellers of its intention to assume any other or additional pre-Petition Contract(s) of the Sellers relating to the Business that (i) has not otherwise been rejected, assumed, or assigned by the Sellers or (ii) is not the subject of a pending Bankruptcy Court motion of the Sellers to reject, assume, or assign, as of the date of such notice (the "Additional Assumed Contracts" and, together with the Post-Petition Contracts and the Initial Assumed Contracts, the "Assumed Contracts"). As soon as practicable after the date of receiving such notice from the Purchaser with respect to the Additional Assumed Contracts, the Sellers shall, pursuant to a motion in form and substance acceptable to the Purchaser, move to assume and assign the Additional Assumed Contracts to the Purchaser, and shall provide notice thereof in accordance with all applicable bankruptcy rules. The Purchaser shall not be obligated to provide the Sellers with any additional consideration in connection with any such assumption and assignment of the Additional Assumed Contracts beyond the Consideration. None of the Sellers shall reject any Contract of Sellers relating to the Business prior to the Closing Date without the consent of Purchaser. In connection with any such assumption and assignment of the Assumed Contracts, Purchaser shall be responsible for any Cure Amounts.

        Section 6.14.  Title Insurance.  Sellers shall use commercially reasonable efforts to assist Purchaser in obtaining good and valid, irrevocable ALTA title insurance commitments (collectively, the "Title Commitments", and each a "Title Commitment"), in final form, from the title insurance company selected by Purchaser (the "Title Company"). Seller shall supply such information within its control or possession and shall provide Title Company with such certificates, affidavits and other documentation as reasonably necessary, to enable Title Company to irrevocably commit (subject only to the satisfaction of any industry standard requirements contained in the Title Commitment and reasonably acceptable to Purchaser) to issuing ALTA form of title insurance policies insuring good, valid, indefeasible fee simple title to the Owned Real Estate in Purchaser, in such respective amounts that Purchaser requires prior to Closing, subject to no Encumbrances or other exceptions to title other than Permitted Encumbrances (collectively the "Title Policies"). On or prior to the Closing Date, Sellers shall execute and deliver, or cause to be executed and delivered, to the Title Company any affidavits, standard gap indemnities and similar documents reasonably requested by the Title Company in connection with the issuance of the Title Commitments or the Title Policies. The Purchaser shall pay at Closing all premiums and other fees, costs and expenses necessary for the issuance of the Title Policies.

Section 6.15.  <u>Surveys</u>.  Sellers shall make available to Purchaser all surveys and other documents and information in its possession or control relating to the Owned Real Estate.

Section 6.16.  <u>Zoning Compliance</u>.  Sellers shall, at the request of Purchaser, reasonably cooperate with Purchaser and its agents and contractors in obtaining certificates of occupancy for the Owned Real Estate.

Section 6.17.  <u>Bulk Transfer Laws</u>.  Each Seller and the Purchaser hereby waive compliance by the Sellers with the provisions of any Bulk Sales Laws.

Section 6.18.  <u>Use of Name</u>.  From and after the Closing, Purchaser shall own all of the corporate names, trade names and trademarks included in the Polaroid Intellectual Property, including without limitation, "Polaroid" and all other variations thereof which include the "Polaroid" name, together with all related designs (collectively, the "<u>Polaroid Name</u>").  Each Seller shall, and shall cause each of its Subsidiaries not acquired by the Purchaser pursuant to this Agreement and, if not acquired by the Purchaser, Polaroid Foundation, Inc. to, promptly following the Closing Date, change its name to delete any reference to the Polaroid Name and any other corporate name, trade name or trademark included in the Polaroid Intellectual Property (and file with the appropriate Governmental Authorities any certificates or instruments required to effect such name change); provided, however, that Sellers may use the Polaroid Name in connection with the disposition of the Case.

Section 6.19.  <u>Treatment of Intercompany Payables and Intercompany Receivables</u>.

(a)  Each Seller agrees that, prior to the Closing, it will (i) offset outstanding intercompany liabilities, including, but not limited to, ordinary course payables and loans payable, which arose prior to the Filing Date (the "<u>Pre-Petition Intercompany Payables</u>") owed by such Seller to each Foreign Subsidiary against intercompany accounts receivable which arose prior to the Filing Date (the "<u>Pre-Petition Intercompany Receivables</u>") owed by each such Foreign Subsidiary to such Seller, (ii) offset outstanding Post-Petition Intercompany Payables owed by such Seller to each Foreign Subsidiary against intercompany accounts receivable which arose on or after the Filing Date (the "<u>Post-Petition Intercompany Receivables</u>") owed by each such Foreign Subsidiary to such Seller, (iii) after the offsets described in clauses (i) and (ii) above, offset outstanding Post-Petition Intercompany Payables owed by such Seller to each Foreign Subsidiary against the Pre-Petition Intercompany Receivables owed by each such Foreign Subsidiary to such Seller, and (iv) cooperate in any filings and proceedings before the Bankruptcy Court as may be necessary to effect the offsets described in clauses (i), (ii) and (iii) above.

(b)  After accounting for the offset of accounts receivable and accounts payable described in subsection (a) above, the Sellers may cause those Foreign Subsidiaries that have accounts payable to the Sellers to pay in cash all or a portion of such accounts payable to the Sellers (such accounts to be paid down being the "<u>Related Party Accounts Receivable</u>"); provided, however, that (i) the Sellers shall not cause such Foreign Subsidiaries to pay down the Related Party Accounts Receivable if such payment would reduce the Cash and Cash Equivalents held by the Foreign Subsidiaries to be less than the minimum amount specified in

Section 8.03(f) hereof; (ii) any Related Party Accounts Receivable repaid will be repaid at their face amount; (iii) the Sellers will inform the Purchaser in writing of the proposed repayment of any Related Party Accounts Receivable at least five Business Days prior to such repayment; and (iv) to the extent requested by the Purchaser in writing, the Sellers will cause the Foreign Subsidiaries not to pay down the Related Party Accounts Receivable specified by, and in the amount requested by, the Purchaser in writing (the "Designated Accounts Receivable"), but instead will cause such Foreign Subsidiaries, as requested by the Purchaser in writing, to either (x) pay the cash that would have been used to pay down the Designated Accounts Receivable to the Sellers as dividends, capital reductions, capital returns, or otherwise (such dividends, capital reductions, or capital returns being the "Requested Dividends"), (y) loan the cash that would have been used to pay down the Designated Accounts Receivable to such other Foreign Subsidiary specified by the Purchaser in writing, which will, in turn, use the proceeds of such loan to, as requested by the Purchaser in writing, either pay down its Related Party Accounts Receivable or pay Requested Dividends or (z) hold the cash that would have been used to pay down the Designated Accounts Receivable in such Foreign Subsidiaries (it being understood that the Cash and Cash Equivalents held by the Foreign Subsidiaries at Closing may exceed the maximum amount specified in Section 8.03(f) to the extent this clause (z) causes the Cash and Cash Equivalents held by the Foreign Subsidiaries at Closing to exceed such maximum amount). The Purchaser and the Sellers will work together to minimize the amount of any foreign withholding Taxes imposed upon the Requested Dividends (the "Requested Dividend Withholding Taxes"). To the extent that the Foreign Subsidiaries pay the Requested Dividends and the Purchaser and the Sellers cannot eliminate any Requested Dividend Withholding Taxes, then the Purchaser agrees to increase the Cash Consideration by an amount equal to the Requested Dividend Withholding Taxes.

