UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SALLY FERRARI, ELAINE JOHNSON JOHN MAGENHEIMER, ELIZABETH WILLIAMS, and DAVID MANISCALCO, | ) ) ) ) |  |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 03-11275 (MLW) |
| v. | ) ) |  |
| POLAROID CORPORATION and NEAL GOLDMAN, | ) ) ) |  |
| Defendants. | ) ) |  |

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANT NEAL GOLDMAN'S MOTION FOR JUDGMENT
ON THE PLEADINGS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

Defendant Neal D. Goldman ("Goldman") submits this memorandum of law in support

of his motion for judgment on the pleadings, or, in the alternative, for summary judgment.

**PRELIMINARY STATEMENT**

This action represents an attempt to hold a member of the administrative committee for a

company's employee benefit plans personally liable for failing to ensure that healthcare and

other insurance coverage somehow was funded and would continue after the company had

declared bankruptcy, sold its business, and terminated the benefit plans themselves.

As of July 2002, Polaroid Corporation ("Old Polaroid") was on the verge of selling its

business under the aegis of the U.S. Bankruptcy Court for the District of Delaware. Plaintiffs

were then receiving long-term disability ("LTD") payments from an insurance company under a

certificate procured by Old Polaroid. (Those LTD payments continue to this day). Old Polaroid

also had been paying Plaintiffs' medical, dental, and life insurance premiums. On July 2, 2004,

Old Polaroid wrote to those on LTD, explaining that their insurance benefits would cease once the sale closed at the end of the month. Two weeks after the closing, on August 15th, Old Polaroid's board of directors terminated its employee benefit plans, including the plans under which Plaintiffs had been receiving insurance coverage.

Plaintiffs' purported claim that Goldman had a fiduciary obligation to insure the continuation of their benefits is legally unfounded, for the following reasons:

- The financing of corporate benefits is a "settlor" function which does not implicate fiduciary standards.

- The complaint in this case contains <u>no</u> allegations to the effect that Goldman had one iota of authority to secure financing for the plans at issue.

- The complaint alleges a chain of classic business decisions by Old Polaroid to wind up its affairs (including the <u>termination</u> of its employee benefit plans) which resulted in the loss of Plaintiffs' benefits, and nowhere alleges what Goldman could have done in a fiduciary capacity to prevent the loss at the time.

- ERISA authorizes certain, specified relief for any wrongful withholding of employee benefits, and does not make members of an administrative committee personally liable as insurers of such benefits.

## BACKGROUND

### I.     PROCEDURAL HISTORY.

Plaintiffs commenced this action in July 2003 — one year after the events which culminated in the sale of Old Polaroid's business and the termination of its employee benefit plans. The case was styled as a class action, and the original complaint named Old Polaroid but not Goldman as a defendant. Counts I & II asserted that Old Polaroid had breached an obligation to provide continuing medical, dental, and life insurance benefits (in addition to the LTD payments which Plaintiffs have continued to receive.) Complaint at 10-11. Plaintiffs primary sought declaratory and injunctive relief, "certifying" their rights and ordering the "restoration" of these benefits. <u>Id.</u> at 15, ¶¶ 1-4.

One month later, Old Polaroid's successor filed a Suggestion of Bankruptcy, and this Court subsequently stayed the case as to Old Polaroid. See Civil Docket Entry, Entry No. 2.

In November 2003, Plaintiffs filed an Amended Complaint, which dropped Old Polaroid (a/k/a Primary PDC, Inc.) as a defendant while adding Goldman. Notably, this new pleading continued to focus on the same relief: plan benefits. Compare Complaint at 15 with Amended Complaint at 13-14. In effect, Plaintiffs claimed that Goldman, in place of Old Polaroid, had a personal obligation to fund their medical, dental, and life insurance benefits.

The recently-filed Second Amended Complaint dropped Plaintiffs' prior class-action allegations, while adding a count to the effect that they were entitled to "make-whole" relief from Goldman. Second Amended Complaint ¶ 53 [hereinafter "SAC"]; id. at 13, ¶ 13.