(c)     The Sellers further agree, upon request of the Purchaser, to cause the Foreign Subsidiaries to cancel or forgive immediately prior to the Closing all or any portion of any outstanding Pre-Petition Intercompany Payables owed by the Sellers to the Foreign Subsidiaries, after giving effect to any offsets requested by the Purchaser pursuant to this Section 6.19. To the extent that pursuant to this Section 6.19(c) the Sellers cause Polaroid Contracting CV to cancel or forgive any Pre-Petition Intercompany Payables, the Sellers shall cause such Foreign Subsidiaries as are designated by the Purchaser to cancel or forgive an equal amount of any loans owed to them by Polaroid Contracting CV.

(d)     The Sellers agree to retain as Excluded Assets the Designated Accounts Receivable and such other accounts receivable from the Foreign Subsidiaries as the Purchaser may request in writing (collectively, the "Retained Related Party Accounts Receivable"). At Closing, the Purchaser shall cause the Foreign Subsidiaries to pay in full all of the Retained Related Party Accounts Receivable.

(e)     The Purchaser and the Sellers will cooperate to minimize any foreign Taxes and costs associated with the actions contemplated by this Section 6.19. In the event that the Purchaser requests that the Sellers take any actions pursuant to this Section 6.19 that the Sellers would not otherwise be required to take, and the Purchaser and the Sellers are unable to eliminate the costs and foreign Taxes associated with such actions, then the Purchaser will pay any costs and foreign Taxes incurred by the Sellers as a result of such actions (except to

the extent that such foreign Taxes are Requested Dividend Withholding Taxes that give rise to an increase to the Cash Consideration pursuant to Section 6.19(b)).

Section 6.20. <u>Closing Date Dividends and Share Buyback</u>.  The Sellers agree that, if requested by the Purchaser in writing, they will (a) cause the Foreign Subsidiaries specified in writing by the Purchaser (the "<u>Borrowing Foreign Subsidiaries</u>") to enter into a Credit Agreement (the "<u>Credit Agreement</u>") in form and substance satisfactory to the Purchaser immediately prior to the Closing, (b) cause each Borrowing Foreign Subsidiary to borrow such amount as is requested by the Purchaser in writing, and (c) cause each such Borrowing Foreign Subsidiary to either (i) distribute such borrowings to the Sellers as a dividend or distribution, (ii) use such borrowings to repurchase or redeem the shares of such Borrowing Foreign Subsidiary from the Sellers, or (iii) loan such borrowings to such other Foreign Subsidiary as may be requested by the Purchaser in writing, which will distribute such borrowings to the Sellers or repurchase or redeem the shares of such other Foreign Subsidiary from the Sellers (all such payments described in clause (i), (ii) or (iii) being referred to as the "<u>Related Party Special Dividends</u>").  The Purchaser and the Sellers agree to reduce the Cash Consideration by the net amount of any Related Party Special Dividends actually paid to the Sellers, after accounting for any foreign withholding Taxes imposed on such Related Party Special Dividends (the "<u>Net Related Party Special Dividends</u>").

## ARTICLE VII
## ADDITIONAL POST-CLOSING COVENANTS

Section 7.01. <u>Further Assurances</u>.  In addition to the provisions of this Agreement, from time to time after the Closing Date, the Sellers and the Purchaser will use all reasonable efforts to execute and deliver such other instruments of conveyance, transfer, or assumption, as the case may be, and take such other action as may be reasonably requested to implement more effectively the Contemplated Transactions.

Section 7.02. <u>Books and Records; Personnel</u>.  Sellers and Purchaser shall reasonably cooperate with each other after the Closing so that (subject to any limitations that are reasonably required to preserve applicable attorney-client privilege) each party and any of their Representatives reasonable access to the respective officers and employees of the other party, and reasonable access to all business records, contracts and other documents and information of the other party existing at the Closing Date and relating to the Acquired Assets, the Assumed Liabilities, the Excluded Liabilities or the conduct of the Business (including copies thereof) as is reasonably necessary for the (a) administration of the Case, or preparation for or the prosecution or defense of any existing or future Legal Proceeding (other than one by or on behalf of a party to this Agreement) by or against Sellers or Purchaser, (b) preparation and filing of any Tax Return or election relating to the Acquired Assets, the Assumed Liabilities or the conduct of the Business and any audit by any taxing authority of any returns of Purchaser or Sellers relating thereto, (c) preparation and filing of any other documents required by governmental or regulatory bodies, and (d) transfer of data to Purchaser relating to the Business.  The party requesting such information and assistance shall reimburse the other party for all out-of-pocket costs and expenses incurred by such party in providing such information and in rendering such assistance, except that Sellers shall bear the costs and expenses of transferring to Purchaser or its designee data and other information reasonably requested by Purchaser in order to enable Purchaser to

establish and operate its own data systems. The access to files, books and records contemplated by this Section 7.02 shall be during normal business hours and upon not less than two Business Days' prior written request, shall be subject to such reasonable limitations as the party having custody or control thereof may impose to preserve the confidentiality of information contained therein, and shall not extend to material subject to a claim of privilege unless expressly waived by the party entitled to claim the same. Unless prohibited by Law, the Sellers shall provide to the Purchaser copies of all personnel records and other Books and Records retained by the Sellers under Section 2.02(c) of this Agreement.

Section 7.03. <u>Continued Cooperation</u>. If any transfer or assignment by the Sellers to, or any assumption by the Purchaser of, any interest in, or liability, obligation or commitment under, any Acquired Asset requires the consent of a Third Party, and any such consent is not obtained prior to the Closing, then, if Purchaser so elects, such Acquired Asset shall not be transferred to Purchaser at the Closing Date and the Sellers shall cooperate in any lawful and reasonable arrangement reasonably proposed by the Purchaser (including the appointment of Purchaser as attorney-in-fact for the Sellers) and do or cause to be done all such things as shall in the reasonable opinion of Purchaser or its counsel be necessary or proper to (a) assure that the rights of Purchaser under such Acquired Asset shall be preserved for the benefit of or transferred or issued to Purchaser and (b) obtain for Purchaser the economic benefits under the asset, claim or right with respect to which the consent has not been obtained. Such reasonable arrangement may include (a) the subcontracting, sublicensing or subleasing to the Purchaser of any and all rights of the Sellers against the other party to such third-party agreement arising out of a breach or cancellation thereof by the other party, and (b) the enforcement by the Sellers of such rights. To the extent, and only to the extent, the Purchaser is able to receive the economic claims, rights and benefits under such asset, the Purchaser shall be responsible for the Assumed Liabilities, if any, arising under such Acquired Asset.

Section 7.04. <u>Estate Costs</u>. (a) If, after June 2, 2002, the aggregate amount of the Estate Costs paid or incurred exceeds $27,000,000, then the Sellers and/or their successor(s) may not incur any expenses to pursue any causes of action, judgments, Claims or demands that constitute Excluded Assets without the Purchaser's and the Agent's prior written consents, which consents shall not be unreasonably withheld.