## II.    PLAINTIFF'S FACTUAL ALLEGATIONS.

### A.    The Parties.

According to the Second Amended Complaint, see SAC ¶¶ 2-6, Plaintiffs are former employees of Old Polaroid who allegedly sought and received approval for LTD benefit payments during the late 1980s and 1990s:

| Name | Year |
|------|------|
| Sally Ferrari | 1997 |
| John Magenheimer (deceased) | 1998 |
| Elaine Johnson | 1991 |
| Elizabeth Williams | 1989 |
| David Maniscalco | 1998 |

Goldman is alleged to have been vice president, general counsel, and secretary of Old Polaroid. SAC ¶ 8. He allegedly was a "prominent member" of Old Polaroid's employee benefits committee. Id. ¶ 2. By way of background, this was a new role: Old Polaroid's Chairman and CEO appointed Goldman to a committee of five individuals who were designated

3

as plan administrators of Old Polaroid's employee benefit plans on July 13, 2001 — only one year before the events at issue took place. <u>See</u> Answer ¶ 22. A copy of the document appointing him is attached to this memorandum.

### B.    The Benefit Plans at Issue.

Plaintiffs do not complain about the termination of their LTD benefits. As the Second Amended Complaint recognizes, they have continued to receive LTD payments under an insurance arrangement which Old Polaroid previously had put in place. SAC ¶ 28.

Instead, Plaintiffs seek what they characterize as ancillary benefits, on top of these LTD payments — specifically the right to receive the full amount of their medical, dental, and life insurance premiums "in addition to long-term Disability benefits." SAC at 13, ¶¶ 1-4.

The Second Amended Complaint is devoid of factual allegations about Goldman's supposed responsibility to ensure financing for Plaintiffs' benefits under these plans. It contains <u>no</u> allegations about how and by whom the medical, dental, and life benefits were to be funded, and <u>no</u> allegations about the powers and duties of Goldman and the other administrative committee members generally. There is nothing in the Second Amended Complaint which would permit an inference that Goldman had any mandate with respect to financing.

Although not necessary to decide this motion, each of the plan documents already before the Court[1] confirms that Old Polaroid — and not any individual such as Goldman — was solely responsible with respect to financing the respective plans. The applicable plan documents include "FINANCING" Articles, which provide for Old Polaroid's payment of premiums for

---

[1] The LTD, medical, and dental plans are in writing, and before the Court as Exhibits 4, 5 and 6, respectively, to Appendix to Defendant Polaroid Corporation's Motion to Dismiss Plaintiffs' Amended Complaint ["Polaroid App."].

medical and dental coverage.[2]  The plan documents further specify the duties of the plan

administrators in administering the respective plans, without granting any authority or control

whatsoever over financing.[3]

---

[2] Section 5.02 of the medical plan states that "[t]he company shall contribute a flat amount for the participant's coverage regardless of the coverage selected. . . ." and that "the company's portion of the contribution, including the expenses of administering this plan, is paid out of the general assets of the company."  Polaroid App., Tab 5 at 8 (emphasis added).  Similarly, Section 5.02 of the dental plan states that "[t]he Employer shall pay a percentage of each participant's premium as determined by the Plan Administrator," and that "[p]articipants who are on Long-Term Disability may have their premiums 100% Employer paid subject to the approval of the Plan Administrator.  Id., Tab 6 at 9 (emphasis added).  Section 3.04 of both the medical and dental plans further provide that someone on "LTD shall be able to continue to participate in this plan, subject to the approval of the plan administrator, until he terminates, retires, dies, or recovers from such long-term disability."  Id., Tab 5 at 6 (emphasis added); id., Tab 6 at 7 (emphasis added).  Article IX of both plans reserves the right to amend or terminate the respective plans at any time.  Id., Tab 5 at 14; id., Tab 6 at 16.

[3] Section 6.02 of the LTD plan provides:

> Duties of the Plan Administrator.  The Plan Administrator, the committee selected by the Chief Executive Officer, shall be responsible for the administration and interpretation of the Plan.  Specifically, the Plan Administrator shall:
>
> (a)   administer the Plan in accordance with all its terms and shall have all the powers necessary to carry out the provisions of the Plan;
> (b)   have the exclusive discretionary authority to interpret the Plan on any and all matters which it has not delegated to the Plan Manager;
> (c)   develop policies and procedures as may be necessary for the proper and effective administration of the Plan;
> (d)   serve on a panel to make final judgment on appeals by Employees;
> (e)   maintain records of its actions;
> (f)   appoint the Plan Manager;
> (g)   engage and consult with counsel, accountants, specialists and other persons as the Plan Administrator deems necessary and desirable;
> (h)   notify the Trustee in writing of all actions the Plan Administrator desires of the Trustee; and
> (i)   delegate such additional duties and responsibilities to the Plan Manager as in its sole discretionary authority deems appropriate.

Polaroid App., Tab 4 at 7-8.  The provisions of the medical and dental plans are shorter but otherwise substantially similar.  See id., Tab 5 at 9-11; id., Tab 6 at 10-12.