(b)     If, after June 2, 2002 and until the distribution of all of the Sellers' Stock by the Sellers and/or their successor(s) to the creditors of the Sellers, the aggregate amount of the Estate Costs paid exceeds $27,000,000 (and the Sellers and/or their successor(s) do not have any cash available to pay additional Estate Costs), then, for any Estate Costs in excess of $27,000,000 that become due and payable, the Purchaser forthwith shall pay to the Sellers and/or their successor(s) an amount equal to such excess up to $4,000,000 in cash, upon receipt by the Purchaser of reasonably satisfactory documentation evidencing Sellers' and/or their successors(s)' obligation to pay such Estate Costs. If, after June 2, 2002 and until the distribution of all of the Sellers' Stock by the Sellers and/or their successor(s) to the creditors of the Sellers, the aggregate amount of the Estate Costs paid exceeds $31,000,000 (and the Sellers and/or their successor(s) do not have any cash available to pay additional Estate Costs), the Sellers and the Purchaser understand that, for any Estate Costs in excess of $31,000,000 that become due and payable, the Agent, on behalf of the secured lenders to the Sellers, forthwith shall pay to the Sellers and/or their successor(s) an amount equal to such excess up to $3,000,000

in cash (the "Bank Reimbursement"), upon receipt by the Agent of reasonably satisfactory documentation evidencing Sellers' and/or their successors(s)' obligation to pay such Estate Costs. If, after June 2, 2002 and until the distribution of all of the Sellers' Stock by the Sellers and/or their successor(s) to the creditors of the Sellers, the aggregate amount of the Estate Costs paid exceeds $34,000,000 (and the Sellers and/or their successor(s) do not have any cash available to pay additional Estate Costs), then, for any Estate Costs in excess of $34,000,000 that become due and payable, the Purchaser forthwith shall pay to the Sellers and/or their successor(s) an amount equal to such excess up to $3,000,000 in cash (the "Second Tier Reimbursement"), upon receipt by the Purchaser of reasonably satisfactory documentation evidencing Sellers' and/or their successors(s)' obligation to pay such Estate Costs.

(c)    If, after June 2, 2002 and until the distribution of all of the Sellers' Stock by the Sellers and/or their successor(s) to the creditors of the Sellers, the aggregate amount of the Estate Costs paid or required to be paid exceeds $37,000,000 (and the Sellers and/or their successor(s) do not have any cash available to pay additional Estate Costs), then, for any Estate Costs in excess of $37,000,000 that become due and payable, and for the sole purpose of generating cash to fund all or a portion of such excess, up to a maximum excess of $4,500,000, the Sellers and/or their successor(s) shall have the right, but not the obligation, to sell to the Purchaser up to such number of shares of the Sellers' Stock as shall equal four percent (4%) of the Issued Stock for a maximum aggregate purchase price of $4,500,000, as follows: the Sellers and/or their successor(s) shall have the right, but not the obligation, to sell such number of shares of the Sellers' Stock to the Purchaser at a price equal to: (i) for the first two percent (2%) of the Issued Stock, $1,250,000 for each one percent (1%) of the Issued Stock (or a pro-rata price based thereon); and (ii) for the next two percent (2%) of the Issued Stock, $1,000,000 for each one percent (1%) of the Issued Stock (or a pro-rata price based thereon). If more than one class of stock is included in the Sellers' Stock, all sales of stock by the Sellers and/or their successor(s) to the Purchaser pursuant to this paragraph must include the same percentage of each class of stock included in the Sellers' Stock. Except in the case of a distribution by the Sellers and/or their successor(s) to the holders of allowed Claims in the Case under a confirmed Chapter 11 plan of reorganization, if the Sellers and/or their successor(s) wish to sell or otherwise transfer shares of the Sellers' Stock to a Third Party pursuant to a bona fide written offer therefor, then the Sellers and/or their successor(s) shall give the Purchaser written notice thereof, which notice shall (x) include a copy of such bona fide written offer and a description of any other material terms of the offer not contained in such offer, including the identity of the transferee, the price or other consideration for which the shares of the Sellers' Stock are proposed to be sold or transferred, and the number of shares of the Sellers' Stock to be sold or transferred, and (y) contain an irrevocable offer to sell such shares of the Sellers' Stock to the Purchaser at the same price and on the same terms contained in the bona fide written offer. For a period of twenty days after its receipt of such notice, the Purchaser and/or its designee(s) shall have the right and option to purchase all or a portion of the shares of the Sellers' Stock at the same price and on the same terms contained in the bona fide written offer.

(d)    If (i) there remains any assets in the Sellers and/or their successor(s) (the "Remaining Assets") and (ii) either the Agent shall have made a Bank Reimbursement or the Purchaser shall have made a Second Tier Reimbursement, then, unless the Sellers and/or their successor(s) determine in good faith that there continues to be a reasonable expectation of additional Estate Costs, the Sellers and/or their successor(s) shall (x) pay to the

Purchaser such percentage of the Remaining Assets as the amount of the Second Tier Reimbursement actually paid bears to the sum of the amount of the Bank Reimbursement actually paid and the amount of the Second Tier Reimbursement actually paid (such sum, the "Total Reimbursement Paid"), up to $5,000,000 and (y) pay to the Agent, for the benefit of the secured lenders to the Sellers, such percentage of the Remaining Assets as the amount of the Bank Reimbursement actually paid bears to the Total Reimbursement Paid, up to $5,000,000. The Sellers and/or their successor(s) shall not make any distributions or payments (other than distributions of the Sellers' Stock or on account of Estate Costs) unless the Sellers shall have (i) made all of the payments described in the immediately preceding sentence and (ii) waived their rights to receive any and all payments under Section 7.04(b) and waived their rights to sell the Sellers' Stock to the Purchaser under Section 7.04(c).

(e)    For purposes of this Section 7.04, "successor(s)" to the Sellers shall mean a plan administrator or a liquidating trust or an entity serving a comparable function, and shall not include the creditors of the Sellers to whom the Sellers' Stock is distributed.

Section 7.05.  Distribution of the Sellers' Stock.  Sellers agree that, without the written consent of the Purchaser, the Sellers will not sell or otherwise transfer or distribute the Sellers' Stock except pursuant to a distribution by the Sellers to the holders of allowed Claims in the Case under a confirmed Chapter 11 plan of reorganization or to One Equity Partners LLC. Sellers further agree that the Sellers' plan of reorganization (the "Proposed Plan") will, if requested by the Purchaser, contain, in form and substance reasonably acceptable to the Purchaser, provisions to the following effect:  (i) the Purchaser shall be deemed to be a "successor" to the Sellers for the limited purpose of the provisions of section 1145(a) of the Bankruptcy Code; and (ii) the distribution of the Sellers' Stock under the Proposed Plan to the holders of allowed Claims against the Sellers shall constitute the offer or sale under a plan of the Sellers of a security in exchange for a claim against, an interest in, or a claim for an administrative expense in the Case.  In addition, Sellers agree that any disclosure statement under section 1125 of the Bankruptcy Code in support of the Proposed Plan shall (i) contain a description, in form and substance reasonably acceptable to the Purchaser, of the exemption from securities laws under section 1145 of the Bankruptcy Code with respect to the Sellers' Stock, and (ii) advise any holder of any Claim potentially entitled to receive such Sellers' Stock to consult their own advisors with respect thereto.  The Purchaser shall cooperate with the Sellers in the preparation of any such disclosure statement and provide such information regarding the Purchaser as shall be necessary to ensure that the disclosure statement complies with section 1125 of the Bankruptcy Code.  Sellers further agree that they will use their reasonable best efforts to obtain a final and non-appealable order of the Bankruptcy Court confirming the Proposed Plan, which final and non-appealable order shall contain, in form and substance reasonably acceptable to the Purchaser, provisions to the following effect: (i) the Purchaser shall be deemed to be a "successor" to the Sellers for the limited purpose of the provisions of section 1145(a) of the Bankruptcy Code; and (ii) the distribution of the Sellers' Stock under the Sellers' confirmed Chapter 11 plan to the holders of allowed Claims against the Sellers shall constitute the offer or sale under a plan of the Sellers of a security in exchange for a claim against, an interest in, or a claim for an administrative expense in the Case.