## C.    The Alleged "Vesting" Of Plaintiffs' Benefits.

Plaintiffs' purported claims against Goldman are based on individual letters they received from Old Polaroid when they applied for LTD benefits (long before Goldman ever became a plan administrator). Each of these letters allegedly stated that "he or she was approved for the receipt of benefits pursuant to the plan." SAC ¶ 25 (emphasis added). The letters allegedly also "detailed the employee's right to additional benefits pursuant to the plan." Id. (emphasis added). Presumably, these allegations refer, respectively, to LTD payments, and to ancillary medical, dental, and life insurance benefits. Each letter allegedly stated that "all insurance premiums that were being deducted from your Polaroid paychecks will be paid for by Polaroid while you are on LTD," and allegedly included no "limitation or reservation of rights" concerning "Polaroid's payment of medical, dental, and life insurance premiums." Id. ¶¶ 26-27. These letters, Plaintiffs contend, gave them vested benefits. Id. ¶ 35.

There follows the legal conclusion that these letters "constituted a novation of the LTD plan's terms, as outlined in the then-existing plan documents." SAC ¶ 36. In other words, Plaintiffs allege the substitution of a new plan or plans, in the form of letters to individual employees, for the plan documents themselves. The Second Amended Complaint does not explain the contradiction between this allegation and the prior allegations that the letters speak in terms of providing benefits "pursuant to" the plan." In the alternative, Plaintiffs assert that each letter "constituted a summary plan description ["SPD"] as defined by 29 U.S.C. § 1022." SAC, ¶ 37. Again, they contend that a new SPD or SPDs (in the form of these letters) was substituted for the existing SPDs themselves. At most, then, these letters constituted an assurance outside the formal plan documents. (The law is that the formal plan documents and SPD control. See, e.g., Sprague v. General Motors Corp., 139 F.3d 388 (1998).)

6

**D.**    <u>The Sale Of Polaroid's Business Out Of Bankruptcy.</u>

Years after Plaintiffs were approved for LTD benefits, "pursuant to an order of the United States Bankruptcy Court, 'new Polaroid' [a/k/a OEPI] purchased the majority of 'old Polaroid's' assets."[4]  SAC ¶ 12.  Section 6.08 of the Purchase Agreement required the purchaser to provide a list of employees of Old Polaroid, to whom New Polaroid intended to offer employment.  <u>Compare</u> Counterclaim ¶ 14 <u>with</u> Answer to Counterclaim ¶ 14.  New Polaroid did not offer to "re-hire" anyone with a long-term disability.  SAC ¶ 31.

On or around July 2, 2002, Old Polaroid sent letters to those on LTD which notified them that they would not be "hired" by New Polaroid, and that they would be terminated from Old Polaroid and their medical, dental, and life insurance benefits would end.  <u>Id</u>.  Their actual LTD benefit payments, however, would continue.  In pertinent part, the letters stated:

> In anticipation of the upcoming sale by Polaroid Corporation of substantially all of the Company's assets, it is important that you be advised of the impact to your health and welfare benefits.
>
>     *   *   *   *
>
> Under the Asset Purchase Agreement, employees on long-term disability will not be hired by One Equity Partners.  Consequently, as of the date of the closing expected in late July, 2002, you will be terminated from Polaroid Corporation, and your group medical, dental and life insurance benefits will end.  However, your long-term disability benefits are insured benefits and should continue for as long as you remain LTD eligible.

<u>Compare</u> Counterclaim ¶ 16 <u>with</u> Answer to Counterclaim ¶ 16.

---

[4]  The term "majority" is an understatement.  As Plaintiffs themselves have admitted, the Bankruptcy Court expressly approved the sale of "'substantially <u>all</u> of the debtor's assets,' finding and determining that 'the Purchase Agreement was negotiated, proposed, and entered into by the Debtor and the Purchaser without collusion, in good faith, and from arms-length bargaining positions.'"  <u>Compare</u> Counterclaim ¶ 17 (emphasis added) <u>with</u> Answer to Counterclaim ¶ 17.

With the closing of the sale referred to in its July 2nd letter, Old Polaroid ceased making premium payments for Plaintiffs' medical, dental, and life insurance.  SAC ¶ 32.

Two weeks later, in the wake of the sale of its business, the board of directors of Old Polaroid duly voted to terminate Old Polaroid's benefit plans, including the plans at issue in this action.  See Minutes, Board of Directors, Primary PDC, Inc., August 15, 2002 at 6-7 (attached to Affidavit of Kevin R. Pond.) [5]

Three months later, on November 18, 2002, the Bankruptcy Court confirmed a plan of reorganization for Old Polaroid.  Compare Counterclaim ¶ 23 with Answer ¶ 23.