Section 7.06.  Non-transferable Claims.  If any cause of action, judgment, Claim or demand intended to be included in the Acquired Assets pursuant to Section 2.01(m) is not

transferable or assignable to the Purchaser for any reason, the Sellers agree not to pursue any such cause of action, judgment, Claim or demand without the prior written consent of the Purchaser.

## ARTICLE VIII

## CONDITIONS PRECEDENT

Section 8.01.  <u>Conditions Precedent to Obligations of the Sellers and the Purchaser</u>.  The respective obligations of each party to effect the Contemplated Transactions shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)     any waiting period applicable to the consummation of the Contemplated Transactions under the HSR Act and any applicable foreign antitrust or competition laws shall have expired or been terminated;

(b)     no statute, rule, regulation, executive order, decree, decision, ruling, or preliminary or permanent injunction shall have been enacted, entered, promulgated, or enforced by any U.S. federal or state court or foreign governmental authority that prohibits, restrains, enjoins or restricts the consummation of the Contemplated Transactions that has not been withdrawn or terminated; and

(c)     the Approval Order in substantially the form contemplated by this Agreement (unless the Purchaser shall have agreed to modifications) shall have been entered by the Bankruptcy Court and shall have become final and non-appealable.

Section 8.02.  <u>Conditions Precedent to Obligation of the Sellers</u>.  The obligation of the Sellers to effect the Contemplated Transactions shall be subject to the satisfaction at or prior to the Closing Date of the conditions set forth in Section 8.01 and of the following additional conditions (compliance with which or the occurrence of which may be waived in whole or in part in a writing executed by Polaroid):

(a)     (i) the Purchaser shall have performed in all material respects its obligations under this Agreement required to be performed by it at or prior to the Closing Date and (ii) the representations and warranties of the Purchaser contained in this Agreement, disregarding all qualifications and exceptions contained in such representations and warranties relating to materiality or material adverse effect, shall be true and correct in all respects, in each case as of the date of this Agreement and as of the Closing Date as if made at and as of such dates, it being understood and agreed (A) that the condition set forth in clause (ii) of this Section 8.02(a) shall be deemed to have been satisfied unless any failure to be true has had, individually or in the aggregate with all other failures relating to the various representations and warranties of the Purchaser, a material adverse effect on the ability of the Purchaser to consummate the Contemplated Transactions, and (B) that representations and warranties made as of a specific date need be true only as of that date; and

(b)     all of the documents, agreements and certificates described in Section 3.02(a) shall have been delivered as described therein.

Section 8.03. <u>Conditions Precedent to Obligation of the Purchaser</u>.    The obligation of the Purchaser to effect the Contemplated Transactions shall be subject to the satisfaction at or prior to the Closing Date of the conditions set forth in Section 8.01 and of the following additional conditions (compliance with which or the occurrence of which may be waived in whole or in part in a writing executed by the Purchaser):

(a)    (i) each Seller shall have performed in all material respects their obligations under this Agreement required to be performed by them at or prior to the Closing Date and (ii) the representations and warranties of the Sellers contained in this Agreement, disregarding all qualifications and exceptions contained in such representations and warranties relating to materiality or Material Adverse Effect, shall be true and correct in all respects, in each case as of the date of this Agreement and as of the Closing Date as if made at and as of such dates, it being understood and agreed (A) that the condition set forth in clause (ii) of this Section 8.03(a) shall be deemed to have been satisfied unless any failure to be true has had, individually or in the aggregate with all other failures relating to the various representations and warranties of the Sellers, a Material Adverse Effect, and (B) that representations and warranties made as of a specific date need be true only as of that date;

(b)    all of the documents, agreements and certificates described in Section 3.02(b) shall have been delivered as described therein;

(c)    all consents and approvals of third parties and Governmental Authorities necessary to consummate the transactions contemplated hereby, other than those consents and approvals the absence of which, individually or in the aggregate, would not have a Material Adverse Effect and would not materially impair the Purchaser's ability to operate the Business substantially in the same manner as the Business is operated immediately prior to the Closing, shall have been obtained in a form reasonably satisfactory to Purchaser, without any diminution in the value of the Acquired Assets;

(d)    the Purchaser shall have received all Permits necessary to allow the Purchaser to operate the Business immediately after the Closing substantially in the same manner as the Business is operated immediately prior to the Closing, other than those Permits the absence of which, individually or in the aggregate, would not have a Material Adverse Effect and would not materially impair the Purchaser's ability to operate the Business substantially in the same manner as the Business is operated immediately prior to the Closing;

(e)    no Material Adverse Effect shall have occurred, nor shall any event or circumstance which could reasonably be expected to have a Material Adverse Effect shall have occurred;

(f)    at least twenty-five million dollars ($25,000,000) and not more than thirty million dollars ($30,000,000) of Cash and Cash Equivalents shall be held by the Foreign Subsidiaries;

(g)    with respect to (i) Transfer Taxes due in connection with the transactions contemplated by this Agreement, and all income Taxes due on the sale of all of the outstanding capital stock of Polaroid de Mexico S.A. de C.V. pursuant to Article 190 of the

Income Tax Law (Mexico), (ii) all withholding Taxes due in connection with the repatriation of Cash and Cash Equivalents held by the Foreign Subsidiaries to the Sellers prior to the Closing, and (iii) all California sales and use Taxes relating to periods from July 1997 through June 30, 2000, including any proposed sales and use Taxes stated by way of notice, audit report, or any other correspondence received from the California Board of Equalization, the Sellers shall have provided evidence reasonably satisfactory to the Purchaser (x) of the full payment of all such Taxes and/or (y) to the extent such Taxes have not been paid in full, that the Sellers have set aside (or have caused the applicable Foreign Subsidiaries to set aside) funds in a separate escrow account reasonably satisfactory to the Purchaser (or, in the case of any Foreign Subsidiary, in such other manner as is reasonably satisfactory to the Purchaser), in amounts sufficient to pay in full any and all such unpaid Taxes, such funds to be held in escrow with an independent escrow agent for the purpose of paying such Taxes; and

(h)    the Sellers shall have provided evidence reasonably satisfactory to the Purchaser that the Sellers, at the Purchaser's request, shall have caused, immediately prior to the Closing, any outstanding intercompany indebtedness owed by any Foreign Subsidiary to any Seller to be contributed to the capital of such Foreign Subsidiary or Foreign Subsidiaries as may be designated by the Purchaser prior to the Closing.

## ARTICLE IX

## FURTHER AGREEMENTS AND TERMINATION

Section 9.01. <u>Termination</u>.    This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)    by mutual consent of each of Polaroid and the Purchaser;

(b)    by either of Polaroid or the Purchaser if a Governmental Authority shall have issued an order, decree or ruling (which order, decree or ruling the parties hereto shall have used their reasonable best efforts to lift), in each case, which has the effect of permanently restraining, enjoining or otherwise prohibiting the Contemplated Transactions and such order, decree, ruling or other action shall have become final and nonappealable;

(c)    by either Polaroid or the Purchaser upon written notice to the non-terminating party by the terminating party:

(i)    (A) if the Bankruptcy Court approves a Competing Transaction or (B) upon the expiration of five Business Days following the Sale Hearing (as defined in the Bidding Procedures) (the "<u>Approval Deadline</u>"), if the Approval Order shall not have been entered by the Bankruptcy Court as a result of the Committee's sponsorship or proposal of a plan of reorganization or liquidation or alternative transaction; or