E.    **Specific Allegations Against Goldman.**

The primary claim against Goldman charges that he should have secured financing for the full amount of Plaintiffs' medical, dental, and life insurance benefits.  SAC at 11-12.  The Second Amended Complaint alleges that Goldman "should have ensured" such financing.  More specifically, Paragraphs 45 and 46 allege as follows:

> As a fiduciary of an employee benefit plan, Goldman had a duty to act in the best interests of the beneficiaries and the Plan.  Goldman should have ensured that "old" Polaroid properly insured or otherwise adequately secured the promised medical, dental, and life insurance premiums, just as it insured the salary continuation benefit.
>
> Goldman breached his fiduciary duty to the plaintiffs and to the plan by failing to ensure that "old" Polaroid insured or otherwise adequately secured the medical, dental, and life insurance premiums that were promised to each plaintiff in his or her acceptance for benefit letter.

SAC ¶¶ 45-46.  In their new Count III, Plaintiffs go so far as to refer to "Goldman's failure to insure the plaintiffs' [benefits]," ¶ 52, but without explaining how he was supposed to do so.

---

[5]  Although Goldman's Counterclaim attached a certified copy of the board minutes, Plaintiffs have professed a lack of knowledge about the termination of Old Polaroid's benefit plans.  Compare Counterclaim ¶¶ 21-22 with Answer to Counterclaim ¶¶ 21-22.  The Court may need to consider the termination to decide this motion.  Accordingly, Goldman has submitted a declaration authenticating the board minutes.

The Second Amended Complaint nowhere alleges that, as a designated plan administrator, Goldman had the slightest authority or discretionary control over plan design and structure, much less power to fund the plans.

The Second Amended Complaint also alleges that Goldman had an incentive to terminate Plaintiffs and to discontinue their benefits, as follows:

> Additionally, instead of acting in the best interests of Polaroid employees receiving Long Term Disability benefits and of the benefits plan, Goldman acted in his own self-interest by negotiating and accepting employment and an equity interest in the "new" Polaroid. Goldman thus had an interest in the "new" Polaroid that would be satisfied if the asset sale agreement went through, giving Goldman an incentive to terminate the employees on Long Term Disability that directly conflicted with his fiduciary duties toward the plaintiffs and the plan.[6]

SAC ¶ 47. Plaintiffs imply that because Goldman somehow was involved in discontinuing their benefits, he must pay those benefits personally. Yet the Second Amended Complaint contains no allegations suggesting, much less showing, that Plaintiffs had a chance of keeping their benefits even if Goldman had acted any differently. The termination of those benefits plans by the Old Polaroid board is not mentioned at all.

## STANDARDS FOR DECISION

As this Court has explained, the standard in deciding a motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) is the same as that for a motion to dismiss under Fed.R.Civ.P. 12(b)(c)(6). American Honda Motor Co., Inc., v. Bernardi's, Inc. 113 F.Supp.2d 58, 60 (D. Mass. 1999) (Wolf, J.) (citing Collier v. City of Chicopee, 158 F.3d 601, 602 (1st Cir. 1998), cert. denied, 526 U.S. 1023, 119 S.Ct. 1262, 143 L.Ed.2d 358 (1999)).

---

[6] This characterization is disputed. In fact, Goldman simply joined New Polaroid, as did many other Old Polaroid employees; only later did he happen to receive New Polaroid stock. In any event, New Polaroid chose whom it wished to hire, and had no interest one way or the other in how Old Polaroid treated those on LTD who were not hired.

"'In considering a motion to dismiss, a court must take the allegations in the [non-moving party's pleading] as true and must make all reasonable inferences in favor of the [non-moving party].'" Id. (citing Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); Raso v. Lago, 958 F.Supp 686, 694 (D. Mass. 1997) (Wolf, J.).

"A court may also 'properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment.'" Raso, 958 F.Supp at 694 (citing Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1220 (1st Cir.1996)).

Although a complaint should not be dismissed for failure to state a claim unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief, the standard for stating a claim is not "toothless." Id. (citing The Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir.1989)). Rather, plaintiffs must "set forth in their complaint 'factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory.'" Id. (emphasis added) (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)). As the First Circuit colorfully wrote: "[M]inimal requirements are not tantamount to nonexistent requirements. The threshold may be low, but it is real — and it is the plaintiff's burden to take the step which brings his case safely into the next phase of the litigation. The court need not conjure up unpled allegations or contrive elaborately arcane scripts in order to carry the blushing bride through the portal." Gooley, 851 F.2d at 514.