(ii)    (A) if the Sellers sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization, Recapitalization or other similar transaction, of all or substantially all or a material portion of the Business or the Acquired Assets (or agrees to do any of the

foregoing) in a transaction or series of transactions to a party or parties other than the Purchaser and other than in a Competing Transaction or (B) upon the filing by the Sellers of a plan of reorganization or liquidation for any of the Sellers which does not provide for the sale of the Acquired Assets to the Purchaser under this Agreement, or upon the confirmation of any such plan, whether or not filed by Sellers;

        (d)    by the Purchaser:

        (i)    if the Sales Procedures Order in substantially the form contemplated by this Agreement (unless the Purchaser shall have agreed to modifications) shall not have been entered by the Bankruptcy Court and become final and non-appealable on or before May 20, 2002; provided, however, Purchaser shall no longer have the right to terminate this Agreement pursuant to this Section 9.01(d)(i) after the Sales Procedure Order in such form shall have been entered by the Bankruptcy Court and shall have become final and non-appealable;

        (ii)    if the Approval Order in substantially the form contemplated by this Agreement (unless the Purchaser shall have agreed to modifications) shall not have been entered by the Bankruptcy Court and become final and non-appealable on or before July 12, 2002; provided, however, Purchaser shall no longer have the right to terminate this Agreement pursuant to this Section 9.01(d)(ii) after the Approval Order in such form shall have been entered by the Bankruptcy Court and shall have become final and non-appealable;

        (iii)    if there shall have been a default or Breach by any Seller of such Seller's representations and warranties, covenants, agreements, terms or conditions in this Agreement, the Ancillary Agreements or in any exhibit, schedule, writing, document, instrument or certificate delivered pursuant to this Agreement or in connection with the transactions contemplated hereby, which default or Breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within 30 Business Days following receipt by the Sellers of written notice of such default or Breach from the Purchaser (specifying, in reasonable detail, such claimed default or Breach and demanding its cure or satisfaction), and which default or Breach would entitle the Purchaser not to consummate the Closing under Section 8.03(a);

        (iv)    if, since the date of this Agreement, there shall have been any event, development or change of circumstance that has had, individually or in the aggregate, a Material Adverse Effect;

        (v)    on or prior to May 1, 2002, if the Purchaser shall not have received a written commitment or commitments for bank financing, on terms and conditions satisfactory to Purchaser in its sole discretion, in an amount (together with the proceeds of the equity financing contemplated by the Equity Commitment Letter) sufficient to (A) consummate the transactions contemplated by this Agreement, (B) pay the fees and expenses of the transactions contemplated by this Agreement and (C) provide for the ongoing working capital needs of the Business;

(vi)    if the Purchaser is ready, willing and able to consummate the Closing and the Sellers have willfully failed or refuse to consummate the Closing within five (5) days after the satisfaction of all conditions precedent to Closing set forth in Sections 8.01 and 8.02; or

(vii)    if the Closing shall not have occurred on or before July 31, 2002.

(e)    by Polaroid:

(i)    if there shall have been a default or Breach by the Purchaser of any of the Purchaser's representations and warranties, covenants, agreements, terms or conditions in this Agreement, the Ancillary Agreements or in any exhibit, schedule, writing, document, instrument or certificate delivered pursuant to this Agreement or in connection with the transactions contemplated hereby, which default or Breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within 30 Business Days following receipt by the Purchaser of written notice of such default or Breach from Sellers (specifying, in reasonable detail, such claimed default or Breach and demanding its cure or satisfaction), and which default or Breach would entitle Sellers not to consummate the Closing under Section 8.02(a); or

(ii)    if the Sellers are ready, willing and able to consummate the Closing and the Purchaser has willfully failed or refuses to consummate the Closing within five (5) days after the satisfaction of all conditions precedent to Closing set forth in Sections 8.01 and 8.03; or

(iii)    if the Closing shall not have occurred on or before August 31, 2002.

Section 9.02.  Termination Payment.

(a)    In the event this Agreement is terminated pursuant to Section 9.01(c)(i), (c)(ii), (d)(iii) or (d)(vi), and provided that the Purchaser is not then in material breach of this Agreement for which the Sellers had previously notified Purchaser (and in the case of Sections 9.01(c)(i) and (c)(ii), such notice shall have been received by the Purchaser prior to the Bid Deadline (as defined in the Bidding Procedures attached hereto as Exhibit M) and such material breach shall not have been cured prior to the Auction (as defined in the Bidding Procedures)), then Polaroid shall be obligated to pay the Purchaser an amount equal to $5,000,000 (the "Termination Payment"). Any Termination Payment payable upon termination of this Agreement pursuant to Section 9.01(d)(iii) or (d)(vi) shall be immediately earned and payable by the Sellers to the Purchaser or its designee upon such termination. Any Termination Payment payable upon termination of this Agreement pursuant to Section 9.01(c)(i) or (c)(ii) shall be immediately earned upon such termination and payable by the Sellers to the Purchaser or its designee upon:

(i)    with respect to a termination pursuant to Section 9.01(c)(i)(A), the earlier of (x) the closing of the Competing Transaction or (y) the

expiration of ninety (90) days following the date of the Bankruptcy Court's approval of such Competing Transaction;

           (ii)    with respect to a termination pursuant to Section 9.01(c)(i)(B), the earlier of (x) the consummation of any such plan or alternative transaction sponsored or proposed by the Committee or (y) the expiration of ninety (90) days following the Approval Deadline;

           (iii)    with respect to a termination pursuant to Section 9.01(c)(ii)(A), the earlier of (x) the consummation of any such sale, transfer, lease or other disposition of all or substantially all or a material portion of the Business or the Acquired Assets or (y) the expiration of ninety (90) days following the date the Sellers enter into any agreement to do any of the foregoing; and

           (iv)    with respect to a termination pursuant to Section 9.01(c)(ii)(B), the earlier of (x) the consummation of any such plan of reorganization or liquidation for any of the Sellers or (y) the expiration of ninety (90) days following the date of filing of any such plan of reorganization or liquidation.

        (b)    In the event this Agreement is terminated pursuant to Section 9.01(b), (d)(ii), (d)(iv), (d)(vii) or (e)(iii), and provided that (i) the Purchaser is not then in material breach of this Agreement for which the Sellers had previously notified the Purchaser, (ii) in the case of Section 9.01(b), the issuance of the relevant order, decree or ruling is not the result of the status of the Purchaser or any action or conduct of the Purchaser, and (iii) in the case of Sections 9.01(d)(ii), (d)(iv) and (d)(vii), the failure or occurrence of the event giving rise to any such termination is not the result of the status of the Purchaser or any action or conduct of the Purchaser (it being understood that for purposes of this clause (iii), Purchaser's failure or refusal to amend, modify or waive any rights or conditions under this Agreement shall not be deemed to be an action or conduct of the Purchaser), then Polaroid shall be obligated to pay the Purchaser an amount equal to the Purchaser's reasonable fees and expenses (including, without limitation, reasonable attorneys' fees, expenses of its financial advisors, and expenses of other consultants) incurred in connection with the transactions contemplated by this Agreement (the "Expense Reimbursement") up to (x) if such termination shall occur prior to June 12, 2002, three million dollars ($3,000,000) or (y) if such termination shall occur on or after June 12, 2002, three million five hundred thousand dollars ($3,500,000). In the event this Agreement is terminated pursuant to Section 9.01(d)(i), and the Bankruptcy Court so authorizes, Polaroid shall be obligated to pay the Purchaser an amount equal to the Expense Reimbursement. Any Expense Reimbursement payable upon termination of this Agreement pursuant to Section 9.01(b), (d)(i), (d)(ii), (d)(iv), (d)(vii) or (e)(iii) shall be immediately earned upon such termination and payable by the Sellers to the Purchaser or its designee promptly upon the delivery of an invoice related to such Expense Reimbursement to Polaroid by the Purchaser, provided, however, that if the Sellers believe, in good faith, that the amount of the Expense Reimbursement sought by the Purchaser is not reasonable, then they shall have the right to seek Bankruptcy Court review thereof prior to paying such amount. Notwithstanding anything to the contrary contained in this Section 9.02, if the Sellers sell substantially all of their assets for consideration totaling in excess of the consideration provided for herein within six (6) months after the termination of this Agreement pursuant to Section 9.01(e)(iii), then Polaroid shall be obligated to pay the Purchaser an amount

equal to the Termination Payment (if the Expense Reimbursement has not been paid previously) or the excess of the Termination Payment over the Expense Reimbursement (if the Expense Reimbursement has been paid previously) (such excess, the "Excess Amount"). Any such Termination Payment or such Excess Amount, as the case may be, shall be immediately earned and payable by the Sellers to the Purchaser or its designee upon the closing of such sale.