If, finally, on a motion to dismiss for failure to state a claim, matters outside the pleadings are considered, the motion is treated as one for summary judgment. Raso, 958 F.Supp. at 694. Summary judgment is then appropriate only if the record, viewed in the light most

favorable to the non-moving party, "shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted once the court is satisfied that plaintiffs have had the discovery needed to address the issues that are ripe for decision. Raso, 985 F. Supp. at 694.

## ARGUMENT

### I.    GOLDMAN HAD NO OBLIGATION TO SECURE FINANCING FOR OLD POLAROID'S BENEFIT PLANS.

#### A.    The Financing Of Employee Benefits Falls Within The Scope Of Corporate Decision-Making And Does Not Implicate Fiduciary Standards.

Fiduciary duties do not attach to decisions about financing corporate benefit plans. See Johnson v. Georgia-Pacific Corp., 19 F.3d 1184, 1188 (7th Cir. 1994). Federal courts have recognized the distinction between "a business corporate management decision" and "an action falling within the fiduciary functions delineated by ERISA." Payonk v. HMW Indus., Inc., 883 F.2d 221, 225 (3d Cir. 1989). Where employers "make business decisions not regulated by ERISA, no fiduciary duties apply." Id. A "plan sponsor does not become a fiduciary by performing settlor-type functions such as establishing a plan and designing its benefits." Coyne & Delaney Co. v. Selman, 98 F.3d 1457, 1465 (4th Cir. 1996) (citing Lockheed Corp. v. Spink, 517 U.S. 882, 116 S. Ct. 1783, 135 L.Ed.2d 153 (1996)). These propositions apply with full force to decisions about "levels of funding" and "the means" by which benefit plans are financed. See Johnson, 19 F.3d at 1188. As the U.S. Court of Appeals for the Seventh Circuit has explained:

> "Employers decide who receives pension benefits and in what amounts, select levels of funding, adjust myriad other details of pension plans, and may decide to terminate the plan altogether. In doing these things, . . . they are no more the employees' 'fiduciaries' than when they decide what wages to offer or whether to close the plant and lay the workers off. . . . As the entity with ultimate

11

responsibility . . . the employer is entitled to control decisions about the level of benefits to be guaranteed <u>and the means</u> by which that is accomplished."

<u>Id</u>. (emphasis added). In <u>Demaio</u> v. <u>Cigna Corp.</u>, Civil Action No. 89-0724, 1993 WL 20173 (E.D.Pa. Jan. 26, 1993), for example, a "decision to stop funding [a benefit plan] in anticipation of its impending bankruptcy petition" was a "business decision . . . made outside of ERISA's fiduciary scope as a matter of law. . . ." <u>Id</u>. at *6. Plaintiffs' principal assertion in this action — that Goldman somehow should have secured financing for their medical, dental, and life insurance benefits, just as Polaroid previously insured the LTD payments themselves — conflicts with these authorities, and fails as a matter of law.

**B.      The Second Amended Complaint Alleges No Facts Establishing Goldman's Authority Over Financing.**

Even if Plaintiffs could overcome the foregoing authorities, which they cannot, their claim that Goldman had an obligation to obtain financing for their benefits is purely conclusory, and bereft of supporting factual allegations. Absent allegations that he was actually in charge of financing, no viable claim can exist. The Second Amended Complaint is silent about Goldman possessing the slightest power over plan financing.

The test for whether a particular act or omission warrants the application of fiduciary standards turns on the alleged fiduciary exercising authority or discretionary control over a matter of plan administration. <u>See</u> <u>Cottrill</u> v. <u>Sparrow, Johnson & Ursillo, Inc.</u>, 74 F.3d 20 (1st Cir. 1996). This test flows from ERISA's definition of a fiduciary, which states in relevant part:

> [A] person is a fiduciary with respect to a plan <u>to the extent</u> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added). The key phrase to this definition is that a fiduciary obligation arises only "to the extent" someone has a mandate concerning plan administration. As one court has put it:

> Note . . . that this definition does not make a person who is a fiduciary for one purpose a fiduciary for every purpose. A person 'is a fiduciary to the extent that' he performs one of the described duties. . . .

Johnson, 19 F.3d at 1188. The ERISA fiduciary duty doctrine thus "envisions that one entity will have fiduciary duty attach to some activities but not others; the existence of a duty turns not on who acts but on the nature of the action. . . ." Campbell v. Bank Boston, N.A., 327 F.3d 1, 6-7 (1st Cir. 2003); accord Vartanian v. Monsanto Co., 131 F.3d 264, 268 (1st Cir. 1997). "The discretionary authority or responsibility which is pivotal to the statutory definition of 'fiduciary' is allocated by the plan documents themselves." Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 61 (4th Cir. 1992).