(c)    The payment to the Purchaser or any designees of the Purchaser pursuant to this Section 9.02 shall be by wire transfer of immediately available funds in Dollars, to such account or accounts as the Purchaser shall designate in writing.

Section 9.03. Procedure and Effect of Termination. In the event of termination and abandonment of the transactions contemplated hereby pursuant to Section 9.01, written notice thereof shall forthwith be given to the other parties to this Agreement and this Agreement shall terminate (subject to the provisions of this Section 9) and the Contemplated Transactions shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided herein no party hereto shall have any liability or further obligation to any other party to this Agreement resulting from such termination except (a) that the provisions of Section 2.06 (Deposit Amount), Section 6.04 (Public Announcements), this Article IX (Further Agreements and Termination), Section 10.02 (Notices), Section 10.05 (Governing Law), Section 10.06 (Venue and Retention of Jurisdiction) and Section 10.08 (Expenses) shall remain in full force and effect; and (b) no party waives any claim or right against a breaching party in respect of any of its representations, warranties, covenants or agreements set forth in this Agreement; provided, however, that in the event the Purchaser is entitled to receive the Termination Payment, the right of the Purchaser to receive such amount shall constitute the Purchaser's sole remedy for (and such amount shall constitute liquidated damages in respect of) any breach by any Seller of any of its representations, warranties, covenants or agreements set forth in this Agreement; and provided further, however, that in the event the Sellers are entitled to receive the Deposit Amount (or any part thereof) pursuant to Section 2.06, the right of the Sellers to receive such amount shall constitute the Sellers' sole remedy for (and such amount shall constitute liquidated damages in respect of) any breach by the Purchaser of any of its representations, warranties, covenants or agreements set forth in this Agreement.

## ARTICLE X

## GENERAL PROVISIONS

Section 10.01. Disclosure Schedule. Nothing in the Disclosure Schedule shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the exception is described on the Disclosure Schedule with reasonable particularity and expressly refers to the applicable Section of this Agreement.

Section 10.02. Notices. All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed given upon (a) confirmation of receipt of a facsimile transmission, (b) confirmed delivery by a standard overnight carrier or when delivered by hand, or (c) the expiration of three (3) Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective parties at the following addresses (or such other address for a party as shall be specified by like notice):

(a)     If to the Purchaser, to:

OEP Imaging Corporation
c/o One Equity Partners LLC
320 Park Avenue, 18th Floor
New York, New York  10022
Attention:  Chuck Auster
Facsimile:  212.277.1533

with copies to:

Dechert
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, Pennsylvania 19103-2793
Attention:  Carmen J. Romano, Esq.
Facsimile:  215.994.2222

Dechert
30 Rockefeller Plaza
New York, New York  10112
Attention:  Joel H. Levitin, Esq.
Facsimile:  212.698.3599

(b)     If to any Seller, to:

Polaroid Corporation
784 Memorial Drive
Cambridge, Massachusetts 02139
Attention: Neal Goldman, Esq.
Facsimile: (781) 386-3924

with copies to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, Delaware  19801
Attention: Gregg M. Galardi, Esq.
Facsimile: (302) 651-3001

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York  10017
Attention:  Marshall S. Huebner, Esq.
Facsimile:  212.450.3099

Akin, Gump, Strauss, Hauer & Feld, L.L.P.
590 Madison Avenue
New York, New York 10022
Attention: Fred S. Hodara, Esq.
Facsimile: 212.872.1002

Section 10.03. Descriptive Headings. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 10.04. Entire Agreement; Assignment. This Agreement (including the Exhibits and the Disclosure Schedule and the other documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the parties, with respect to the subject matter hereof. This Agreement and the rights and obligations may not be assigned in whole or in part by any party hereto, including by operation of law or otherwise except (a) with the written consent of the other parties hereto, (b) by the Purchaser to one or more direct or indirect subsidiaries or other Affiliates of the Purchaser which assignment shall not relieve the Purchaser of any of its obligations hereunder or (c) by the Purchaser as collateral security to any entity providing direct or indirect financing to Purchaser or any of its Affiliates. To the extent any such assignment by the Purchaser relates to the assignment by any Seller of an executory contract or unexpired lease hereunder and occurs prior to Closing such that, at Closing, this Agreement will provide for the Sellers' assignment of such executory contract or unexpired lease to a party other than the Purchaser, such assignment by the Seller shall be subject to all applicable provisions of the Bankruptcy Code.

Section 10.05. Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware without giving effect to the rules of conflict of laws of the State of Delaware that would require application of any other law.

Section 10.06. Venue and Retention of Jurisdiction. All actions brought, arising out of, or related to the Contemplated Transactions shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions.

Section 10.07. Risk of Loss. Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business shall be borne exclusively by the Sellers.

Section 10.08. Expenses. Except as otherwise expressly provided herein, whether or not the actions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the Contemplated Transactions shall be paid by the party incurring such expenses.

Section 10.09. Amendment. This Agreement (including the Exhibits and the Disclosure Schedule) may not be amended except by an instrument in writing signed on behalf of the parties hereto.

Section 10.10. Waiver. At any time prior to the Closing Date, the parties hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions contained herein. Except as otherwise expressly provided herein, any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

Section 10.11. Counterparts; Effectiveness. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement. This Agreement shall become effective when each party hereto shall have received counterparts thereof signed by all the other parties hereto.

Section 10.12. Severability; Validity. If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other persons or circumstances, shall not be affected thereby, and to such end, the provisions of this Agreement are agreed to be severable.

Section 10.13. No Third Party Beneficiaries or Liabilities. Nothing in this Agreement, express or implied, is intended to or shall (i) confer on any Person other than the parties hereto and their respective successors or assigns any rights (including third party beneficiary rights), remedies, obligations or liabilities under or by reason of this Agreement, (ii) constitute the parties hereto as partners or as participants in a joint venture (iii) confer on any director, officer or employee of the Purchaser or its Affiliates any obligations or liabilities under or by reason of this Agreement. This Agreement shall not provide third parties with any remedy, claim, liability, reimbursement, cause of action or other right in excess of those existing without reference to the terms of this Agreement. Nothing in this Agreement shall be construed as giving to any Employee or any other individual any right or entitlement under any Benefit Plan maintained by Sellers except as expressly provided in such Benefit Plan. No third party shall have any rights under Sections 502, 503 or 504 of ERISA or any regulations thereunder because of this Agreement which would not otherwise exist without reference to this Agreement. No third party shall have any right, independent of any right which may exist irrespective of this Agreement, under or granted by this Agreement, to bring any suit at law or equity for any matter governed by or subject to the provisions of this Agreement.