This case is cut from the same cloth as the First Circuit's decision in Cottrill. That case turned on whether Mr. Cottrill was a fiduciary with respect to a $130,000 investment by an ERISA-regulated profit-sharing plan. Cottrill, 74 F.3d at 21. The U.S. District Court for the District of Rhode Island concluded that Cottrill was a fiduciary because he had authority and control concerning management and disposition of the investment. Id. This conclusion was based on subsidiary findings that Cottrill was a principal of the employer, as well as a participant in the plan itself; he had "recommended the investment," "specifically by reporting that he had looked into it and the investment looked good"; he had assumed responsibility for managing the investment, documenting it, disbursing funds, and collecting income; and he was a partner in the vehicle for the investment and listed himself as being in charge of it. Id. Despite such extensive involvement, the First Circuit (per Aldrich, J.) reversed. "None of these subsidiary findings . . .

amount[ed] to 'authority or control over the management or disposition" of the funds in question. Id. (emphasis in original). "On the contrary," the Court pointed out, a different individual actually "authorized the investment." Id.

The decisive question at the pleadings stage of this case is thus whether Goldman allegedly had "authority or control over" financing the benefit plans at issue. See id. He did not. The Second Amended Complaint contains no allegations suggesting that he, rather than Old Polaroid, had any mandate whatsoever with respect to financing. The plan documents before the Court confirm that Old Polaroid was responsible for financing, see supra, pp. 4-5, and the very letters on which Plaintiffs rely likewise speak in terms of Old Polaroid paying Plaintiffs' insurance premiums, see supra, p. 6. There is no hint, nor could there be, that any individual designated as a plan administrator had the power to pay those premiums. Whatever Plaintiffs might suggest about Goldman ensuring that Old Polaroid secure the requisite funds, Old Polaroid alone had control over financing. Accordingly, Plaintiffs' principal charge against Goldman does not state a claim upon which relief can be granted.

## II. PLAINTIFFS' REMAINING ALLEGATIONS ABOUT GOLDMAN HAVING A CONFLICT OF INTEREST STATE NO COGNIZABLE CLAIM.

Having failed to allege that Goldman had authority over financing, Plaintiffs are relegated to insinuating that Goldman terminated them in order to get a better employment deal for himself from New Polaroid. His involvement during July 2002, they say, means that Goldman must now fund their benefits. This accusation fails to state a claim upon which relief can be granted, for two independent legal reasons.

**A.    The Second Amended Complaint Alleges No Facts Suggesting That Goldman's Conduct Resulted In Plaintiffs' Loss Of Benefits.**

Plaintiffs have failed to allege how action by Goldman in a fiduciary capacity caused the loss of Plaintiffs' medical, dental, and life insurance benefits.  Any claim for breach of fiduciary duty must include a causal connection between the alleged breach and the resulting loss.  See Brandt v. Grounds, 687 F.2d 895, 898 (7th Cir. 1982); Friend v. Sanwa Bank California, 35 F.3d 466, 469 (9th Cir. 1994); see also Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 917 (8th Cir. 1994); Kuper v. Iovenko, 66 F.3d 1447, 1459-60 (6th Cir. 1995); Iron Workers Local # 272 v. Bowen, 695 F.2d 531, 536 (11th Cir. 1983).  The Second Amended Complaint fails this test.  A series of business decisions, including termination of Old Polaroid's benefit plans by the board of directors, caused Plaintiffs' loss of benefits.  The Second Amended Complaint nowhere describes how Goldman, acting as a fiduciary, could have prevented this outcome.

Plaintiffs complain of Goldman's involvement in terminating them from Polaroid.  But that involvement did not implicate ERISA's fiduciary standards.  A decision to terminate someone represents a business decision by the employer, rather than a decision involving plan administration.  As one court has stated: "Decisions to terminate [employees] rather than carry them on the payroll [are] employment decisions that [do] not directly affect the administration of the pension plan or the investment of its assets."  Hickman v. Tosco Corp., 840 F.2d 564, 567 (8th Cir. 1988).

More broadly, Plaintiffs lost their medical, dental, and life insurance benefits as a result of a larger chain of events, beginning with the Old Polaroid bankruptcy itself, continuing with Old Polaroid's decision to sell its business, culminating in the termination of Old Polaroid's benefit plans generally, and concluding with a plan of reorganization to wrap up the affairs of a bankrupt company.  Goldman implemented these larger business decisions.  Against the

backdrop of Old Polaroid's demise, the Second Amended Complaint does not begin to suggest, because it cannot, what he might have done in a fiduciary capacity to prevent the loss of benefits. Plaintiffs' purported claim thus comes full circle, back to the fatally-flawed assertion that Goldman somehow could and should have "insured" their medical, dental, and life insurance benefits in the first place. Compare SAC ¶ 52 with supra, pp. 11-14.