Section 10.14. Enforcement of Agreement. The parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

Section 10.15. Separate Agreements. Notwithstanding any provision to the contrary contained herein, the Purchaser and/or its designated Affiliate may, at Purchaser's election, purchase all or a portion of the Sellers' right, title and interest in and to any or all of the outstanding capital stock of the Acquired Subsidiaries under one or more separate acquisition

agreements substantially in the form attached hereto as Exhibit S (each, an "Acquisition Agreement"). If the Purchaser and/or its designated Affiliate elects to enter into one or more Acquisition Agreements, the Consideration for the Acquired Assets under this Agreement shall be reduced by the amount of the purchase price for the capital stock of the Acquired Subsidiaries purchased or sold under such Acquisition Agreements. Notwithstanding the foregoing, for purposes of any allocations of consideration (as that term is defined in Treasury Regulation section 1.1060-1(c)), the amounts paid under this Agreement and any and all Acquisition Agreements shall be aggregated as set forth in Section 3.03(c) of this Agreement. If the Purchaser and/or its designated Affiliate elects to enter into one or more Acquisition Agreements, the indemnification and other post-closing obligation provisions of this Agreement shall apply to such Acquisition Agreements and be binding on the parties to such Acquisition Agreements as if the capital stock of the Acquired Subsidiaries purchased or sold under such Acquisition Agreements were purchased and sold under this Agreement. In addition to the foregoing, the Sellers agree to cooperate with the Purchaser in structuring the acquisition of the Foreign Subsidiaries in such manner as the Purchaser may reasonably request to facilitate any financing to be entered into by the Purchaser in connection with the Contemplated Transactions. Furthermore, the Sellers agree to cooperate with the Purchaser in transferring Cash and Cash Equivalents between the Sellers and the Foreign Subsidiaries and between the Foreign Subsidiaries in such manner as the Purchaser may reasonably request in connection with the Contemplated Transactions. Without limiting the generality of the immediately foregoing two sentences, the Sellers agree, at Purchaser's request in writing, to form new entities and, immediately prior to the Closing, to transfer the equity interests of Foreign Subsidiaries designated by the Purchaser in writing to such newly formed entities and that in lieu of acquiring such designated Foreign Subsidiaries, the Purchaser shall acquire all the equity interests of such newly formed entities. The Sellers and the Purchaser agree that such newly formed entities shall be deemed to be "Foreign Subsidiaries" under this Agreement. Notwithstanding any provision to the contrary contained herein, the Sellers shall not be required to take any action pursuant to this Section 10.15 unless the Purchaser agrees to reimburse the Sellers for any added costs or Taxes resulting therefrom, nor shall the Sellers be required to take any action pursuant to this Section 10.15 that would delay the Closing. Prior to the date of the Auction, the Purchaser shall notify the Sellers of its election or non-election to enter into one or more Acquisition Agreements and, if applicable, the structure of the acquisition of the Foreign Subsidiaries.

        Section 10.16.    Non-Survival of Representations and Warranties and Certain Covenants. None of the representations and warranties contained in this Agreement and none of the covenants contained in this Agreement which are required by their terms to be performed prior to the Closing shall survive the Closing.

## ARTICLE XI

## INDEX OF DEFINED TERMS

        Section 11.01.    Index. The terms listed below shall have meanings set forth in the Section listed across from the term.

| Term | Section or Reference |
|---|---|
| 2001 Audited Financial Statement | 4.06 |
| 2002 Financial Plan | 1.01 |
| Accounts Payable | 1.01 |
| Accounts Receivable | 1.01 |
| Acquired Assets | 2.01 |
| Acquired Stock | 2.01 |
| Acquired Subsidiaries | Preamble |
| Additional Assumed Contracts | 6.13(c) |
| Affiliate | 1.01 |
| Agreement | Preamble |
| Allocation | 3.03(a) |
| Ancillary Agreements | 1.01 |
| Acquisition Agreement | 11.15 |
| Acquisition Proposal | 1.01 |
| Applicable Law | 1.01 |
| Approval Order | 1.01 |
| Assumed Contracts | 1.01 |
| Assumed Liabilities | 2.03 |
| Audited Financial Statements | 4.09 |
| Bank Reimbursement | 7.04(b) |
| Bankruptcy Code | Preamble |
| Bankruptcy Court | Preamble |
| Bidding Procedures | 1.01 |
| Books and Records | 1.01 |
| Borrowing Foreign Subsidiaries | 6.20 |
| Breach | 1.01 |
| Bulk Sales Laws | 1.01 |
| Business | 1.01 |
| Business Day | 1.01 |
| Capital Lease Obligations | 1.01 |
| Case | Preamble |
| Cash and Cash Equivalents | 1.01 |
| Cash Consideration | 2.05 |
| CERCLA | 1.01 |
| CERCLIS | 1.01 |
| Claim | 1.01 |
| Closing | 3.01 |
| Closing Date | 3.01 |
| Code | 1.01 |
| Committee | 1.01 |
| Competing Transaction | 1.01 |
| Confidentiality Agreement | 1.01 |
| Consideration | 2.05 |

| Term | Section or Reference |
|---|---|
| Contemplated Transactions | Preamble |
| Contract | 1.01 |
| Copyrights | 1.01 |
| Credit Agreement | 6.20 |
| Cure Amounts | 2.03(a) |
| date hereof | 1.01 |
| date of this Agreement | 1.01 |
| Debt Repayment Amount | 6.21 |
| Demolition Agreement | 2.01(v) |
| Demolition Deposit | 2.01(v) |
| Deposit Amount | 2.06 |
| Deposit Escrow Agreement | 1.01 |
| Designated Accounts Receivable | 6.19(b) |
| Determination Date | 1.01 |
| Digimarc Asset Purchase Agreement | 2.01(bb) |
| Disclosure Schedule | 1.01 |
| Dollar | 1.01 |
| Domain Names | 1.01 |
| Earn-Out Note | 2.01(u) |
| Elections | 6.07(b) |
| Employee | 1.01 |
| Employment Laws | 4.21 |
| Encumbrance | 1.01 |
| Environmental Audits | 4.15(g) |
| Environmental Laws | 1.01 |
| Environmental Liabilities | 1.01 |
| Environmental Permits | 4.15(d) |
| Equity Commitment Letter | 5.06 |
| Equity Interest | 1.01 |
| ERISA | 1.01 |
| ERISA Affiliate | 1.01 |
| Escrow Agent | 1.01 |
| Excess Amount | 9.02(b) |
| Excluded Assets | 2.02 |
| Excluded Liabilities | 2.04 |
| Exclusivity Order | 1.01 |
| Expense Reimbursement | 9.02(b) |
| Filing Date | Preamble |
| Financial Statements | 4.09 |
| Foreign Plans | 4.16(d) |
| Foreign Subsidiaries | 1.01 |
| GAAP | 1.01 |
| Governmental Authority | 1.01 |