Even if Goldman somehow could have spared Plaintiffs from losing their benefits in July 2002, causation is defeated by the corporate-level decision only weeks later to terminate Old Polaroid's benefit plans. Goldman himself did not terminate these plans; the board of directors did. See supra p. 8 & n.5. It is blackletter law that even an employer which has fiduciary responsibilities with respect to its benefit plans does not act in a fiduciary capacity in adopting, modifying, or terminating such plans. Lockheed Corp. v. Spink, 517 U.S. 882, 889-90, 116 S. Ct. 1783, 135 L. Ed2d 153 (1996); Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78, 115 S. Ct. 1223, 131 L. Ed.2d 94 (1995). "When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust." Spink, 517 U.S. at 889-90 (citations omitted). In this case, Old Polaroid's board made the decision to terminate its plans in the wake of the sale of the business. That board-level decision marked the end of Old Polaroid's benefits program. The Second Amended Complaint contains no allegations which suggest, much less show, how Goldman could have had any fiduciary responsibility in this context. He had none. Even if Goldman had some duty not to terminate Plaintiffs and discontinue their benefits, Old Polaroid's termination of the plans themselves constituted a supervening cause, which defeats any claim for relief against him.[7]

---

[7] Plaintiffs also assert that Section 406(b) of ERISA categorically prohibited Goldman from discontinuing Plaintiffs' benefits while negotiating for a position with New Polaroid. The

**B.    ERISA's Remedial Scheme Precludes Plaintiffs From Recovering Plan Benefits From Individual Plan Administrators.**

ERISA does not authorize holding individual plan administrators personally liable for wrongfully-withheld plan benefits, essentially as an insurer of the actual plan sponsor. Section 502, 29 U.S.C § 1132, establishes a comprehensive array of remedies for aggrieved plan participants. First, and foremost, Section 502(a)(1)(B) grants a cause of action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." See id. § 1132 (a)(1)(B) (emphasis added). As the First Circuit has made clear: "It is under this statutory provision that claims . . . challenging denials . . . of employer-sponsored . . . benefits are brought." Terry v. Bayer Corp., 145 F.3d 28, 34 (1st Cir. 1998). Plaintiffs themselves originally asserted just such a claim against Old Polaroid in this action, and no claim at all against Goldman.

No other provision of Section 502 authorizes Plaintiffs to enforce any right they might have to plan benefits against Goldman personally. While Section 502(a)(2) permits actions by plan participants seeking "appropriate relief" for breaches of fiduciary duty, the Supreme Court

---

assertion is specious. As its title reveals, Section 406(b) prohibits "Transactions between plan and fiduciary." See 29 U.S.C. § 1106(b) (emphasis added). It bars transactions as follows:

> A fiduciary with respect to a plan shall not –
> (1)    deal with the assets of the plan in his own interest or for his own account,
> (2)    in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
> (3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

Id. The only alleged "transaction" took place between Old Polaroid and New Polaroid. The employee benefit plans at issue remained Old Polaroid's responsibility. Old Polaroid terminated those plans.

held in <u>Mass. Mut. Life Ins. Co.</u> v. <u>Russell</u>, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d (1985),

that this provision authorizes relief solely for the benefit of the plan as a whole. <u>Id.</u>; <u>accord</u>

<u>Drinkwater</u> v. <u>Metropolitan Life Ins. Co.</u>, 846 F.2d 821, 825 (1st Cir. 1980). In so holding, the

Court noted that the "statute elsewhere explicitly authorizes . . . an action to enforce . . .

rights under the plan." <u>Russell</u>, 473 U.S. at 144.

This leaves Section 502(a)(3), which allows actions to obtain "appropriate equitable

relief." <u>See</u> 29 U.S.C § 1132 (a)(3). In <u>Varity Corp.</u> v. <u>Howe</u>, 516 U.S. 489, 116 S.Ct. 1065,

134 L.Ed.2d 1130 (1996), an employer which administered one of its benefit plans tricked the

plaintiffs into withdrawing from the plan and forfeiting their benefits. <u>Id.</u> at 491-92. The Court

held that Section 502(a)(3) authorized equitable relief in the form of an injunction requiring

reinstatement to the plan. <u>Id.</u> Plaintiffs could not sue under Section 502(a)(1)(B), the Court

noted, since they were no longer members of the plan. <u>Id.</u> at 515. The Court distinguished

<u>Russell</u> because in that case, ERISA provided "specific relief" for a "wrongful denial of

benefits." <u>Id.</u> at 510.