| Term | Section or Reference |
|------|----------------------|
| Governmental Requirements | 4.03 |
| Guarantee Obligation | 1.01 |
| Hazardous Materials | 1.01 |
| Hired Employee | 1.01 |
| HSR Act | 4.03 |
| Improvements | 1.01 |
| Including | 1.01 |
| Indebtedness | 1.01 |
| Initial Assumed Contracts | 6.13(b) |
| Intellectual Property | 1.01 |
| Interest Rate | 1.01 |
| Interim Financial Statements | 4.09 |
| Inventory | 1.01 |
| Law | 1.01 |
| Leased Real Estate | 4.17(b) |
| Lease Deposit | 2.01(t) |
| Leases | 4.17(b) |
| Legal Proceeding | 1.01 |
| Liability | 1.01 |
| Licenses | 1.01 |
| Manage | 1.01 |
| Marks | 1.01 |
| Material Adverse Effect | 1.01 |
| Modified List | 6.08(a) |
| Multiemployer Plan | 1.01 |
| Net Related Party Special Dividends | 6.20 |
| OEP | 5.06 |
| Ordinary Course of Business | 1.01 |
| Owned Real Estate | 4.17(a) |
| Patents | 1.01 |
| PD Winter Street Lease | 2.01(t) |
| Pension Plan | 1.01 |
| Permits | 1.01 |
| Permitted Encumbrances | 1.01 |
| Person | 1.01 |
| Petitions | Preamble |
| Polaroid | Preamble |
| Polaroid Employee | 1.01 |
| Polaroid Entities | 1.01 |
| Polaroid ID | 2.01(bb) |
| Polaroid Intellectual Property | 4.20(a) |
| Polaroid Name | 6.18 |
| Post-Petition Contracts | 1.01 |

| Term | Section or Reference |
|---|---|
| Post-Petition Intercompany Payables | 2.03(d) |
| Post-Petition Intercompany Receivables | 6.19(a) |
| Pre-Petition Intercompany Payables | 6.19(a) |
| Pre-Petition Intercompany Receivables | 6.19(a) |
| Preliminary Assumed Contracts List | 6.13(a) |
| Projected Balance Sheet | 1.01 |
| Prior Period Returns | 6.07(h)(i) |
| Projected Balance Sheet | 2.05 |
| Purchaser | Preamble |
| Purchaser's Consent | 1.01 |
| Purchaser's 401(k) Plan | 6.08(d) |
| Purchaser's Welfare Benefit Plan | 6.08(b) |
| Real Estate | 4.17(c) |
| Recapitalization | 1.01 |
| Related Party Accounts Receivable | 6.19(b) |
| Related Party Special Dividends | 6.20 |
| Release | 1.01 |
| Remaining Assets | 7.04(c) |
| Remediation | 4.15(c) |
| Representative | 1.01 |
| Requested Dividends | 6.19(b) |
| Requested Dividend Withholding Taxes | 6.19(b) |
| Restated Asset Purchase Agreement | Preamble |
| Retained Related Party Accounts Receivable | 6.19(d) |
| Requested Retained Cash | 2.05(b) |
| Sales Procedures Order | 1.01 |
| Second Tier Reimbursement | 7.04(b) |
| Securities Act | 4.25 |
| Seller Guarantees | 6.11 |
| Sellers' 401(k) Plan | 6.08(d) |
| Sellers | Preamble |
| Sellers' Auditors | 1.01 |
| Sellers' Knowledge | 1.01 |
| Sellers' Stock | 1.01 |
| Sellers' Portion | 6.07(h)(ii) |
| Straddle Period | 6.07(h)(ii) |
| Straddle Period Return | 6.07(h)(ii) |
| Subsidiary | 1.01 |
| Synthetic Lease Obligation | 1.01 |
| Taxes | 1.01 |
| Tax Items | 1.01 |
| Tax Returns | 1.01 |
| Termination Payment | 9.02 |

| Term | Section or Reference |
| --- | --- |
| Third Party | 1.01 |
| 35 Day List | 6.08(a) |
| Threshold Amount | 10.01(a)(i) |
| Title Commitments | 6.14 |
| Title Company | 6.14 |
| Title Policies | 6.14 |
| Total Reimbursement Paid | 7.04(d) |
| Trade Secrets | 1.01 |
| Transfer Taxes | 6.07(a) |
| UK Loan Agreement | 4.24 |
| WARN Act | 4.21 |
| Welfare Plan | 1.01 |
| Zoning Certifications | 6.17 |

IN WITNESS WHEREOF, the Purchaser and each of the Sellers have caused this Asset Purchase Agreement to be executed on their behalf by their officers thereunto duly authorized, as of the date first above written.

PURCHASER

OEP IMAGING CORPORATION

By: _____

    Name: _Charles F. Auster_

    Title: _President_

SELLERS

**POLAROID CORPORATION**

By: _____
    Name: William L. Flaherty
    Title: Chief Financial Officer

**POLAROID ASIA PACIFIC LIMITED**

By: _____
    Name: William L. Flaherty
    Title: President

**POLAROID EYEWEAR, INC.**

By: _____
    Name: William L. Flaherty
    Title: Treasurer

**INNER CITY, INC.**

By: _____
    Name: Neal D. Goldman
    Title: Assistant Secretary

**POLAROID ASIA PACIFIC INTERNATIONAL INC**

By: _____
    Name: William L. Flaherty
    Title: President

**POLAROID LATIN AMERICA CORPORATION**

By: _____
    Name: William L. Flaherty
    Title: Vice President

**POLAROID MALAYSIA LIMITED**

By: _____
    Name: William L. Flaherty
    Title: Treasurer

**INTERNATIONAL POLAROID CORPORATION**

By: _____
    Name: William L. Flaherty
    Title: Treasurer

IN WITNESS WHEREOF, the Purchaser and each of the Sellers have caused this Asset Purchase Agreement to be executed on their behalf by their officers thereunto duly authorized, as of the date first above written.

PURCHASER

**OEP IMAGING CORPORATION**

By: _____
    Name: _____
    Title: _____

SELLERS

**POLAROID CORPORATION**

By: _____
    Name: William L. Flaherty
    Title: Chief Financial Officer

**POLAROID ASIA PACIFIC INTERNATIONAL INC**

By: _____
    Name: William L. Flaherty
    Title: President

**POLAROID ASIA PACIFIC LIMITED**

By: _____
    Name: William L. Flaherty
    Title: President

**POLAROID LATIN AMERICA CORPORATION**

By: _____
    Name: William L. Flaherty
    Title: Vice President

**POLAROID EYEWEAR, INC.**

By: _____
    Name: William L. Flaherty
    Title: Treasurer

**POLAROID MALAYSIA LIMITED**

By: _____
    Name: William L. Flaherty
    Title: Treasurer

**INNER CITY, INC.**

By: _____
    Name: Neal D. Goldman
    Title: Assistant Secretary

**INTERNATIONAL POLAROID CORPORATION**

By: _____
    Name: William L. Flaherty
    Title: Treasurer

MAG-MEDIA LTD.

By: _____
Name:  William L. Flaherty
Title:  President

PMC, INC.

By: _____
Name:  William L. Flaherty
Title:  President

POLAROID PARTNERS, INC.

By: _____
Name:  William L. Flaherty
Title:  Treasurer

POLINT, INC.

By: _____
Name:  William L. Flaherty
Title:  President

PRD CAPITAL, INC.

By: _____
Name:  William L. Flaherty
Title:  President

PRD INVESTMENT, INC.

By: _____
Name:  William L. Flaherty
Title:  President

POLAROID EYEWEAR FAREAST, INC.

By: _____
Name:  William L. Flaherty
Title:  Treasurer

SUB DEBT PARTNERS CORP.

By: _____
Name:  William L. Flaherty
Title:  President

POLAROID ONLINE SERVICES, INC.

By: _____
Name:  William L. Flaherty
Title:  Treasurer

POLAROID ID SYSTEMS, INC.

By: _____
Name:  William L. Flaherty
Title:  President

POLAROID DRY IMAGING, LLC

By:  POLAROID PARTNERS, INC.
     Manager

     By: _____
     Name:  William L. Flaherty
     Title:  Treasurer