Subsequent decisions by lower federal courts have confirmed that Section 502(a)(3) is a

"catch all" provision, which authorizes equitable relief only for injuries that Section 502 does not

otherwise address. <u>See</u> <u>Coyne & Delany Co.</u>, v. <u>Blue Cross Blue Shield of VA, Inc.</u>, 102 F.3d

712, 715-16 (4th Cir. 1996); <u>accord</u> <u>Wald</u> v. <u>Southwestern Bell Corp. Customcare Med. Plan</u>, 83

F.3d 1002, 1006 (8th Cir. 1996); <u>Forsyth</u> v. <u>Humana, Inc.</u>, 114 F.3d 1467, 1474-75 (9th Cir.

1997); <u>see</u> <u>Perlman</u> v. <u>Swiss Bank Corp. Comprehensive Disability Protection Plan</u>, 916 F. Supp.

843, 844 (M.D.Ill. 1996) (refusing "to permit a denial of benefits claims to be bootstrapped into a

fiduciary duty claim").

In this case, Plaintiffs have had a claim for benefits under Section 502(a)(1)(B), which they could, and should, have pursued against Old Polaroid. Indeed, they made just such a claim in this action before dropping Old Polaroid as a defendant. They may not secure the same relief from Goldman personally simply because Old Polaroid happens to be in bankruptcy. As this Court has held, such relief may become available only when the individual fiduciary himself is responsible for a plan's insolvency or other lack of capacity to pay benefits. See Jackson v. Truck Drivers' Union Local 42 Health and Welfare Fund, 933 F. Supp. 1124, 1135-37 (D. Mass. 1996).[8] The argument thus returns, once again, to Plaintiffs' fatally-flawed assertion that Goldman had an obligation personally to insure financing for their benefits — an assertion which is contrary to the law, and unsupported by any specific factual allegations.

---

[8] In their new Count III, Plaintiffs claim the right to "make-whole" relief from Goldman under Section 502(a)(3), presumably on the authority of Justice Ginsberg's recent concurring opinion in Aetna Health Inc. v. Davila, ___ U.S. ___, 124 S.Ct. 2488, 2504, ___ L.Ed.2d ___(2004) (Ginsberg, J, concurring). The notion is that a fiduciary who wrongfully denies needed medical care, for example, may thereby become liable for "making whole" a plan participant who is harmed as a result. It is far from clear that the Court which decided Russell and Varity would adopt Justice Ginsberg's suggestion. Be that as it may, there is no basis whatsoever for concluding that her opinion would apply to a naked claim for plan benefits only, for which Section 502(a)(1)(B) affords a remedy. Under Russell and Varity, any such result would be untenable.

## CONCLUSION

For the reasons stated above, the Court should grant Goldman's motion for judgment on the pleadings, or, alternatively, for summary judgment.

Respectfully submitted,

*MICHAEL R PONTRELLI*

Michael R. Pontrelli (BBO # 549194)
Jeffrey M. Rosin (BBO #629216)
Epstein, Becker & Green, P.C.
111 Huntington Avenue
Boston, MA 02199
(617) 342-4000

Attorneys for Defendant Neal D. Goldman

Dated: October 27, 2004

## APPOINTMENT OF PLAN ADMINISTRATORS

I, Gary T. DiCamillo, Chairman and Chief Executive Officer of Polaroid Corporation, appoint the following individuals listed below as Plan Administrators for all Polaroid Employee Benefits Plans governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the Internal Revenue Code of 1986, as amended (the "Code"), and its implementing regulations, as amended from time to time, effective July 13, , 2001.

| | |
|---|---|
| Neal D. Goldman | Chairperson |
| Donald M. Halsted, III | Plan Administrator |
| William R. Hubert | Plan Administrator |
| Janet B. Cramer | Plan Administrator |
| Deirdre J. Evans | Plan Administrator |

This Appointment shall remain in effect for each person as long as he/she is an active employee of the Company or until this delegation is rescinded, whichever is sooner.

IN WITNESS WHEREOF, I have signed this Appointment and have affixed the seal of the Company as of this 13 day of July , 2001.

_____
Gary T. DiCamillo

\\NORFILE1\LEGAL\LI.C\E R I S A\Plan Administrators\31Jul01 GTD Appointment Plan Administrators.doc